ACCEPTED
01-15-00867-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/12/2015 8:00:39 PM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00867-CV

FIRST COURT OF APPEALS

HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/12/2015 8:00:39 PM
CHRISTOPHER A. PRINE
Clerk

PENN VIRGINIA OIL & GAS GP, L.L.C. & PENN VIRGINIA OIL AND GAS, L.P.,
Appellants.

V.

ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT FRIEND FOR XXXXXX
XX XX XXXXX AND XXXXXXXX XX XX XXXXX, MINORS

&

JOHN PAUL ADAME, INDIVIDUALLY AND AS NEXT FRIEND OF XXXXXXXXX
XXXXXX XXXXX, XXXX XXXX XXXXX XXX, AND XXXX XXXXXXXX XXXXX,
MINORS,
Appellees

On Appeal from the 215th Judicial District Court,
Harris County, Texas
Cause No. 2014-42519

APPELLEES' MOTION TO DISMISS FOR LACK OF JURISDICTION

TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:

NOW COMES Appellee Alfredo De La Garza, individually and as next friend for

XXXXXX XX XX XXXXX AND XXXXXXXX XX XX XXXXX, minors, and files this

Appellees' Motion to Dismiss Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia

Oil & Gas L.P.'s appeal, and in support thereof would respectfully show the Court the following:

## Introduction & Summary of Motion

1. Appellants are Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas L.P. Appellees are Alfredo De La Garza, individually and as next friend for XXXXXX XX XX XXXXX AND XXXXXXXX XX XX XXXXX, minors.

2. Appellants filed their Motion to Compel Arbitration and to Abate on June 18, 2015. A copy of that motion is attached as **Exhibit "A"**. Appellees filed their response to appellants' Motion to Compel Arbitration and to Abate on July 30, 2015. A copy of that response is attached as **Exhibit "B"**. On August 26, 2015, appellees filed their First Amended Response to appellants' Motion to Compel Arbitration and to Abate. A copy of this amended response is attached as **"Exhibit "C"**. On September 10, 2015, appellants filed their reply to appellees' Response to Motion to Compel Arbitration and to Abate. A copy of appellants' reply is attached as **Exhibit "D"**. On September 11, 2015, appellees filed their first supplement to their First Amended Response to appellants' Motion to Compel Arbitration and to Abate. A copy of this supplement is attached as **Exhibit "E"**. The hearing on appellants' Motion to Compel Arbitration and to Abate was initially set on July 31, 2015, but was reset at appellees' request for September 11, 2015 with agreement of counsel for appellants. On September 11, 2015, the trial court heard appellants' Motion to Compel Arbitration and to Abate. Appellants' Motion to Compel Arbitration and to Abate was denied by order dated September 11, 2015. See **Exhibit "F"**.

3. Appellants filed a Motion for Reconsideration of Order Denying Motion to Compel Arbitration on October 1, 2015. A copy of this motion is attached as **Exhibit "G"**. Appellees opposed this motion and objected to the affidavit of Ernest Nelson, attached to appellants' Motion for Reconsideration of Order Denying Motion to Compel Arbitration. A copy of appellees'

response is attached as **Exhibit "H"**. On October 9, 2015, appellants filed their reply to appellees' Response to Motion for Reconsideration of Order Denying Motion to Compel Arbitration. A copy of appellants' reply is attached as **Exhibit "I"**. The Hon. Elaine Palmer, Judge of the 215th District Court denied appellants' Motion for Reconsideration of Order Denying Motion to Compel Arbitration on October 12, 2015. A copy of the order is attached as **Exhibit "J"**.

4. Appellants filed their Notice of Appeal on October 13, 2015. A copy of this notice is attached hereto as **Exhibit "K"**. In appellants' Notice of Appeal, they seek to appeal the court's order denying appellants' Motion to Compel Arbitration and to Abate signed on September 11, 2015. Appellants also seek to appeal the order denying defendant's motion for reconsideration of the order denying the motion to compel arbitration signed by Judge Palmer on October 12, 2015.

5. On October 14, 2015, appellants filed their Motion for Extension of Time to File Notice of Appeal.

6. The notice of appeal was untimely. The facts averred to by appellants' counsel fail to reasonably explain the need for an extension.

7. The order denying appellants' Motion for Reconsideration of Order Denying Motion to Compel Arbitration is not an appealable order.

### Argument and Authorities

8. This is an accelerated appeal pursuant to Tex. R. App. P. 28.1. Perfecting the appeal is completed by timely filing notice of appeal within 20 days pursuant to Tex. R. App. P. 28.1(b) and 26.1(b). Appellants' notice of appeal was filed 33 days after Judge Palmer's September 11, 2015 order was signed and is untimely. The notice should have been filed on October 1, 2015.

9. The facts alleged in appellants' motion and supported by appellants' affidavit attached to their motion for extension of time do not reasonably explain the need for extension as required by Tex. R. App. P. 10.5(b)(1)(C).

10. The reply filed by appellants in response to Appellees' Response to Appellants' Motion for Extension of Time to File Notice of Appeal fails to address Thomas J. Smith's knowledge of the deadline for filing the notice of appeal in an accelerated appeal. The verification of Kelly C. Hartmann filed by appellants was not timely filed within fifteen days as required by Tex. R. App. P. 26.3 and Tex. R. App. P. 10.5(b).

11. Appellants also seek to appeal the October 12, 2015 order denying appellants' motion for reconsideration of the trial court's order denying appellants' motion for arbitration and to abate. This is a non-appealable order. Tex. Civ. Prac. & Rem. Code § 51.016. 9 U.S.C. § 16(a). The motion for reconsideration also did not extend the appellate timetable. *Hydro Management Systems, LLC v. Jalin, Ltd.,* No. 04–09–00813–CV, 2010 WL 1817813 (Tex. App.-San Antonio May 5, 2010, no pet. h.). See also *Nabors Well Servs. Co. v. Aviles*, No. 06-10-00018-CV, 2010 WL 2680087, at *1-2 (Tex. App. July 7, 2010, no pet. h.).

12. Tex. Civ. Prac. & Rem. Code § 51.016. provides that "[i]n a matter subject to the [FAA], a person may take an appeal or writ of error to the court of appeals from the judgment or interlocutory order of a district court, county court at law, or county court under the same circumstances that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16." Tex. Civ. Prac. & Rem. Code Ann. § 51.016.

13. Section 16(a) of the FAA, titled "Appeals," provides, in relevant part, as follows:

*2 (a) An appeal may be taken from(1)-

(1) an order-

(A) refusing a stay of any action under section 3 of this title,

(B) denying a petition under section 4 of this title to order arbitration to proceed,

(C) denying an application under section 206 of this title to compel arbitration,

(D) confirming or denying confirmation of an award or partial award, or

(E) modifying, correcting, or vacating an award.

9 U.S.C. § 16(a) (2015).

14. *Lucchese Boot Co. v. Licon*, 388 S.W.3d 365 (Tex. App. El Paso 2012, no pet. h.) is distinguishable because it dealt with an amended motion to compel arbitration on an arbitration agreement which had not previously been offered as a basis for its original motion to compel arbitration. See also: *Nazareth Hall Nursing Ctr. v. Castro*, 374 S.W.3d 590 (Tex. App. El Paso 2012, no pet. h.) (following *Hydro Mgmt. Sys. LLC.* and distinguishing *Lucchese*).

## Prayer

Wherefore, premises considered, appellees, Alfredo De la Garza, XXXXXX XX XX XXXXX and XXXXXXXX XX XX XXXXX, minors, pray that this Court dismiss appellants' appeal for want of jurisdiction pursuant to Tex. R. App. P. 42.3(a), and for such other and further relief to which they may be entitled, whether in law or in equity.

Respectfully submitted,

_____
JOHN DAVID HART
State Bar No. 09147700

THE LAW OFFICES OF JOHN DAVID HART
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
(817) 870-2102 - phone
(817) 332-5858 - facsimile
johnhart@hartlaw.com

**ATTORNEY FOR APPELLEES, ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT FRIEND FOR XXXXXXX XX XX XXXXX and XXXXXXXX XX XX XXXXX, MINORS**

## CERTIFICATE OF CONFERENCE

Pursuant to Tex. R. App. P. 10.1(a)(5), I conferred with counsel for Appellants on October 21, 2015 who have indicated that they are opposed to this Motion.

_____
JOHN DAVID HART

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing instrument has been forwarded on this the 12th day of November, 2015 to the following attorneys of record pursuant to Tex. R. App. P. 9.5:

**VIA CERTIFIED MAIL & E-MAIL**
Mr. Thomas J. Smith
Mr. Kelly C. Hartmann
Ms. Alexis M. Butler Hester
Galloway, Johnson, Tompkins,
Burr & Smith
1301 McKinney, Suite 400
Houston, Texas 77010
*Attorneys for Appellants, Penn Virginia*
*Oil & Gas GP, LLC and Penn Virginia*
*Oil & Gas, L.P.*

**VIA CERTIFIED MAIL & E-MAIL**
Mr. J. Javier Gutierrez
Ms. Ana Laura Gutierrez
The Gutierrez Law Firm, Inc.
700 East Third Street
Alice, Texas 78332
*Attorneys for Appellees, John Paul Adame,*
*Individually and as Next Friend for*
*XXXXXXXX XXXXX XXXXX, XXXX*
*XXXX XXXXX XXX, and XXXX*
*XXXXXXXX XXXXX, minors*

**VIA CERTIFIED MAIL & E-MAIL**
Mr. J.J. Knauff
The Miller Law Firm
Turtle Creek Centre
3811 Turtle Creek Blvd., Ste. 1950
Dallas, Texas 75219
*Attorney for Third Party Defendant*
*Penn Virginia MC Energy, LLC*

**VIA CERTIFIED MAIL & E-MAIL**
Mr. Brit T. Brown
Mr. Benjamin A. Escobar, Jr.
Beirne, Maynard & Parsons, L.L.P.
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
*Attorney for Third Party Plaintiff*
*Cudd Pressure Control, Inc.*

_____
JOHN DAVID HART

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED and REDACTED , minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § § § | 281ST JUDICIAL DISTRICT |

## DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP, LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE

Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC (collectively referred to hereinafter as "Penn Virginia" unless individual reference is necessary) file this Motion to Compel Arbitration and to Abate pending such arbitration. In support thereof, Penn Virginia would show as follows:

## I. INTRODUCTION

1.     Plaintiff, Alfredo "Freddie" De La Garza ("Plaintiff" or "De La Garza"), Individually and as Next Friend of REDACTED and Intervenor, John Paul "J.P." Adame ("Adame"), Individually and as Next Friend of REDACTE REDACTED (collectively "the parties") filed personal injury claims against Penn Virginia on July 24, 2014 and November 6, 2014, respectively. Their claims arise out of an April 29, 2014 incident, which occurred at a well site

EXHIBIT "A"

located near Shiner, Texas while De La Garza and Adame were working in the course and scope of their employment with Nabors Completion & Production Co. ("NCPS").

2. Nabors Industries, Inc. ("Nabors") and its subsidiaries, one of which is NCPS, have a valid arbitration agreement which requires that disputes involving injuries to employees that are incurred during the course and scope of employment be submitted to final and binding arbitration. De La Garza and Adame both acknowledged and accepted the terms of the arbitration agreement.

3. The arbitration agreement applies to all direct and indirect subsidiaries of Nabors, all current and former employees of the aforementioned subsidiaries, and any "Electing Entity" that has agreed to be bound by the terms of the agreement.[1] Penn Virginia is an "Electing Entity" and has agreed on more than one occasion to be bound by the terms of the agreement.[2] De La Garza's and Adame's individual claims fall within the scope of the arbitration agreement as both were employees of NCPS at the time of the incident and allege that their injuries occurred while in the course and scope of their employment. De La Garza and Adame also filed claims as representatives of their minor children. The minors' claims are also subject to the arbitration agreement as they are derivative of De La Garza and Adame's claims. Consequently, De La Garza and Adame's individual claims against Penn Virginia and the claims filed on behalf of their minor children all fall within the scope of the arbitration agreement.

4. Therefore, Penn Virginia's Motion to Compel Arbitration should be granted, and this case should be abated or dismissed and compelled to final and binding arbitration.

---

[1] *See Nabors Dispute Resolution Program ("DRP"),* a true and correct copy of which is attached as Exhibit 1-A.

[2] *See 2008 Penn Virginia Oil & Gas, LP IADC Contract,* a true and correct copy of which is attached as Exhibit 1-B; *see also Contractors Special Provisions,* a true and correct copy of which is attached as Exhibit 1-C, at ¶ 16 "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program." *See also 2010 Penn Virginia MC Energy, LLC IADC Contract,* a true and correct copy of which is attached as Exhibit 1-D; *see also Contractors Special Provisions,* a true and correct copy of which is attached as Exhibit 1-E, at ¶ 16.

## II. UNDISPUTED FACTS

5.      Nabors is the "Sponsor" of the Nabors Dispute Resolution Program ("DRP"), as that term is defined by the DRP.[3]

6.      The DRP is subject to the Federal Arbitration Act ("FAA").[4]

7.      By its terms, the Nabors DRP is designed to provide a means for the resolution of disputes between the "Company" and the Company's present and former employees that are related to or that arise out of a current or former employment relationship with the Company.[5]

8.      The DRP is intended to create an exclusive procedural mechanism for the final resolution of all disputes falling within its terms.[6] Consequently, the DRP requires that all disputes between De La Garza, Adame and the Company are subject to binding arbitration.[7]

9.      The DRP defines "Dispute" to include personal injuries that are incurred at the workplace or in the course and scope of employment.[8]

10.     The DRP defines "Company" as "Sponsor and every direct and indirect subsidiary... of Sponsor, **(and) any Electing Entity**."[9] As previously mentioned, Nabors is the

---

[3] *Affidavit of Keith Nicholson ("Nicholson Aff."),* a true and correct copy of which is attached as Exhibit 1, at ¶ 4; *see also* Exhibit 1-A, at ¶ 2(L).

[4] *See* Exhibit 1-A at ¶ ¶ 2(C) and 8. The Federal Arbitration Act, 9 U.S.C. § 2, applies in state courts and preempts state anti-arbitration laws to the contrary. *Circuit City Stores, Inc. v. Adams,* 121 S.Ct. 1302; *Southland Corp v. Keating,* 465 U.S. 1, 16 (1984); *see also Palm Harbor Homes v. McCoy,* 944 S.W.2d 716, 721 (Tex. App.—Fort Worth 1997) (holding that FAA preempted Texas Arbitration Act's requirement that party's attorney sign agreement). Although the FAA preempts state arbitration laws, courts still must resort to general state law contract principles to determine whether an arbitration agreement will be enforced.

[5] *See* Exhibit 1-A, at ¶ 1.

[6] *See* Exhibit 1-A, at ¶ 1.

[7] *See* Exhibit 1-A.

[8] "Dispute" means all legal and equitable claims, demand and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to... **6. *any personal injury allegedly incurred in or about a Company Workplace or in the course and scope of an Employee's employment.*** *See* Exhibit 1-A at ¶ 2(E) (emphasis added).

[9] *See* Exhibit 1-A at ¶ 2(D) (emphasis added).

"Sponsor" of the DRP. NCPS, De La Garza and Adame's employer at the time of the workplace incident, is a subsidiary of Nabors.[10] The DRP extends to and includes employees of NCPS.[11]

11. Further, Penn Virginia is an "Electing Entity" and agreed to be bound by the terms of the DRP in two IADC Contracts between it and Nabors.[12] As an "Electing Entity," Penn Virginia is required to resolve disputes with any past or present employee(s) or applicants of Nabors in accordance with the DRP.[13]

12. On January 2, 2013, Adame executed a document entitled "Application For Hourly And Daily Employment," as well as another document entitled "Notice to Applicants Regarding Dispute Resolution Program."[14] Likewise, on July 16, 2013, De La Garza executed the "Application For Hourly And Daily Employment" and the "Notice to Applicants Regarding Dispute Resolution Program."[15] De La Garza and Adame, by their signatures, acknowledged and agreed that they would be "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to... arbitration."[16]

13. On January 7, 2013, Adame also executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program."[17] The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program."[18] De La Garza executed the same document on July 22, 2013.[19] De La Garza and Adame, by their

---

[10] *See Nicholson Aff.* at ¶ 6.
[11] *See Nicholson Aff.* at ¶ 6; *see also Affidavit of Katherine Ryan*, a true and correct copy of which attached as Exhibit 2.
[12] *See Nicholson Aff.* at ¶ ¶ 7 through 9; *see also* Exhibits 1-B and 1-D; *see also* Exhibits 1-C and 1-E, at ¶ 16.
[13] *See Nicholson Aff.* at ¶ 10; *see also* Exhibits 1-B – 1-G.
[14] *See Nicholson Aff.* at ¶ 12; *see also* Exhibit 1-F.
[15] *See Nicholson Aff.* at ¶ 16; *see also* Exhibit 1-G.
[16] *See Nicholson Aff.* at ¶¶ 12 and 16; *see also* Exhibit 1-F and 1-G.
[17] *Nicholson Aff.* at ¶ 13; *see also* Exhibit 1-H.
[18] *Nicholson Aff.* at ¶ 13; *see also* Exhibit 1-H.
[19] *Nicholson Aff.* at ¶ 17; *see also* Exhibit 1-I.

signatures, again acknowledged and agreed that they would be "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to... arbitration."[20]

14. On April 29, 2003, Adame was hired by Nabors Well Services, Ltd. as a crew worker.[21] On January 7, 2013, as a result of a business reorganization, he became a crew worker for NCPS when Nabors Well Services, Ltd. liquidated into Nabors Well Services, Co., which liquidated and dissolved into NCPS.[22] As a crew worker, Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Adame's job duties also involved activities associated with rigging-up and rigging-down workover rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations.[23] Adame's job duties and responsibilities did not include the movement of goods in interstate commerce.[24] While employed by NCPS, Adame was never employed as a commercial truck driver or transportation worker.[25]

15. On July 22, 2013, De La Garza was hired by NCPS as a crew worker.[26] As a crew worker, De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. De La Garza's job duties also involved activities associated with rigging-up and rigging-down workover rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations.[27] De La Garza's job duties and responsibilities did not include

---

[20] *Nicholson Aff.* at ¶¶ 13 and 17; *see also* Exhibit 1-E.
[21] *Nicholson Aff.* at ¶ 14.
[22] *Nicholson Aff.* at ¶ 14.
[23] *Nicholson Aff.* at ¶ 14.
[24] *Id.*
[25] *Id.*
[26] *Nicholson Aff.* at ¶ 18.
[27] *Nicholson Aff.* at ¶ 18.

the movement of goods in interstate commerce.[28] While employed by NCPS, De La Garza was never employed as a commercial truck driver or transportation worker.[29]

16. On July 24, 2014, De La Garza filed his Original Petition, and on September 8, 2014 and October 1, 2014, De La Garza filed his First and Second Amended Petitions.[30] Likewise, on November 6, 2014 and February 19, 2015, Adame filed his Original and First Amended Petitions in Intervention.[31] A copy of all pleadings are maintained in the Court's records. De La Garza and Adame allege that on April 29, 2014 and while working for NCPS, they were injured when a piece of NCPS line pipe parted, causing both to be thrown back as a result of the released pressurized gas.[32]

### III. SUMMARY OF THE ARGUMENT

17. The Company (defined to include Nabors, its subsidiaries, and any "Electing Entity") has a valid arbitration agreement, which both De La Garza and Adame acknowledged and accepted. Because Penn Virginia is an "Electing Entity," the parties' claims against Penn Virginia fall within the scope of the arbitration agreement. Consequently, the parties' claims must be submitted to final and binding arbitration in accordance with the DRP. Therefore, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated.

### IV. ARGUMENT & AUTHORITIES

18. Pursuant to the DRP, the parties' lawsuit must be submitted to binding arbitration. It is undisputed that Texas courts recognize that arbitration agreements in an "at-will" employment setting apply to personal injury claims. In fact, there is a strong presumption in Texas favoring arbitration. *See Circuit City Stores, Inc. v. Adams*, 121 S. Ct. 1302 (2001);

---

[28] *Id.*
[29] *Id.*
[30] Plaintiff's Original Petition, First Amended Petition, and Second Amended Petition.
[31] Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[32] *See* Plaintiff's Original Petition and First Amended Petition, as well as Adame's Original Petition in Intervention and First Amended Petition in Intervention.

*Cantella & Co. v. Goodwin*, 924 S.W.2d 943 (Tex. 1996); *Jack B. Anglin v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992). If a valid arbitration agreement exists, and the claims are within the agreement's scope, a trial court has no discretion and must compel arbitration. *Cantella*, 924 S.W.2d at 944; *Shearson Lehman Bros., Inc. v. Kilgore*, 871 S.W.2d 925, 928 (Tex. App.— Corpus Christi, 1994, orig. proceeding).

19.     The clear language of the DRP states that the Federal Arbitration Act, 9 U.S.C. § 1, et. seq. ("FAA") controls.[33] The Texas Supreme Court has held that in cases where the FAA is stated in the agreement as the controlling law, the FAA prevails. *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996). In adjudicating a motion to compel arbitration under the FAA, courts generally try to determine whether the parties agreed to arbitrate the dispute in question. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Folse v. Richard Wolf Medical Instruments Corp.*, 56 F.3d 603, 605 (5th Cir. 1995); *R.M. Perez & Assocs., Inc. v. Welch*, 960 F.2d 534, 538 (5th Cir. 1992).

20.     Under the FAA, the court applies ordinary state contract law principles in order to decide whether a valid arbitration agreement exists. *See In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); 9 U.S.C.A. § 1 et seq.; CIV. PRAC. & REM. CODE § 171.001 et seq. Once a valid arbitration agreement is established, a presumption attaches favoring arbitration. *Dallas Cardiology Assoc., P.A. v. Mallick*, 978 S.W.2d 209, 212 (Tex. App.—Dallas, 1998, pet. denied). Then Court must then determine whether the arbitration agreement covers the non-movant's claims. *In re Jim Walter Homes, Inc.*, 207 S.W.3d 888 (Tex. App.—Houston [14th Dist.] 2006). In doing so, a court must focus on the complaint's factual allegations rather than the legal causes of action asserted. *Id.*

---

[33] *See* Exhibit 1-A at ¶ ¶ 2(C) and 8.

21.     Thus, two questions guide the determination of whether Penn Virginia's Motion to Compel should be granted: 1) is there a valid agreement to arbitrate; and 2) does the dispute in question fall within the scope of the agreement? *Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.*, 147 S.W.3d 507, 511 (Tex. App.—San Antonio 2004, no pet.).

**A.     Valid Agreement to Arbitrate**

22.     An "at-will" employee who receives notice of an employer's arbitration policy and continues or commences employment accepts the terms of the agreement as a matter of law. *See In re Halliburton*, 80 S.W.3d 566 (Tex. 2002); *In re Dallas Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 162 (Tex. 2006). In *Halliburton*, the employer created a dispute resolution program which obligated both employees and the employer to arbitrate all disputes between them. *See Halliburton*, 80 S.W.3d at 566. The Texas Supreme Court held that the employer was justified in giving notice to all employees of the program and informing them that by continuing to work after the adoption of the program, employees would be considered to have accepted the program. *See id* at 569-71.

23.     Four years later, the San Antonio Court of Appeals extended *Halliburton* even further. Relying on *Halliburton*, the Fourth Court of Appeals compelled arbitration where the employee expressly refused to sign an arbitration agreement but continued to work after receiving notice of the arbitration requirement. *In re RRGT, Inc.*, 2006 WL 622736 (Tex. App.—San Antonio 2006, orig. proceeding).

24.     It should also be noted that the San Antonio Court of Appeals has specifically considered the Nabors DRP and held that it is valid and enforceable on multiple occasions. *See NDUSA USA, LP v. Pena*, 385 S.W.3d 103 (Tex. App.—San Antonio 2012, pet. denied); *NDUSA USA, LP v. Carpenter*, 198 S.W.3d 240, 249 (Tex. App.—San Antonio 2006, orig.

proceeding). Furthermore, in October 2013 and then again in December 2013, the Texas Supreme Court denied the family of a deceased Nabors' employee's petition for review when the family sought to reverse the Fourth Court of Appeals' determination that the DRP was **valid** and **enforceable**. *See Pena*, 385 S.W.3d 103.

25.     De La Garza and Adame executed documents on several occasions that clearly express both parties' agreement to the terms of the DRP.[34]  The documents specifically state that De La Garza and Adame acknowledged receiving, reviewing, understanding, and accepting the DRP's requirement to submit disputes to arbitration.[35]  De La Garza and Adame's signatures on the aforementioned documents is strong evidence of their actual acknowledgment and agreement that they are required to adhere to the DRP.  *See In re Bunzl USA*, 155 S.W.3d 202 (Tex. App.—El Paso 2004, orig. proceeding).

26.     De La Garza and Adame accepted the terms of the DRP as a matter of law. Therefore, a valid and enforceable agreement to arbitrate was formed. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006).

**B.     The Dispute Falls Within the Scope of the Agreement**

27.     The parties' claims fall within the scope of the DRP. The DRP requires that disputes between the Company (defined as Nabors, its subsidiaries, and any "Electing Entity") and its current or former employees be submitted to arbitration. According to the parties' Petitions, De La Garza and Adame were both employees of a Nabors' subsidiary (NCPS) and both were allegedly injured while in the course and scope of their employment. Consequently, this dispute, which is between NCPS employees and Penn Virginia (an "Electing Entity"), falls within the scope of the agreement.

---

[34] *See Nicholson Aff.* at ¶ ¶ 12, 13, 16, and 17; *see also* Exhibits 1-F – 1-I.
[35] *Nicholson Aff.* at ¶ ¶ 12, 13, 16, and 17; *see also* Exhibits 1-F – 1-I.

28.     Whether a claim falls within the scope of an arbitration agreement depends on the factual allegations of the complaint rather than the legal causes of action asserted. *Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995); *Ikon Office Solutions, Inc. v. Eifert*, 2 S.W.3d 688, 697 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding); *Prudential-Bache Secs., Inc. v. Garza*, 848 S.W.2d 803, 807 (Tex. App.—Corpus Christi 1993). Based on the factual allegations contained in the parties' pleadings, the parties' claims fall squarely within the scope of the DRP.

29.     It is undisputed that De La Garza and Adame were employed by NCPS, which is a Nabors subsidiary.[36] It is undisputed that La Garza and Adame both alleged that they were injured at the workplace and/or in the course and scope of their employment.[37]

30.     De La Garza and Adame signed an acknowledgement that specifically states, "I have received a copy of the Nabors Dispute Resolution Program...and understand that I am required to adhere to the Dispute Resolution Program and its **requirement** for submission of disputes to... **arbitration.**"[38] All of these terms are clearly defined in the DRP.

31.     The DRP clearly and unequivocally states that it "applies to and binds the Company, each Employee and Applicant."[39] The DRP defines "Dispute" to include any personal injury that is incurred at the workplace or in the course and scope of employment.[40] According to the DRP, "Company" means "Sponsor and every direct and indirect subsidiary...of Sponsor, (and) any Electing Entity."[41]

---

[36] *Nicholson Aff.* at ¶ ¶ 6, 11 through 15; *see also* Plaintiff's Original Petition and First Amended Petition, and Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[37] *See* Plaintiff's Original Petition and First Amended Petition and Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[38] *Nicholson Aff.* at ¶¶ 13 and 16; *see also* Exhibits 1-H and 1-I (emphasis added).
[39] *See* Exhibit 1-A, at ¶ 1.
[40] *See* Exhibit 1-A at ¶ 2(E).
[41] *See* Exhibit 1-A at ¶ 2(D).

32.     Nabors is the "Sponsor" of the DRP.[42] NCPS is a subsidiary of Nabors.[43] Penn Virginia is an "Electing Entity" and agreed that it is bound by the terms of the DRP.[44] Therefore, Penn Virginia falls within the scope of the "Company."

33.     The parties' claims clearly fall within the scope of the arbitration agreement. Consequently, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

## V. CONCLUSION

34.     Nabors has instituted a comprehensive dispute resolution program, which requires arbitration of disputes between the Company (which is defined as Nabors Industries, Inc., its subsidiaries, and any "Electing Entity") and current or former employees. De La Garza and Adame unequivocally agreed to adhere to the DRP and its requirement to submit all claims to arbitration. The DRP applies to personal injuries that occur at the workplace or while the employee is in the course and scope of his employment. Therefore, the parties' claims, as asserted in this lawsuit, are subject to the terms of the DRP. Consequently, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

## PRAYER

For the foregoing reasons, PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP, LLC request that the Court grant this Motion, abate or dismiss this action, and order that the claims asserted by Alfredo De La Garza, Individually and as Next Friend of REDACTED and Intervenor, John Paul Adame, Individually and as Next Friend of REDACTED be

---

[42] *Nicholson Aff.* at ¶ 4; *see also* Exhibit 1-A, at ¶ 2(L).
[43] *Nicholson Aff.* at ¶ 6.
[44] *See Nicholson Aff.* at ¶ ¶ 7 through 10; *see also* Exhibits 1-C and 1-E, at *Contractors Special Provisions*, ¶16.

compelled to final and binding arbitration. PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP, LLC further request all other relief to which they are entitled.

Respectfully submitted,

/s/ Thomas J. Smith
Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**Attorneys for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served electronically, by and through the Court approved electronic filing manager, to participating parties on this 18th day of June 2015, as follows:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone  817-870-2102
Fax     817-332-5858
*Counsel for Plaintiff, Individually and as Next Friend of* REDACTED
REDACTED *Minor Children*

Benjamin A. Escobar, Jr.
Brit T. Brown
**BEIRNE, MAYNARD & PARSON, L.L.P.**
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Phone  713-623-0887
Fax     713-960-1527
*Counsel for Defendant, Cudd Pressure Control, Inc.*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas  78332
Phone  361-664-7377
Fax     361-664-7245
*Counsel for Intervenor,*
*John Paul Adame, Individually and as Next Friend of* REDACTED
REDACTED

/s/ Thomas J. Smith
Thomas J. Smith

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR REDACTED and | § | |
| REDACTED minors | § | |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, LP, | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority on this day personally appeared Thomas J. Smith, who after being duly sworn upon his oath stated as follows:

1.      "My name is Thomas J. Smith. I am over twenty-one (21) years of age. I am of sound mind and in all ways competent to make this verification.

2.      I am one of the attorneys of record for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC. I have personal knowledge of the facts stated in this affidavit and those facts are true and correct.

3.      I have reviewed the foregoing Motion to Compel Arbitration and to Abate this case pending such arbitration. In my personal knowledge, the Motion truly and correctly recites the factual allegations set forth in the pleadings and the evidence in the trial court record."



Thomas J. Smith

SUBSCRIBED AND SWORN TO before me a notary public, which witness my hand and seal of this office this /5ᵗʰ day of June, 2015.

Notary Public in and for the State of Texas

RHONDA SCHNITZ
Notary Public, State of Texas
My Commission Expires
December 13, 2018

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED and REDACTED minors | § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF<br><br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br><br>281ST JUDICIAL DISTRICT |

v.

PENN VIRGINIA OIL & GAS, LP,
PENN VIRGINIA OIL & GAS GP, LLC,
MIKE FERGUSON, TRIFECTA
OILFIELD SERVICES, LLC, CUDD
PRESSURE CONTROL, INC.,
ROYWELL SERVICES, INC. and OAKS
PERSONNEL SERVICES, INC. d/b/a
THE OAKS GROUP

## AFFIDAVIT OF KEITH NICHOLSON

**STATE OF TEXAS**      §
                        §
COUNTY OF HARRIS        §

Before me, the undersigned notary, on this day personally appeared Keith Nicholson, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Keith Nicholson. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am Assistant General Counsel for Nabors Corporate Services, Inc.

3. In my capacity as Assistant General Counsel, I am required to be familiar with Nabors Industries, Inc.'s corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also required to be familiar with the Nabors Dispute Resolution Program ("DRP").

4. Nabors Industries, Inc. is the "Sponsor" of the Nabors DRP as that term is defined by the DRP. A true and correct copy of the DRP is attached to my affidavit as Exhibit 1-A.

5. The DRP provides that it applies to all direct and indirect subsidiaries of Nabors Industries, Inc., as well as all "Electing Entities" that have agreed to be bound by same.

6. Nabors Completion & Production Services Co. ("NCPS") was a subsidiary of Nabors

**EXHIBIT "1"**

Industries, Inc. at the time of the April 29, 2014 incident which makes the basis of the lawsuit.

7. On September 23, 2008, Penn Virginia Oil & Gas, LP agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

8. The Contractors Special Provisions page states at paragraph 16 that "Operator, its parent, subsidiary, and affiliated corporations...(collectively "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity..."

9. In addition, on September 8, 2010, Penn Virginia MC Energy, LLC agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E. It is my understanding that Penn Virginia MC Energy, LLC is a subsidiary or affiliated corporation of Penn Virginia Oil & Gas, LP and/or Penn Virginia Oil & Gas GP, LLC.

10. As an "Electing Entity," Defendants, Penn Virginia Oil & Gas, LP and Penn Virginia Oil & Gas GP, LLC are required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

11. Based upon my review of the personnel file of Mr. Adame, I can confirm that Mr. Adame was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

12. Specifically, my review of the relevant documents confirms that on January 2, 2013, Mr. Adame executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-F. Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."

13. Further, on January 7, 2013, Mr. Adame executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-H. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."

14. Mr. Adame was employed by NCPS as a crew worker. As a crew worker, Mr. Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. Adame's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. While employed by NCPS, Mr. Adame was never a commercial truck driver or transportation worker.

15. Based upon my review of the personnel file of Mr. Alfredo De La Garza, I can confirm that Mr. De La Garza was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

16. Specifically, my review of the relevant documents confirms that on July 16, 2013, Mr. De La Garza executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-G. By his signature, Mr. De La Garza acknowledged and agreed that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

17. Further, on July 22, 2013, Mr. De La Garza executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-I. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. De La Garza acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

18. Mr. De La Garza was employed by NCPS as a crew worker. As a crew worker, Mr. De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. De La Garza's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. Mr. De La Garza's job duties and responsibilities did not include the movement of goods in interstate commerce. While employed by NCPS, Mr. De La Garza was never a commercial truck driver or transportation worker.

19. At all times relevant to this matter, NCPS was engaged in interstate commerce as it was in the business of providing services for the development of oil and gas resources that are placed into commerce in both Texas and other states of the United States.

20. On information and belief, Penn Virginia is also engaged in interstate commerce as it is in the business of producing oil and gas resources that are placed into commerce in both Texas and other states of the United States.

21. Attached as Exhibit 1-A to my affidavit is a true and correct copy of Nabors Industries, Inc.'s DRP booklet, in English and Spanish, respectively. These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

22. Attached as Exhibit 1-B to my affidavit is a true and correct copy of the 2008 IADC Drilling Contract between Nabors and Penn Virginia Oil & Gas, LP, and attached as Exhibit 1-C is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

23. Attached as Exhibit 1-D to my affidavit is a true and correct copy of the 2010 IADC Drilling Contract between Nabors and Penn Virginia MC Energy, LLC, and attached as Exhibit 1-E is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

24. The records attached as Exhibits 1-F, 1-G, 1-H, and 1-I are true and correct copies of records that are kept by NCPS in the regular course and scope of business, and it was the regular course of business of NCPS for an employee or representative of NCPS, with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time the act or event that was recorded."

FURTHER AFFIANT SAYETH NOT.

Keith Nicholson

Sworn to and subscribed before me by Keith Nicholson on the 16TH day of June, 2015.

Notary Public in and for the State of Texas
My Commission expires: MAy 5, 2018

MARY D. HOISINGTON
Notary Public, State of Texas
My Commission Expires
May 05, 2018

# NABORS DISPUTE RESOLUTION
# PROGRAM and RULES



Copies of this pamphlet are available in Spanish, upon
request, from any Nabors subsidiary's Human
Resources Department.

Copias de este folleto estan disponible en español con
solo requerirlas al Departamento de Recursos
Humanos de EXHIBIT "1-A" de Nabors

# THE [ ]BORS DISPUTE RESOLUTION P[ ]GRAM

## 1. Purpose and Construction

The Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment, related to or arising out of a current, former or potential employment relationship with the Company. The Program is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Program contractually modifies the "at-will" employment relationship between the Company and its Employees, but only to the extent expressly stated in the Program. The Program should be interpreted in accordance with these purposes.

## 2. Definitions

A. "AAA" means the American Arbitration Association.

B. "JAMS" means Judicial Arbitration and Mediation Services.

C. The "Act" means the Federal Arbitration Act, 9 U.S.C.§1, et seq., as amended from time to time.

D. "Company" means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the successors and assigns of all such entities, plans and persons; provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.

E. "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes

der the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1. this Program;

2. the employment or potential reemployment of an Employee, including the terms, conditions, or termination of such employment with the Company;

3. employee benefits or incidents of employment with the Company;

4. any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress, antitrust claim concerning wages or otherwise, or status, claim or membership with regard to any employee benefit plan;

5. an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6. any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Program (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

F. "Electing Entity" means any legal entity that has agreed to be bound by the Program as provided herein.

G. "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Program, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to

laws of the United States or any state, municipality, or other political subdivision of the United States.

H. "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Program.

I. "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Program.

J. "Program" means this Nabors Dispute Resolution Program, as amended from time to time.

K. "Rules" means the Nabors Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

L. "Sponsor" means Nabors Industries, Inc., a Delaware corporation.

3. Name, Application and Coverage

A. The Program shall be referred to as the "Nabors Dispute Resolution Program." Alternatively, it may be referred to as the "Dispute Resolution Program."

B. Until revoked by Sponsor pursuant to this Program, this Program applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Program shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C. Except as provided for herein, this Program applies to any Dispute.

D. Notwithstanding anything to the contrary in this Program, the Program does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E. Mediation and arbitration are only available for Disputes involving legally protected rights.

F.    twithstanding any other provision eof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Program. Furthermore, an action under The Limitation of Ship Owners Liability Act, 46 U.S.C. §§181-189, shall not be subject to this Program.

4. **Resolution of Disputes**

All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules.

5. **No Retaliation**

No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Program.

6. **Amendment**

A. This Program may be amended by Sponsor at any time by giving at least 10 days' notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules, unless otherwise agreed.

B. Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules unless otherwise agreed.

7. **Termination**

This Program may be terminated by Sponsor at any time by giving at least 10 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination unless otherwise agreed.

8. **Applicable Law**

A. The Act shall apply to this Program, the Rules, and any proceedings under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules.

B. arbitrations held pursuant to this Program shall be convened as near as possible to the worksite where the events in dispute occurred if Nabors continues to perform work at that location. Otherwise the arbitration will occur at the place most convenient for the majority of the witnesses.

C. Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

D. Other than as expressly provided herein, or in the Rules, the Program shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Program.

E. Notwithstanding the provisions of the preceding sub-section, in any proceeding before an arbitrator, the arbitrator, in his or her discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award. The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law. If the arbitrator awards attorney fees without authorization for such an award by statute or contract, such award will be limited to $2,500.00.

9. **Administrative Proceedings**

A. This Program shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B. Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Program to any such Dispute upon termination of the administrative or judicial proceedings. A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Program as it would in a court of competent jurisdiction.

## 10. Exc ive Remedy

Proceedings under the Program shall be the exclusive, final and binding method by which Disputes are resolved.

## 11. Electing Entities

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

## 12. Effective Date

The Effective Date of this Program shall be April 15, 2001.

## 13. Severability

The terms of this Program and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Program, any otherwise invalid provision of the Program or the Rules may be reformed and, as reformed, enforced.

## 14. Assent

Employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Program.

# NABORS DISPUTE RESOLUTION RULES

## 1. Definitions

All definitions included in the Nabors Dispute Resolution Program apply to these Rules.

## 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

B. ...se Rules apply in the form existing the time proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS also apply to all proceedings governed by these Rules.

3. **Initiation of the Process**

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS, and tendering the appropriate administrative fee.

C. Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

D. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Program Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA or JAMS.

E. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

4. **Administrative Conference**

AAA or JAMS shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA or JAMS will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA or JAMS will implement the procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the

Par    have previously attempted and failed r    esolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

## 5.  Appointment of Arbitrator

Immediately after payment of the arbitration fee, AAA or JAMS shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA or JAMS. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA or JAMS shall invite the acceptance of the arbitrator or arbitrators to serve. In those cases where more than $2,000,000 is in controversy, either Party shall have the right to require that the arbitration proceed before a three member panel rather than a single arbitrator. The Party who elects for a panel in these circumstances shall notify the other Parties during the administrative conference described in Section 4 of the Program. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA or JAMS shall issue a new list of arbitrators consistent with the above procedures.

## 6.  Qualifications of the Arbitrator

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

## 7.  Vacancies

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

8. **Da** **Time and Place of Hearings**

A. The arbitrator shall set the date, time and place of any proceeding pursuant to the requirements of Section 8B of the Program.

B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

9. **Conferences**

At the request of AAA or JAMS, or of a Party or on the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A. venue,

B. clarification of issues,

C. determination of preliminary issues, including summary determination of dispositive legal issues,

D. discovery,

E. the time and location of proceedings or conferences,

F. interim legal or equitable relief authorized by applicable law,

G. pre- or post-hearing memoranda,

H. stipulations; and/or

I. any other matter of substance or procedure.

10. **Mode of Hearings and Conferences**

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

## 11. Preparing Discovery

A. On any schedule determined by the arbitrator, each Party shall submit in advance the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B. The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C. Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

## 12. Representation

Any Party may be represented by counsel or by any other authorized representative.

## 13. Attendance at Hearings

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

## 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The pendency of court proceedings related to the same matter is not good cause for postponement.

## 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

## 16. Record of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator. The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

## 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

## 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

## 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

## 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

## 21. Closing and Reopening of Proceedings

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

## 22. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

## 23. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

## 24. Communications with the AAA, JAMS, and the Company

A. Any Party may notice, serve or communicate with AAA by contacting:

> Regional Administrator
> American Arbitration Association
> 1001 Fannin St., Suite 1005
> Houston, Texas 77002
> (713) 739-1302
> Fax: (713) 739-1702

B. Any Party may notice, serve or communicate with JAMS by contacting:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C. y notice, service or communicatic with the Company will be to:

Legal Department
Nabors Industries, Inc.
515 West Greens Road, Suite 1200
Houston, Texas 77067-4525
(281) 874-0035
Fax: (281) 775-8431

## 25. Communication with the Arbitrator

There shall be no communication between the Parties and the arbitrator other than at any oral hearings or conferences. Any other oral or written communications from the parties to the arbitrator shall be directed to the AAA or JAMS (and copied to the Parties) for transmission to the arbitrator, unless the Parties and the arbitrator agree otherwise.

## 26. Time of Award

The award shall be promptly made by the arbitrator, unless otherwise agreed by the Parties or specified by applicable law, no later than thirty (30) days from the date of the closing of the proceeding or, if applicable, the closing of a reopened proceeding.

## 27. Form of Award

The award shall be in writing and shall be signed by the arbitrator. The arbitrator shall write a statement of reasons for the award if requested to do so in the request to initiate proceedings or in the answering statement. The award shall be executed in any manner required by applicable law.

## 28. Modification of Award

On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.

## 29. Set    nent

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

## 30. Scope of Arbitrator's Authority

The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

## 31. Judicial Proceedings and Exclusion of Liability

A. Neither AAA, JAMS, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules,

B. Neither AAA, JAMS, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met, pending the institution of proceedings under these Rules.

## 32. Fee and Expenses

A. The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B. All attorneys' fees shall be borne by the Party incurring them except as otherwise provided by law, by the Program, or in the award of the arbitrator.

C. Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D. The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E. The Employee or Applicant shall pay a $150 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules, including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F. If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G. Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

## 33. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be in interpreted and applied by the AAA or JAMS.

## 34. Applicable Law

A. Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B. Except where otherwise expressly provided in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

## 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

## 36. Spanish

A copy of this Program is available in Spanish.



January 17, 2007

TO:     All Employees of Nabors Industries, Inc. and Subsidiaries

RE:     Nabors Dispute Resolution Program

Dear Employee:

Effective ten (10) days after the date of this notice, pursuant to Section 6 of the Nabors Dispute Resolution Program, Nabors Industries, Inc. ("Nabors") and its subsidiaries are amending the Nabors Dispute Resolution Program and Rules for the determination of all disputes between employees and Nabors or one of its subsidiaries.

The amendments to the Program and Rules are enclosed on the back of this page. Nabors is amending one (1) section of the Nabors Dispute Resolution Program and one (1) section of the Nabors Dispute Resolution Rules. You should already have a copy of the current Program and Rules, or they may be found on the Nabors Intranet under policy number 200.80.1 at http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

As before, the Nabors Dispute Resolution Program, as amended, gives you the most effective and efficient means of resolving any disputes you may have through a process which encourages resolution at the earliest opportunity. Employees do not waive any substantive legal rights under the Program. Rather, the Program, as amended, provides that any substantive legal issues you may have will be resolved on an individual basis in mediation or before a neutral arbitrator, whose decision will be final and binding on you and the Company. Under the Program, as amended, however, you waive any procedural rights you may have to bring a court action, on an individual or on a class, collective or representative basis; and you waive your right to a jury trial concerning any dispute you may have with the Company or any Electing Entity (as defined in the Program), including any personal injury claims or claims of discrimination based on race, national origin, gender, religion, age or disability under any federal or state civil rights statute.

Every individual who works for Nabors Industries, Inc. or a subsidiary is subject to the Program, as amended, except that the amended provisions will affect only disputes initiated after the effective date of the amendments, and not any matters pending before the effective date. Your continued employment after the date you receive this notice will constitute your acceptance of the amendments to the Program, both during and after your employment with the Company.

We look forward to continuing to work together. If you have any questions about the amendments to the Program and Rules or any other term of your employment, please do not hesitate to contact the Human Resources Department of your employer.

Sincerely,

NABORS INDUSTRIES, INC.

*A copy of this notice is available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.

* Una copia de esta noticia está disponible en español con solo requerirla al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.



## Amendment to THE NABORS DISPUTE RESOLUTION PROGRAM:

### 4. Resolution of Disputes

A. All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules. The Parties forego any right either may have to a jury trial on claims relating in any way to any Dispute.

B. Each Dispute shall be arbitrated on an individual basis. The Parties forego and waive any right to join or consolidate claims in arbitration with others or to make claims in arbitration as a representative or as a member of a class or in a private attorney general or similar capacity, unless such procedures are agreed to by all Parties. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Program shall have no authority to conduct the matter as a consolidated, class, collective or representative action.

C. If the procedural limitation in Paragraph B of this Section is held unenforceable by a court in a proceeding in which a party seeks to pursue a consolidated, class or collective action or otherwise act in a representative capacity, then this Program shall apply to such proceeding only to the following extent. The court will decide whether the Dispute should proceed on a consolidated, class, collective or other representative basis and, if so, will define the scope of the class. None of the foregoing determinations shall be submitted to the arbitrator, and in no event shall the arbitrator have the power to determine class, collective or representative action certification. The court's decisions will be subject to appeal pursuant to the applicable rules of procedure. If the court certifies a class, collective or other representative action, then all other determinations in or related to the Dispute shall be made by the arbitrator. The arbitrator shall determine questions of liability to or of the class as a whole and remedies available to or from the class as a whole. The arbitrator shall also decide the relief, if any, to which a party or class member may be entitled individually. If the court, however, ultimately denies a party's request to proceed on a consolidated, class, collective or representative basis, then that party's individual claim(s) shall still be subject to this Program and referable to arbitration pursuant to its terms.

## Amendment to NABORS DISPUTE RESOLUTION RULES:

### 30. Scope of Arbitrator's Authority

A. The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

B. The arbitrator shall not have the power to hear any claims in arbitration as a class or collective action, or in a private attorney general or similar capacity, or on any other representative capacity basis, or, absent the consent of all parties, on a consolidated basis. The arbitrator shall be authorized to decide only the disputed claims between the individual parties.

# PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors*

# PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS

l.  **1. Propósito y Diseño**

El Programa está diseñado con el fin de proporcionar un medio para la resolución rápida, justa, accesible y económica de conflictos entre la Compañía y los Empleados actuales y anteriores de la Compañía y los Aspirantes para puestos de empleo, con respecto a o como consecuencia de una relación de empleo actual, anterior o potencial con la Compañía. El Programa está diseñado para facilitar un proceso para la resolución definitiva de todas los Conflictos descriptos en los términos del mismo. No está diseñada para limitar o aumentar los derechos fundamentales disponibles bajo las leyes aplicables. El Programa modifica en forma contractual la relación de empleo efectuado entre la Compañía y sus Empleados, pero sólo en la medida en que esté expresamente establecido en el Programa. El Programa deberá ser interpretado de acuerdo con esta intención.

**2. Definiciones**

A.  "AAA" significará la Asociación Americana de Arbitraje (the American Arbritration Association).

B.  "JAMS" significará los Servicios de Mediación y Arbitraje Judiciales (Judicial Arbitration and Mediation Services)

C.  La "Ley" significará la Ley Federal de Arbitraje (the Federal Arbitration Act)

D.  La "Compañía" significará el patrocinador del Programa y las filiales directas o indirectas (ya sean una corporación, una compañía de responsabilidad limitada, una sociedad u otra entidad legal) del patrocinador, la Entidad que Selecciona el Programa, la entidad o persona que se alega tiene responsabilidad asociada o separada con respecto a cualquier Conflicto, y todos sus directores, funcionarios, empleados y agentes, plan de beneficios, ya sea exento o no-exento de impuestos, establecido o mantenido por dicha entidad, los fiduciarios, agentes y empleados de dichos planes, y los sucesores y beneficiarios de dichas entidades, planes y personas; siempre y cuando, en el caso de la Entidad que selecciona el Programa, "La Compañía" deberá incluir la Entidad que Selecciona el Programa solamente en la medida establecida en el contrato de dicha Entidad en la que estará obligada por el Programa.

E. "Conflicto" significará todas las demandas legales y justas, los reclamos y controversias, de cualquier índole o tipo, ya fueren contractuales, o de responsabilidad extracontractual, de acuerdo con el derecho escrito o las regulaciones o alguna otra ley, entre las partes obligadas por el Programa o por un contrato para resolver los Conflictos de acuerdo al Programa, o entre una persona obligada por el Programa y una persona o entidad con derecho a recibir sus beneficios, incluyendo pero sin limitarse a lo siguiente:

1. este Programa;

2. la contratación o la posible recontratación de un Empleado, incluyendo los términos, condiciones o el cese de dicho empleo con la Compañía;

3. los beneficios o incidentes de empleo con la Compañía;

4. todo asunto relacionado con la relación entre el Empleado y la Compañía incluyendo, por ejemplo pero sin limitarse a: la discriminación basada en la raza, el sexo, la religión, el origen nacional, la edad, la condición de veterano de guerra o cualquier incapacidad; el acuso sexual u cualquier otro tipo de acoso; las represalias por concepto de compensación laboral; la difamación, la imposición de un agravio emocional, la reclamación de antimonopolio relacionado con sueldos o el estado de, una reclamación por o una membresía relacionado con los planes de beneficios para empleados;

5. la solicitud de un Aspirante para un puesto de empleo y las acciones y decisiones de la Compañía con respecto a dicha solicitud; y

6. cualquier lesión personal supuestamente incurrida en o alrededor del sitio de trabajo de una Compañía o durante el término y alcance de las actividades laborales de un Empleado,

El "Conflicto" incluye todo lo anteriormente mencionado, independientemente del momento en que hayan ocurrido los eventos en los cuales estén basados, incluyendo los asuntos basados en eventos que hayan sucedido antes de que el Empleado estuviera sujeto a este Programa (siempre y cuando dichos conflictos no fueren establecidos con anterioridad en un tribunal jurídico) o después de la terminación de la relación de empleo

F. La "Entidad que Selecciona el Programa" significará toda entidad legal que hubiera acordado una obligación por medio el Programa de acuerdo a las disposiciones de este documento.

G. El "Empleado" significará toda persona que estuviera o hubiera sido empleada por la Compañía a la fecha o después de la fecha de vigencia de este Programa, incluso si estuviera o no estuviera empleado por la Compañía en el momento en que una demanda fuera presentada en relación con un Conflicto, y que residiera en los Estados Unidos de América, o que estuviera sujeto a las leyes de los Estados Unidos o de cualquier estado, municipalidad u otra subdivisión política de los Estados Unidos.

H. El "Aspirante" significará toda persona que estuviera buscando o que haya buscado empleo con la Compañía después de la fecha de vigencia de este Programa.

I. Las "Partes" significarán, las personas perjudicadas en relación con un Conflicto particular, y/o las entidades que obligadas y vinculadas por este Programa.

J. El "Programa" significará este Programa de Resolución de Conflictos de Nabors, y como fuere modificado de tiempo en tiempo.

K. Las "Reglas" significarán las Reglas para la Resolución de Conflictos de Nabors, según fueran modificadas de tiempo en tiempo, que sean aplicables a la mediación y el arbitraje.

L. El "Patrocinador" significará Nabors Industries, Inc., una corporación del estado de Delaware.

## 3. Nombre, Aplicación y Cobertura

A. El Programa será denominado el "Programa de Resolución de Conflictos de Nabors". De forma alternativa, podrá ser referido como el "Programa de Resolución de Conflictos".

B. Hasta que sea revocado por la entidad Patrocinadora de acuerdo con lo dispuesto en este Programa, dicho Programa se aplica y obliga la Compañía, cada Empleado y cada Aspirante y sus herederos, los beneficiarios y los cesionarios de dicha persona o entidad; siempre que este Programa no se aplique a un Empleado que sea parte de un grupo de Empleados representados por una organización laboral o a la Compañía relacionada con dichos empleados, excepto

en la medida permitida en un convenio de negociación colectiva (entre patronos y sindicatos obreros) o legalmente impuesto por la Compañía cuando ningún convenio de negociación colectiva estuviera vigente.

C. Este Programa se aplica a todo Conflicto, salvo se estipule lo contrario en este documento.

D. Sin perjuicio de lo estipulado en este Programa, el mismo no se aplica a las reclamaciones por concepto de indemnización o compensación de beneficios para obreros o de beneficios por concepto de desempleo.

E. La mediación y el arbitraje están solamente disponibles para los Conflictos que involucren derechos que estuvieren protegidos legalmente.

F. Sin perjuicio de otras disposiciones establecidas en este documento, todo tribunal con jurisdicción sobre las Partes puede emitir órdenes judiciales (incluyendo requerimientos judiciales preliminares) si los requerimientos legales y equitativos de acuerdo a las leyes aplicables se cumplieran durante la institución de las demandas bajo el Programa. Adicionalmente, una demanda bajo la Ley denominada The Limitation of Ship Owners Liability Act, 46 U.S.S §§181-189, no estará sujeta a este Programa.

4. **Resolución de Conflictos**

Los conflictos que no fueren resueltos por las Partes serán definitivamente resueltos de acuerdo con este Programa y sus Reglas.

5. **Artículo referente a Represalias**

No se podrá imponer ninguna forma de disciplina, ni se deberá tomar represalias con los empleados por haber iniciado o participado de buena fe en un proceso o una demanda de acuerdo con este Programa.

6. **Enmienda**

A. Este Programa puede ser modificado por el Patrocinador en cualquier momento mediante una notificación previa a los empleados actuales de por lo menos 10 días. Sin embargo, no se deberá aplicar ninguna enmienda a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas salvo se convenga lo contrario

B. El Patrocinador puede modificar las Reglas en cualquier momento por medio de la notificación de las enmiendas en AAA y JAMS. Sin embargo, ninguna enmienda de

las Reglas deberá aplicar a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas, salvo se acuerde lo contrario.

7. **Terminación del Programa**

Este Programa podrá ser terminado por el Patrocinador en cualquier momento mediante la notificación a los Empleados actuales en un plazo no mayor de 10 días previo a la terminación antedicha. Sin embargo, la terminación no entrará en vigencia para los Conflictos para los cuales una demanda haya sido iniciada de acuerdo con las Reglas antes de la fecha de terminación, salvo se acuerde lo contrario.

8. **Ley Aplicable**

A. La Ley se aplicará a este Programa, las Reglas y cualquier demanda realizada de acuerdo al Programa o las Reglas, incluyendo las demandas para obligar, hacer cumplir, anular o confirmar demandas, adjudicaciones, órdenes de un árbitro, o resoluciones de acuerdo al Programa o las Reglas.

B. Todos los arbitrajes efectuados de acuerdo con este Programa deberán ser convocados tan cerca como fuera posible del sitio de trabajo donde sucedieron los eventos en disputa, en caso que Nabors continúe realizando labores en esa ubicación. De lo contrario, el arbitraje tomará lugar en el sitio más conveniente para la mayor parte de los testigos.

C. Salvo se establezca de manera expresa en las Reglas contenidas en este documento, se conservan los derechos legales fundamentales, los recursos y los mecanismos de defensa de todas la Partes. En caso de arbitraje, el árbitro tendrá la autoridad para determinar las leyes aplicables y de ordenar las compensaciones legales o equitativas, que una Parte pudiera obtener de un tribunal de jurisdicción competente en base a las reclamaciones presentadas en la demanda.

D. Salvo se estipule de forma expresa en este documento, o en las Reglas del mismo, no se deberá interpretar el Programa con el propósito de otorgar derechos, recursos o mecanismos de defensa fundamentales, legales o contractuales adicionales, los cuales no podrían ser aplicados por un tribunal de una jurisdic-

ción competente en ausencia del Programa.

E. Sin perjuicio de las disposiciones establecidas en la subcláusula anterior, en toda demanda presentada ante un árbitro, el árbitro, a su total discreción, podrá permitir que un Empleado o Aspirante prevaleciente reciba los honorarios para el pago de abogados como parte del fallo dictado. La discreción para permitir la concesión de una asignación de honorarios de acuerdo a esta subcláusula será adicional a toda discreción, derecho o autoridad que el árbitro pudiera tener de acuerdo a las leyes aplicables. Si el árbitro concede los honorarios de abogado sin la autorización para dicha asignación por derecho escrito o contrato, dicha asignación estará limitada a $2,500.00.

## 9. Procesos Administrativos

A. Este Programa se deberá aplicar a un Conflicto que estuviera pendiente ante toda entidad administrativa o tribunal local, estatal o federal, a menos que estuviera prohibido por la ley.

B. La participación en todo proceso administrativo o judicial por la Compañía no deberá afectar la aplicabilidad del Programa a dicho Conflicto una vez que fuere terminado el proceso administrativo o judicial. Un fallo, una recomendación o una decisión efectuada por una entidad administrativa en base a los méritos de un Conflicto deberá tener el mismo peso o efecto legal de acuerdo al Programa como si hubieran sido dictados por un tribunal de una jurisdicción competente.

## 10. Recurso Exclusivo

Los procesos efectuados de acuerdo al Programa deberán ser el método exclusivo, inapelable y vinculante por medio de los cuales se resolverán los Conflictos.

## 11. Las Entidades que Seleccionen el Programa

A. Las Corporaciones u otras entidades legales, que no fuesen Partes del mismo, tienen la opción de decidir si quisieren estar vinculadas y obligadas por este Programa mediante un contrato escrito con el Patrocinador.

B. Dicha opción para participar en este Programa puede ser efectuada en relación con algunos tipos de Conflictos, o en relación con algunas personas, a discreción de la Entidad que Seleccione el Programa.

## 2. La Fecha de Vigencia

La Fecha de Vigencia de este Programa será el 15 de abril de 2001.

## 3. Atribución de Separación

Los términos de este Programa y las Reglas son separables. La falta de validez o de la obligación para que se cumplieran algunas de las disposiciones en este documento no afectará la aplicación de las otras disposiciones. Donde fuere posible, y en forma consistente con los propósitos del Programa, toda disposición que fuera invalidada en el Programa o en las Reglas se podrá modificar y después de modificada, se podrá obligar su cumplimiento.

## 14. Asentimiento

El empleo o la continuación del empleo después de la Fecha en Vigencia de este Programa constituyen el consentimiento por parte del Empleado y la Compañía para estar obligados por las disposiciones de este Programa, durante la duración del empleo y después del cese del mismo. La presentación de una solicitud de empleo, independientemente del formulario utilizado, constituye el consentimiento por parte del Aspirante y la Compañía para estar obligados por las disposiciones de este Programa.

# REGLAS PARA LA RESOLUCIÓN DE CONFLICTOS DE NABORS

## 1. Definiciones

Todas las definiciones incluidas en el Programa de Resolución de Conflictos de Nabors se aplicarán a estas Reglas.

## 2. Aplicación

A. Si hubieran reglas diferentes que fueran aplicables a una determinada clase específica de Conflicto, y éstas hubieran sido adoptadas por el Patrocinador y notificadas a AAA y JAMS, estas Reglas no se aplicarán a dicha clase de Conflictos.

B. Estas Reglas se aplican de la forma en que existieran en el momento en que se iniciaran los procesos establecidos de acuerdo con las mismas.

A. En la medida que fuera consistente con estas

las Reglas de Resolución de Conflictos Laborales de AAAo JAMS también se aplicarán a todos los procesos reglamentados por estas Reglas.

§. El Inicio del Proceso

A. Una Parte puede iniciar la demanda de acuerdo con lo establecido por estas Reglas en cualquier momento, sujeto a los mecanismos de defensa e incluyendo aquellos que apliquen en el tiempo oportuno de la reclamación, incluyendo las limitaciones y demoras indebidas.

B. Una Parte puede iniciar la demanda mediante la entrega de una solicitud escrita para iniciar la demanda en AAAo JAMS y después del pago de cargo administrativo correspondiente.

C. Las copias de la solicitud deberán ser entregadas a todas las otras Partes del Conflicto por AAAo JAMS. La solicitud deberá describir la índole del Conflicto, el monto involucrado, si lo hubiese, el recurso que se solicita y el sitio solicitado para el proceso.

D. Las demandas también pueden ser iniciadas por un Empleado o Aspirante mediante la entrega de una solicitud escrita para iniciar los procesos al Administrador del Programa de Resolución de Conflictos de la Compañía. En dicho caso, la Compañía deberá entregar en la brevedad posible a AAA o JAMS toda solicitud que hubiera recibido y que hubiera sido entregada en forma apropiada.

E. Las Partes contra quienes se haya presentado una demanda deberán presentar una declaración en respuesta a dicha demanda dentro del plazo de 21 días de la fecha a partir de la que se recibió la notificación de la intención de arbitrar o la descripción de las reclamaciones, la cual deberá incluir las contrademandas y las solicitudes para que el árbitro (si lo hubiera) prepare una declaración fundamentando las razones por las cuales se concede la indemnización.

4. Junta Administrativa

AAA o JAMS deberán convocar una junta administrativa tan pronto como sea posible después de haber recibido la declaración de respuesta o después del vencimiento del plazo para la presentación de la declaración de respuesta, si

dicha declaración no hubiera sido presentada. La junta puede ser sostenida en persona o por teléfono. En la junta,

A.    En la medida que fuera consistente con estas

AAAo JAMS determinarán si las Partes han acordado un método para resolver el Conflicto. Si las Partes estuvieran de acuerdo, AAA o JAMS implementarán el proceso de acuerdo con sus reglas una vez que se haya efectuado el pago del cargo correspondiente. Si las Partes no pueden llegar a un acuerdo, o si las Partes hubieran intentado llegar a un acuerdo y no pudieron resolver el Conflicto por medio de la mediación u otro mecanismo que no fuera vinculante u obligatorio, el Conflicto deberá ser arbitrado de acuerdo con estas Reglas.

### 5. El Nombramiento de un Árbitro

Inmediatamente después del pago del cargo por concepto de arbitraje, AAA o JAMS deberán enviar simultáneamente a cada Parte involucrada una lista idéntica de los nombres de las personas que fueron escogidas de un panel de árbitros calificados que AAA o JAMS deberá seleccionar y mantener. Cada una de las Partes del Conflicto tendrá catorce (14) días a partir de la fecha del comunicado para tachar los nombres que no prefiere, numerar en orden de preferencia los nombres restantes y devolver la lista a AAA o JAMS. Si una de las Partes no regresara la lista dentro del plazo especificado, todas las personas en la misma serán consideradas como aceptables. Entre las personas que hayan sido aprobadas en ambas listas, y de acuerdo con el orden de preferencia mutua, AAAo JAMS deberán invitar a que uno de ellos o más de uno ejerza/n de árbitro/s. En los casos en los cuales más de $2,000,000 esté en controversia, cualquiera de las partes tendrá el derecho de solicitar que el arbitraje proceda delante de un panel de tres miembros en vez de un solo árbitro. La Parte que escoja un panel en estas circunstancias deberá notificar a las otras Partes durante la junta administrativa descrita en la Cláusula 4 del Programa. Cualquiera de las Partes tendrá el derecho de tachar una lista de árbitros en su totalidad. Cuando una de las Partes ejercita este derecho, AAAo JAMS deberá emitir una nueva lista de árbitros de manera consistente con los procesos anteriormente mencionados.

### 6. Requisitos para la designación de un Árbitro

Ninguna persona deberá ejercer como árbitro en ningún caso en el cual dicha persona tuviera un interés financiero o personal. Antes de aceptar el nombramiento, el posible candidato deberá revelar cualquier circunstancia que posiblemente pudiera impedir una audiencia oportuna o crear la presunción de parcialidad. Una vez recibida dicha información por parte del árbitro o de cualquier otra fuente, AAA o JAMS tendrá que sustituir esa persona o comunicar la información a las Partes involucradas para que

puedan formular sus comentarios. A partir de entonces, AAA o JAMS podrán descalificar dicha persona y su decisión será concluyente.

## 7. Vacantes

Si hubiera una vacante por cualquier razón o si un árbitro designado no pudiera ejercer en forma oportuna, se deberá aplicar el proceso para determinar nombramientos descripto en la Cláusula 5 para la selección de un árbitro substituto.

## 8. Fecha, Hora y Sitio para las Audiencias

A. El árbitro deberá fijar la fecha, hora y sitio de cualquier proceso efectuado de acuerdo con las disposiciones de la Cláusula 8B del Programa.

B. Se proporcionará la notificación de la audiencia con un plazo no mayor de diez (10) días de anticipación, salvo que el árbitro determinara o que las Partes convengan que un periodo más corto fuera necesario.

C. El árbitro deberá realizar su labor, sin incurrir en gastos indebidos, para acomodar el Empleado o el Aspirante en la selección de un sitio para el proceso.

## 9. Juntas

A pedido de AAA o JAMS, o de una de las Partes o por iniciativa del árbitro, el árbitro de AAA o JAMS podrá convocar a juntas previa notificación para la discusión y la determinación de cualquier asunto que agilice el proceso, incluyendo:

A. la jurisdicción,

B. la aclaración de asuntos de especial interés

C. la determinación de asuntos preliminares, incluyendo el sumario de las consideraciones y disposiciones legales

D. la junta previa a la audiencia

E. el tiempo y sitio para los procesos o juntas de arbitraje

F. los recursos equitativos o legales interinos autorizados por las leyes aplicables

G. los memorandums anteriores o posteriores a la audiencia

H. las disposiciones, y/o

I. cualquier otro asunto o proceso fundamental

## 0. La modalidad para realizarAudiencias y Juntas

A discreción del árbitro o por común acuerdo entre las Partes, se podrán realizar juntas y audiencias por teléfono o por escrito, así como en persona.

## 1. La Junta previa a la Audiencia

A. En un horario que será determinado por el árbitro, cada una de las partes deberá entregar por adelantado los nombres y direcciones de los testigos que se pro-pone presentar y también los documentos que tiene planeado presentar.

B. El árbitro tendrá la discreción para determinar el for-mato, la cantidad y la frecuencia de las juntas con las Partes involucradas.

C. Las juntas antedichas podrán tomar el formato permi-tido por las Reglas Federales para Procesos Civiles, ser modificadas de tiempo en tiempo, y estar sujetas a las restricciones impuestas por el árbitro.

## 2. Representación

Cualquiera de las Partes podrá ser representada por un abogado o por cualquier otro representante autorizado.

## 3. La Asistencia a las Audiencias

El árbitro deberá guardar la privacidad de los procesos hasta donde fuera permitido por la ley. Todas aquellas personas que tienen un interés personal en el caso a ser tratado ten-drán el derecho de asistir a los procesos de arbitraje.

El árbitro deberá tener la autoridad de excluir a cualquier testigo que no fuera una de las Partes u otra persona esen-cial, durante del testimonio de otros testigos. El árbitro deberá determinar si alguna otra persona podrá asistir al proceso. A pedido de cualquiera de las Partes, el árbitro deberá excluir cualquier testigo durante el testimonio de otros testigos.

## 14. Aplazamiento de los procesos o juntas de arbitraje

A. El árbitro, debido a una causa justificada demostrada por una de las Partes, o de común acuerdo con las Partes, podrá postergar cualquier proceso o junta de

arbitraje.

B. La realización de procesos judiciales pendientes y relacionados con el mismo asunto no constituye una causa justificada para su aplazamiento.

## 15. Declaración Jurada

Antes de proseguir con la primera audiencia, cada árbitro podrá tomar el juramento para el ejercicio de su cargo y así lo hará si fuera requerido por la ley. El árbitro puede requerir que los testigos testifiquen bajo juramento conducido por una persona debidamente calificada y así lo hará si fuera requerido por la ley o requerido por alguna de las Partes.

## 16. Registro de los Procesos de Arbitraje

No habrá ningún registro estenográfico, de audio o video de los procesos de arbitraje salvo que fueran solicitados por alguna de las Partes o determinado por el árbitro. La Parte que solicite el registro deberá pagar el costo total de su producción. Se suministrarán copias del registro a pedido de las otras Partes y una vez que se haya pagado el costo de la reproducción.

## 17. Proceso

El Proceso deberá ser dirigido por el árbitro en el orden y de la manera que permita la más rápida presentación de la evidencia y de los argumentos de las Partes.

## 18. El Arbitraje en Ausencia de una de las Partes

El árbitro podrá proseguir en ausencia de una de las Partes o representantes que, después de la debida notificación, no se presentaran o no obtuvieran un aplazamiento. No se alcanzará un fallo solamente en base a la falta de asistencia de una de las Partes. El árbitro deberá requerir que cualquiera de las Partes presentes presente toda la evidencia que el árbitro requiriera con el fin de alcanzar un fallo o conceder una asignación.

## 19. Evidencia

A. El árbitro será el único que juzgará la relevancia, la importancia, y la admisibilidad de la evidencia que fuera presentada. La conformidad con las reglas legales referentes a evidencia no será necesaria.

B. El árbitro puede citar con una orden de comparecencia a testigos o documentos a pedido de una de las Partes o

por la iniciativa propia del árbitro.

C. El árbitro puede considerar la evidencia de los testigos mediante una declaración jurada o una declaración, pero le deberá dar el peso que el árbitro considere apropiado después de haber considerado cualquier objeción hecha para su admisión al proceso de arbitraje.

## 20. Presentación de la Evidencia después de la Audiencia

La evidencia documentada a ser considerada por el árbitro deberá ser presentada en la audiencia salvo que el árbitro encuentre una justificación para que se permita una presentación posterior a dicha audiencia. Se les deberá proporcionar a todas las Partes la oportunidad para examinar y comentar sobre cualquier evidencia que fuera presentada posteriormente a la audiencia. El árbitro deberá permitir la presentación de expedientes a pedido de una de las Partes y deberá determinar el proceso y el momento oportuno de dicha presentación.

## 21. El Cierre y la Reapertura de los Procesos de Arbitraje

A. Cuando el árbitro esté satisfecho que el registro está completo, incluyendo los expedientes que hayan sido presentados con su permiso después de la audiencia, el árbitro deberá declarar el cierre del proceso.

B. Se podrá reabrir el proceso por iniciativa del árbitro o mediante la solicitud de una de las Partes en cualquier momento anterior al fallo del árbitro.

## 22. Renuncia al Derecho de Objetar en el Proceso de Arbitraje

Después de haber tenido conocimiento de que no se hubiera cumplido con las disposiciones o requerimientos relacionados con estos procesos y reglas de arbitraje, cualquiera de las Partes que no se oponga por escrito será considerada como que hubiera renunciado al derecho de objetar.

## 23. Notificaciones

Cualquier comunicado, notificaciones o procesos necesarios o apropiados para la iniciación o la continuación de cualquier proceso de arbitraje efectuado de acuerdo con estas Reglas (incluyendo el fallo del árbitro, cualquier demanda judicial en relación con el mismo, o la adjudicación de una indemnización efectuada de acuerdo con estos procesos) puede ser enviado por correo dirigido a la Parte o su representante a la dirección más reciente de la cual se

tuviera conocimiento o entregado mediante un servicio de mensajería. AAAo JAMS, las Partes, y el árbitro también podrán usar la transmisión por facsímile, telex, telegrama, u cualquier otra forma escrita de comunicación electrónica con el fin de entregar cualquier notificación requerida por esta Reglas.

**4. La Comunicación con AAA, JAMS y la Compañía**

A. Cualquiera de las Partes podrá notificar o comunicarse con AAA, comunicándose con:

> Regional Administrador
> (Administrador Regional)
> American Arbitration Association
> (Asociación Americana de Arbitraje)
> 1001 Fannin St. Suite 1005
> Houston, Texas 77002
> (713) 739-13022
> Fax: (713) 739-1702

B. Cualquiera de las Partes podrá notificar o comunicarse con JAMS, comunicándose con:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C. Cualquier notificación o comunicado con la Compañía deberá ser dirigido a:

> Legal Department (Departamento Legal)
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

**25. Comunicación con el Árbitro**

No habrá ninguna comunicación con las Partes y el árbitro aparte de la comunicación en las audiencias o juntas de arbitraje. Cualquier otra forma de comunicación ya sea oral o escrita de las partes al árbitro deberán ser dirigidas a AAA o JAMS (y su copia enviada a las Partes) para ser transmitidas al árbitro, salvo que las Partes y el árbitro acuerden lo contrario.

**26. Plazo para efectuar el Fallo de Arbitraje**

El fallo se efectuará rápidamente por el árbitro, salvo que se hubiera acordado lo contrario por las Partes o que estu-

viera estipulado por las leyes aplicables, en un plazo no mayor de treinta (30) días a partir de la fecha del cierre de los procesos o, si fuera aplicable, del cierre de un proceso de arbitraje que haya sido reabierto.

## 27. El Formato del Fallo de Arbitraje

El fallo del arbitraje deberá ser por escrito y deberá ser firmado por el árbitro. El árbitro deberá redactar una declaración de las razones para el fallo, si fuera requerido en la solicitud para iniciar los procesos o en la declaración de respuesta que se hubieran presentado. El fallo del árbi - tro deberá ser ejecutado de la manera requerida por las leyes aplicables.

## 28. Modificaciones del Fallo del Árbitro

Como consecuencia de un mandato de un tribunal de jurisdicción competente, o por común acuerdo entre las Partes, el árbitro deberá modificar cualquier fallo que se hubiera dictado. El árbitro podrá modificar un fallo mediante la moción de alguna de las Partes si el árbitro considera que el fallo fuera ambiguo o presentara algún defecto, o si el fallo requiriera un acto ilegal o imposible de realizar. Estas son las únicas circunstancias por medio de las cuales un árbitro tendrá jurisdicción para retirar o modificar un dictamen o fallo.

## 29. Resolución

Si las Partes resuelven su Disputa durante el transcurso del arbitraje, el árbitro podrá describir los términos de la resolución en un fallo de consentimiento.

## 30. Alcance de la Autoridad del Árbitro

La autoridad del árbitro deberá estar limitada a la resolución de Conflictos legales entre las Partes. Como tal, el

árbitro deberá estar obligado por y deberá aplicar las leyes aplicables, incluyendo las que estén relacionadas con la determinación del peso de la prueba, así como las leyes fundamentales. El árbitro tendrá la autoridad para limitar o extender los derechos fundamentales protegidos por las leyes aplicables. El árbitro podrá también conceder un recurso de emergencia o provisional que esté o que podría estar autorizado por las leyes aplicables. El árbitro deberá estar obligado a cumplir con las disposiciones del Programa y las Reglas.

## 31. Los Procesos Judiciales y la Exclusión de Responsabilidad

A. Ni AAA, JAMS o ningún árbitro deberán constituir

ninguna de las Partes de ningún proceso judicial en relación con los procesos de arbitraje efectuados de acuerdo con estas Reglas.

B. Ni AAA, JAMS o ningún árbitro será responsable ante ninguna de las Partes por ningún acto de omisión en relación con cualquier proceso que se encuentre dentro del alcance de estas Reglas.

C. Cualquier tribunal con jurisdicción sobre las Partes podrá obligar a alguna de las Partes a proceder de acuerdo con estas Reglas en cualquier lugar y podrá hacer cumplir cualquier fallo que se haya dictado.

D. Se considerará que las Partes bajo estas Reglas consienten en que el fallo del árbitro podrá ser admitido y que dicho fallo se podrá hacer cumplir en cualquier tribunal federal o estatal que tuviera jurisdicción sobre las Partes.

E. La iniciación de, la participación en, o la eliminación de un proceso legal no constituirá una renuncia al derecho a proceder de acuerdo con estas Reglas.

F. Cualquier tribunal con jurisdicción sobre las Partes podrá presentar órdenes judiciales (incluyendo órdenes preliminares) si se cumplieran los requisitos legales necesarios y equitativos de acuerdo con las leyes aplicables, en espera de la institución de los procesos de arbitraje efectuados de acuerdo con estas Reglas.

32. Honorarios y Gastos

A. Los gastos de los testigos deberán ser pagados por la Parte que presenta dichos testigos, salvo se indique lo contrario en las leyes aplicables o en el fallo del árbitro.

B. Todos los honorarios de los abogados deberán ser pagados por la Parte que los contrató, salvo se indique lo contrario en las leyes aplicables, en el Programa o en el fallo del árbitro.

C. Los costos de las juntas a realizarse (por ejemplo: los honorarios del relator para la transcripción original) deberán ser pagados por la Parte que inicia la junta. El costo de las copias de la transcripción de la declaración jurada y cualquier otro costo deberá ser pagado por la Parte que solicite la copia.

D. Los honorarios y los gastos de los peritos, asesores y demás que fueren presentados o consultados por una de las Partes, deberán ser pagados por la Parte que utilice dichos servicios.

E. El Empleado o Aspirante deberá pagar un cargo de $150 si él o ella inicia el arbitraje o mediación. Aparte de dicho cargo, el Empleado / Aspirante no será responsable de pagar los honorarios y gastos del proceso efectuado de acuerdo a estas Reglas, incluyendo los viáticos requeridos de un árbitro o mediador, AAA o JAMS, y el costo de cualquier evidencia que fuere presentada a la discreción del árbitro.

F. Si la demanda para mediación o arbitraje es iniciada por la Compañía, dichos honorarios serán pagados por la Compañía.

G. Salvo se indique lo contrario en las leyes vigentes o en el fallo del árbitro, todos los otros gastos, honorarios y costos del proceso efectuado de acuerdo a estas Reglas serán pagados de manera equitativa por las Partes que no son Empleados/Aspirantes.

## 33. Interpretación y Aplicación de Estas Reglas

El árbitro deberá interpretar y aplicar estas Reglas en lo que respecta a los poderes y deberes del árbitro. Todas las otras reglas deberán ser interpretadas y aplicadas por AAA o JAMS.

## 34. Ley Aplicable

A. Los Procesos efectuados de acuerdo a estas Reglas y la revisión judicial de los fallos deberán ser regidos por la Ley.

B. Salvo se indique lo contrario de forma expresa en estas Reglas, las leyes fundamentales aplicadas

deberán ser leyes estatales o leyes federales fundamentales que serían aplicadas por un Tribunal de Distrito de los Estados Unidos que tomara el lugar del proceso de arbitraje.

## 35. Mediación

En cualquier momento después de que el proceso de arbitraje haya concluido, las Partes podrán acordar la mediación de su disputa por medio de la notificación de AAA o JAMS. AAA o JAMS deberán determinar que procesos se aplican a dicha mediación.

## 36. Español

Este Programa de Resolución de Conflictos se encuentra disponible en inglés y en español

**Nabors Industries, Inc.**
April 2001



**17 de enero de 2007**

**A:** Todos los Empleados de Nabors Industries, Inc. y Subsidiarias

**REF:** Programa de Resolución de Disputa de Nabors

Estimado Empleado:

A partir de diez (10) días después de la fecha de este aviso, de conformidad con la Sección 6 del Programa de Resolución de Disputa de Nabors de Nabors Industries, Inc. ("Nabors") y sus subsidiarias están enmendando el Programa y Reglamentos de Resolución de Disputa de Nabors para la determinación de todas las disputas entre los empleados y Nabors o una de sus subsidiarias.

Las enmiendas al Programa y Reglamentos están anexas en la parte posterior de esta página. Nabors estás enmendando una (1) sección del Programa de Resolución de Disputa de Nabors y una (1) sección de los Reglamentos de Resolución de Disputa de Nabors. Usted debe ya tener una copia del programa y los reglamentos actuales o pueden encontrarse en la Intranet de Nabors, de acuerdo a la política número 200.80.1, en http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

Como antes, el Programa de Resolución de Disputa de Nabors, incluyendo sus enmiendas, le da los medios más efectivos y eficientes para resolver cualquier disputa que pueda tener, a través del proceso que estimula la resolución a la oportunidad más inmediata. Los empleados no renuncian a algún derecho legal sustantivo de acuerdo al Programa. En su lugar, el programa, incluyendo sus enmiendas, estipula que cualquier asunto legal sustantivo que pueda tener, sea resuelto sobre una base individual por mediación o ante un árbitro neutral, cuya decisión será final y que lo obliga a usted y a la Compañía. De acuerdo al programa. incluyendo sus enmiendas, sin embargo, usted renuncia a todo derecho de procedimiento que pueda tener para iniciar una acción judicial en base individual, colectiva, de clase o representativa; y usted renuncia al derecho de un juicio ante jurado en relación con alguna disputa que pueda tener con la Compañía o alguna Entidad Electora (como es definida en el Programa), que incluye alguna reclamación de lesión o reclamación de discriminación en base a raza, origen nacional, género, religión, edad o discapacidad ,de acuerdo con cualquier estatuto de derechos civiles federales o estatales.

Cada individuo que trabaja para Nabors Industries, Inc. o una subsidiaria está sujeto al Programa, incluyendo sus enmiendas, excepto que las disposiciones enmendadas afecten solamente a las disputas iniciadas después de la fecha efectiva de la enmiendas y sin asuntos pendientes antes de la fecha efectiva. Su empleo continuado después de la fecha en que reciba este aviso constituirá su aceptación de las enmiendas al Programa, tanto durante y después de su empleo con la Compañía.

Esperamos continuar trabajando juntos. Si tiene alguna pregunta acerca de estas enmiendas al Programa y a los Reglamentos o a cualquier otro término de su empleo, por favor, no dude en comunicarse con el Departamento de Recursos Humanos de su empleador.

Atentamente,

NABORS INDUSTRIES, INC.

*\*Una copia de este aviso está disponible en español,*
*si la solicita al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*



## Enmienda al PROGRAMA DE RESOLUCIÓN DE DISPUTA DE NABORS:

### 4. Resolución de disputas

A. Todas las disputas que no sean de otro modo establecidas por las Partes serán finales y resueltas de manera concluyente, de acuerdo a este Programa y a los Reglamentos. Las partes renuncian a todo derecho que puedan tener a un juicio ante jurado sobre reclamaciones relacionadas de alguna manera a cualquier disputa.

B. Cada disputa será arbitrada sobre una base individual. Las Partes preceden y renuncian a cualquier derecho para unirse o consolidar reclamaciones en arbitraje cono otros o para hacer reclamaciones al arbitraje como un representante o como un miembro de una clase o en capacidad de abogado particular o similar, a menos que tales procedimientos sean convenidos por todas las partes. Ni la Compañía ni algún Empleado o Solicitante puede continuar alguna Disputa sobre una base de acción de clase, de acción colectiva o consolidada o en capacidad de representación de otras personas o entidades que hayan reclamado estar situados similarmente o participado como un miembro de clase en tal demanda. El árbitro en alguna demanda de acuerdo a este Programa no tendrá autoridad para conducir el asunto como una acción consolidada, de clase colectiva o de representación.

C. Si la limitación del procedimiento en el Párrafo B de esta Sección no puede hacerse cumplir por un tribunal en una demanda en la cual una parte busca ejercer una acción consolidada, de clase o colectiva, o actuar de otra manera en una capacidad de representación, entonces este programa aplicará a tal demanda sólo al siguiente alcance. El tribunal decidirá si la Disputa debe proceder sobre una base consolidada, de clase, colectiva u otra de representación y, si es así, definirá el alcance de la clase. Ninguna de las determinaciones anteriores será remitida al árbitro y en ningún caso el árbitro tendrá el poder para determinar la certificación de acción de clase, colectiva o de representación. Las decisiones del tribunal estarán sujetas a apelación en conformidad a las reglas de procedimiento aplicables. Si el tribunal certifica una acción de clase, colectiva u otra representación, entonces todas las otras determinaciones, dentro o relacionadas con la Disputa, serán hechas por el árbitro. El árbitro determinará las preguntas de responsabilidad para, o de la clase, como un todo y los remedios disponibles para o de la clase, como un todo. En árbitro también decidirá el desagravio, si lo hay, al cual una parte o miembro de clase puede tener derecho individualmente. Si el tribunal, no obstante, niega en última instancia una solicitud de una parte para proceder sobre una base consolidada, de clase, colectiva o de representación, entonces esa reclamación individual de la parte estará todavía sujeta a este Programa y referible al arbitraje en conformidad a sus términos.

## Enmienda a los REGLAMENTOS DE RESOLUCIÓN DE DISPUTA DE NABORS:

### 30. Alcance de la Autoridad del Árbitro

A. La autoridad del árbitro será limitada a la resolución de Disputas legales entre las Partes. Como tal, el árbitro estará obligado y aplicará la ley pertinente, que incluye aquello relacionado con la ubicación de la carga de la prueba, así como la ley sustantiva. El árbitro no tendrá la autoridad, ya sea de abreviar o aumentar, los derechos sustantivos disponibles de acuerdo con la ley aplicable. El árbitro también puede otorgar desagravio de emergencia o temporal que sea o sería autorizado por la ley aplicable. El árbitro estará obligado y cumplirá con las disposiciones del Programa y los Reglamentos.

B. El árbitro no tendrá el poder de escuchar reclamaciones en el arbitraje como una acción de clase o colectiva, o en capacidad de abogado particular o similar o sobre otra base de capacidad de representación, o ausente el consentimiento de todas las partes, sobre una base consolidada. El árbitro estará autorizado a decidir solamente las reclamaciones disputadas entre las partes individuales.



## Applicant Must Read And Verify With Signature

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me.

_____Adlg_____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _____Adlg_____ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_____Adlg_____ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. _____Adlg_____ - INITIALS

This application will be considered active for thirty (30) days.

_____Alfredo De h Haya_____          _____7-16-13_____
Applicant's Signature                            Date

HR-105 (01/07/11)

## NOTICE TO APPLICANTS REGARDING
## DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1   I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.   By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_Alfredo De La Garza_
_____
Name of Applicant

_Alfredo De La Garza_ (signature)
_____
Signature of Applicant

_7-16-13_
_____
Date

Alfredo De La Garza

## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
## DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todas los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.   Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4   Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____
Nombre del Aspirante

_____
Firma del Aspirante

_____
Fecha

HR-106

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

Alfredo De La Garza
Name of Employee (Print)

Alfredo De la Ga
Signature of Employee

7-22-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

Nombre del Empleado (Letra de Imprenta/Molde)

Firma del Empleado

Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of this form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.



Revised April, 2003

**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**
## DRILLING BID PROPOSAL
### AND
## DAYWORK DRILLING CONTRACT - U.S.

TO: NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____ , 20_____ .
to the following address: _____

---

### THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK – SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| **OPERATOR:** | Penn Virginia Oil & Gas, LP |
| Address: | 840 Gessner Road, Suite 800 |
| | Houston, Texas 77024 |
| **CONTRACTOR:** | NABORS DRILLING USA, LP |
| Address: | 515 W. Greens Road, Suite 1000 |
| | Houston, Texas 77067 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

1. **LOCATION OF WELL:**
   Well Name and Number: **To be advised by Operator**
   Parish/County: **Jefferson**   State: **Texas**   Field Name: _____
   Well location and land description: **To be advised by Operator**

   1.1 Additional Well Locations or Areas: **None.**

Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
   Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____, 20____

   or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Contractor shall have the right to terminate this Contract unless Operator pays Contractor the Standby Time Rate from such release date until the location is ready. If Contractor so terminates, the termination shall be deemed to be a termination at Operator's election, and the provisions of Sub-paragraph 6.4(a) shall apply.**

3. **DEPTH:**
   3.1 Well Depth: The well(s) shall be drilled to a depth of approximately **10,500'** Feet, or to the _____ formation, whichever is deeper, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ ** feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
   Contractor shall be paid at the following rates for the work performed hereunder.

   4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ or a mobilization day rate of $ **19,000\*** per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
   **\*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

   4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ or a demobilization day rate ~~during tear down of~~ $ **19,000\*** per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.**
   **\*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

   ~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ Operator shall pay Contractor a sum of $_____ per twenty-four (24) hour day~~

   4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

| Depth Intervals | | Without Drill Pipe | | With Drill Pipe | |
|---|---|---|---|---|---|
| From | To | | | | |
| 0 | Rig Release | $ 21,000 | per day | $ 21,000 | per day |
| | | $ | per day | $ | per day |
| | | $ | per day | $ | per day |

Using Operator's drill pipe $ **21,000** per day.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



## EXHIBIT "1-B"

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | | Size | Grade | Directional or Uncontrollable Deviated Hole | | Size | Grade |
|---|---|---|---|---|---|---|---|
| $ N/A | per ft. | | | $ N/A | per ft. | | |
| $ N/A | per ft. | | | $ N/A | per ft. | | |
| $ N/A | per ft. | | | $ N/A | per ft. | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ___eight (8)___ hours for any one rig repair job, but not to exceed twenty-four (24) hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 Standby Time Rate: $ 100% of the Operating Day Rate / per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 Drilling Fluid Rates: When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $___20___ per man per day for Contractor's rig-site personnel.
(b) $___110___ per day additional operating rate; and
(c) Cost of all labor, material and services plus ___twenty-four (24)___ hours operating rate to clean rig and related equipment.

4.8 Force Majeure Rate: $ 100% of the Operating Day Rate / per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ten (10)_____ percent for such cost of handling. When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.

4.10 Revision in Rates: The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than _____zero (0)_____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $___N/A___: Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
(f) Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119102) to determine to what extent a price variance has occurred in said spare parts and supplies;
(g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

## 5. TIME OF PAYMENT

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 Disputed Invoices and Late Payment: Operator shall pay all invoices within _____thirty (30)_____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____1 1/2_____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

## 6. TERM:

6.1 Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well or wells specified in Paragraph 1 above, or for a term of _____ commencing on the date specified in Paragraph 2 above.

6.2 Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by ___Not used.___

6.3 Early Termination:

(a) By Either Party: Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NDUSA

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.5 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4 Early Termination Compensation:

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.5) for a period of~~ _____ days or a lump sum of $ ___105,000___.

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or~~ ___plus, as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate___

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for ___five (5)___ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $_____ ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ ___as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate___

7. CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8. DRILLING METHODS AND PRACTICES:

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9. INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10. SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

11. **EQUIPMENT CAPACITY**

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder or where canal or water depths are in excess of_____feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

12. **TERMINATION OF LOCATION LIABILITY:**

*When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.*

13. **INSURANCE**

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extent of the indemnification obligations assumed herein.

14. **RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:**

14.1 *Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.*

14.2 *Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or _____100_____ percent of current new replacement cost of such equipment delivered to the well site.*

14.3 *Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.*

14.4 *Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.*

14.5 *The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.*

14.6 *Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.*

14.7 *Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against, any such liability.*

14.8 *Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.*

14.9 *Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or*

NDUSA



damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 *Liability for Wild Well:* Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 *Pollution or Contamination:* Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 *Consequential Damages:* Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 *Indemnity Obligation:* Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.6 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws



of   THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.
NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT.

**19.   INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person. firm, or corporation other than Operator's designated representatives.

**20.   SUBCONTRACTS:**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

**21.   ATTORNEY'S FEES**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

**22.   CLAIMS AND LIENS:**

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

**23.   ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment. the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

**24.   NOTICES AND PLACE OF PAYMENT:**

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

**25.   CONTINUING OBLIGATIONS:**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

**26.   ENTIRE AGREEMENT:**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

**27.   SPECIAL PROVISIONS:**

**27.1** Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

**27.2** In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

**27.3** For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $19,000 per day.

**27.4** Epoch Well Services, Inc. ("Epoch"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Epoch $260 per day (spud to release) for rental of the Epoch Rig Watch system.

The Epoch Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included with option for 6 additional probes), trip tank volume probes (1 probe included with option for 1 additional probe), and return flow paddle.

**28.   ACCEPTANCE OF CONTRACT:**

*The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this* 23 *day of* Sep *, 20* 08 *.*

OPERATOR:   Penn Virginia Oil & Gas

By:   _(signature)_

Title:   Ops Mgr

*The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this* 22nd *day of* September *, 20 08 , which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within* Seven (7) *days of the above date Contractor shall be in no manner bound by its signature thereto.*

CONTRACTOR:   Nabors Drilling USA, LP By NDUSA Holdings Corp., Its General Partner

By:   _(signature)_

Title:   Vice President Marketing and Sales

# EXHIBIT "A"

To Daywork Contract dated _____ September 22 _____, 20 _08_

Operator __Penn Virginia Oil & Gas, LP__                    Contractor __Nabors Drilling USA, LP__

Well Name and Number ___To be advised by Operator___

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in. | lbs/ft. | | ft. | hrs |
| Surface | in. | in. | lbs/ft. | | ft. | hrs |
| Protection | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |
| Production | in. | in. | lbs/ft. | | ft. | hrs |
| Liner | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 8.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

### 3. INSURANCE (See Paragraph 13)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million___ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million___ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3 Automobile Public Liability Insurance with limits of $___one (1) million___ for the death or injury of each person and $___one (1) million___ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___one (1) million___ for each accident.

3.4 ~~In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.~~

3.5 Other Insurance: __Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.__

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ___712*___, the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof.___

Engines: Make, Model, and H.P. _____

    No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

    No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size ___4 1/2"___ in. weights and grades as necessary to maintain 100,000 lbs overpull ft.; Size _____ in. _____ ft.

Drill Collars: Number and Size ___25-6 ½" (nominal); 6-8" (nominal)___

Form provided by Forms On-A-Disk
(214) 340-9428 · FormsOnADisk.com



Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____

B.O.P. Accumulator: _____

4.2 Derrick timbers.

4.3 Normal strings of drill pipe and drill collars specified above.

4.4 Conventional drift indicator.

4.5 Circulating mud pits.

4.6 Necessary pipe racks and rigging up material.

4.7 Normal storage for mud and chemicals.

4.8 Shale Shaker.

4.9 _____

4.10 _____

4.11 _____

4.12 _____

4.13 _____

4.14 _____

4.15 _____

4.16 _____

4.17 _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1 Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2 Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.

5.3 Test tanks with pipe and fittings.

5.4 Mud storage tanks with pipe and fittings.

5.5 Separator with pipe and fittings.

5.6 Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7 Labor to disconnect and clean test tanks and mud gas separator.

5.8 Drilling mud, chemicals, lost circulation materials and other additives.

5.9 Pipe and connections for oil circulating lines.

5.10 Labor to lay, bury and recover oil circulating lines.

5.11 Drilling bits, reamers, reamer cutters, stabilizers and special tools.

5.12 Contract fishing tool services and tool rental.

5.13 Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14 Conventional core bits, core catchers and core barrels.

5.15 Diamond core barrel with head.

5.16 Cement and cementing service.

5.17 Electrical wireline logging services.

5.18 Directional, caliper, or other special services.

5.19 Gun or jet perforating services.

5.20 Explosives and shooting devices.

5.21 Formation testing, hydraulic fracturing, acidizing and other related services.

5.22 Equipment for drill stem testing.

5.23 Mud logging services.

5.24 Sidewall coring service.

5.25 Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26 Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.

5.27 Casing scratchers and centralizers.

5.28 Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.

5.29 Special or added storage for mud and chemicals.

5.30 Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31 Blowout preventer testing packoff and testing services.

5.32 Replacement of BOP rubbers, elements and seals, if required, after initial test

5.33 Casing Thread Protectors and Casing Lubricants.

5.34 $H_2S$ training and equipment as necessary or as required by law.

5.35 Site septic systems.

5.36 _____Ditching around rig and location._____

5.37 _____Third party BOP testing service._____

5.38 _____

5.39 _____

5.40 _____

5.41 _____

5.42 _____

5.43 _____

5.44 _____

5.45 _____

5.46 _____

5.47 _____

5.48 _____

5.49 _____

5.50 _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com





**6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:**

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| | Item | To Be Provided By and At The Expense Of Operator | Contractor |
|---|---|:---:|:---:|
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____ ) | X | |
| 6.4 | Fuel Lines (length __of rig only__ ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property: | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: **Any required** | X | |
| | | | |
| | | | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Epoch electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number_____ | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser | X | |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ___(Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



7. OTHER PROVISIONS:

INDUSA

Revised April, 2003

## EXHIBIT "B"

(See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)    The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)    The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)    The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)    The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04




# NABORS DRILLING USA, LP

## Rig No. 712

### Diesel Electric Land Rig

**DRAWWORKS:** Mid - Continent U712 EA, with an input rating of 1,000 horsepower, Baylor 6032 Dynamatic brake, crown-o-matic and Foster catheads. Drum is lebus grooved for a 1 1/4" drilling line.

**PRIMARY POWER:** Three Caterpillar D-399 engines rated at 1,215 horsepower each, driving three KATO 1030 KW generators with a Ross Hill SCR system.

**MAST:** Dreco 136' cantilever, 136' clear height x 21' base at floor. API static hook load of 571,000 lbs. w/ 10 lines strung.

**SUBSTRUCTURE:** Dreco "Slingshot", with a 22' floor height and 18' clear height under the rotary beams. Substructure is designed for a 600,000 lbs. casing load simultaneous with a setback load of 350,000 lbs.

**MUD PUMPS:** Two Gardner Denver PZ-10 triplex mud pumps rated at 1,300 horsepower each, driven by one 1000 horsepower GE 752 motors each.

**MUD TANKS:** Two tank, 970 barrel system with a 75 barrel slugging compartment in the suction tank. Mud system is equipped with stirring guns and clean out gates. Mud mixing and 10 HP mud agitators.

**SOLIDS CONTROL:** 12 cone desilter.
2 cone desander.
Two linear motion shale shakers.

**WATER STORAGE:** One 500 barrel tank.

**FUEL STORAGE:** One 12,000 gallon tank.

**HOOK/BLOCK:** BJ 5350 Hook and National 545G Block, both rated at 350 tons.

**SWIVEL:** CE LB 400. 400 ton.

**ROTARY:** GD 27 1/2".

**ACCUMULATOR:** Koomey, 180 gallon, eight station, with an electric powered triplex pump, two air operated pumps, regulating valves and eight station remote control.

**BLOWOUT PREVENTERS:** One 11" x 5,000 psi, Annular, H2S Trim.
One 11" x 5,000 psi, Single ram, H2S Trim.
One 11" x 5,000 psi, Double ram, H2S Trim.
One 3 1/8 x 5,000 psi, choke manifold, H2S Trim.

**DRILL PIPE:** As per contract

**DRILL COLLARS:** As per contract

**MISC. EQUIPMENT:**
Automatic driller
Wireline unit
4 Pen drilling recorder
Upper Kelly valve
Full opening safety valve
Vapor proof lighting system
Spinning wrench

One air hoist
0-7 degree drill indicator
Lower Kelly valve
Inside BOP
5 1/4" x 40' Hex Kelly
Kelly spinner



### CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial Inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04

## EXHIBIT "1-C"

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.

Revised April, 2003



**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**
**DRILLING BID PROPOSAL**
**AND**
**DAYWORK DRILLING CONTRACT - U.S.**

TO: NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____ , 20 ____ ,
to the following address: _____

## THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,
## RELEASE OF LIABILITY, AND ALLOCATION OF RISK –
## SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

**OPERATOR:** Penn Virginia MC Energy, LLC
**Address:** 110 West 7th, Suite 1800
Tulsa, Oklahoma 74119
**CONTRACTOR:** NABORS DRILLING USA, LP
**Address:** 515 W. Greens Road, Suite 1000
Houston, Texas 77067

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

1. **LOCATION OF WELL:**
   Well Name and Number: To be advised by Operator *Huerta #1-30H AW CA*
   Parish/ ~~Wachita~~ *Logan AW* State: Oklahoma Field Name: _____ *AW CA*
   County:
   Well location and land description: To be advised by Operator *Sec 30-16N-3W AW CA*

   1.1 Additional Well Locations or Areas: None.

   Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
   Contractor agrees to use reasonable efforts to commence operations for the drilling of the well ~~by the~~ _____ ~~day of~~ _____ ~~, 20 ____ ,~~ or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Operator shall pay Contractor the Standby Time Rate from such release date until the location is ready.** *Operator accepts Rig upon Execution of Contract AW CA*

3. **DEPTH:**
   3.1 Well Depth: The well(s) shall be drilled to a depth of approximately **TBA** Feet, ~~or to the~~ ~~formation, whichever is deeper,~~ but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of ** _____ feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
   Contractor shall be paid at the following rates for the work performed hereunder.

   4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ or a mobilization day rate of $ **17,000*** per day. This sum shall be ~~due and payable in full at the time the rig is rigged up or positioned~~ at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
   ***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

   4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ or a demobilization day rate ~~during tear-down of~~ $ **17,000*** per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.** *If the Rig has notifications to MoveON. AW CA*
   ***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

   ~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on~~ _____ ~~, Operator shall pay Contractor a sum of $~~ _____ ~~per twenty-four (24) hour day.~~

   4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

| Depth Intervals | | | | | | | |
|---|---|---|---|---|---|---|---|
| From | To | | Without Drill Pipe | | | With Drill Pipe | |
| 0 | Rig Release | $ | 20,000** | per day | $ | 20,000** | per day |
| | | $ | | per day | $ | | per day |
| | | $ | | per day | $ | | per day |

   Using Operator's drill pipe $ **20,000*** per day. **The Operating Day Rate Includes a Canrig top drive.

   The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.



# EXHIBIT "1-D"

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | Size | Grade | Directional or Uncontrollable Deviated Hole | Size | Grade |
|---|---|---|---|---|---|
| $ __N/A__ per ft. | | | $ __N/A__ per ft. | | |
| $ __N/A__ per ft. | | | $ __N/A__ per ft. | | |
| $ __N/A__ per ft. | | | $ __N/A__ per ft. | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5  Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed *four (4)* compensation at the applicable rate for such shut down time up to a maximum of ~~eight (8)~~ hours for any one rig repair job, but not to exceed ~~thirty-six (36)~~ *twenty-four (24)* hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____ zero (0) _____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig and top drive maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6  Standby Time Rate: $_____ 100% of the Operating Day Rate / _____ per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7  Drilling Fluid Rates: When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a)  $____ 20 ____ per man per day for Contractor's rig-site personnel.
(b)  $____ 110 ____ per day additional operating rate; and
(c)  Cost of all labor, material and services plus ____ twenty-four (24) ____ hours operating rate to clean rig and related equipment

4.8  Force Majeure Rate: $_____ 100% of the Operating Day Rate / _____ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9  Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ fifteen (15) percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10  Revision in Rates: The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than ____ zero (0) ____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a)  Labor costs, including all benefits, of Contractor's personnel;
(b)  Contractor's cost of insurance premiums;
(c)  Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $__N/A__; Operator shall provide all fuel.
(d)  Contractor's cost of catering, when applicable;
(e)  If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
~~(f)Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU110102) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
(g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5.  TIME OF PAYMENT

Payment is due by Operator to Contractor as follows:

5.1  Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2  Disputed Invoices and Late Payment: Operator shall pay all invoices within ____ thirty (30) ____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____ 1 1/2 _____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

6.  TERM:

6.1  Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of~~ _____ commencing on the date specified in Paragraph 2 above.

6.2  ~~Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by~~ *Not used.*

6.3  Early Termination: *for additional well or for a period of time subject to mutually agreed rates, terms and conditions.* *Operator Notification within 15 days after S/OD has the right to extend*

(a)  By Either Party: Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.



(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4 **Early Termination Compensation:**

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty a sum equal to the standby time rate (Subparagraph 4.6) for a period of _____ days or a lump sum of $___140,000___.

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term of ___plus, as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate___

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor, but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for ___seven (7)___ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $_____ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or ___as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate___

7. **CASING PROGRAM**

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8. **DRILLING METHODS AND PRACTICES:**

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9. **INGRESS, EGRESS, AND LOCATION:**

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10. **SOUND LOCATION:**

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

**11. EQUIPMENT CAPACITY**

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder ~~or where canal or water depths are in excess of~~ _____ ~~feet.~~ Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

**12. TERMINATION OF LOCATION LIABILITY:**

*When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.*

**13. INSURANCE**

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extent of the indemnification obligations assumed herein.

**14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:**

*14.1 Contractor's Surface Equipment:* Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.

*14.2 Contractor's In-Hole Equipment:* Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or ___100___ percent of current new replacement cost of such equipment delivered to the well site.

*14.3 Contractor's Equipment - Environmental Loss or Damage:* Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.

*14.4 Operator's Equipment:* Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.

*14.5 The Hole:* In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.

*14.6 Underground Damage:* Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

*14.7 Inspection of Materials Furnished by Operator:* Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against, any such liability.

*14.8 Contractor's Indemnification of Operator:* Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

*14.9 Operator's Indemnification of Contractor:* Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or



damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15.   AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16.   NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17.   FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18.   GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

Form provided by Forms On-A-Disk
(214) 340-9428 · FormsOnADisk.com



of THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT.

**19. INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

**20. SUBCONTRACTS:**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

**21. ATTORNEY'S FEES**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

**22. CLAIMS AND LIENS:**

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

**23. ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

**24. NOTICES AND PLACE OF PAYMENT:**

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

**25. CONTINUING OBLIGATIONS:**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

**26. ENTIRE AGREEMENT:**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

**27. SPECIAL PROVISIONS:**

27.1 Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $17,000 per day.

27.4 Canrig Drilling Technology Ltd. ("Canrig"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Canrig $260 per day (spud to release) for rental of the Canrig Rig Watch system.

The Canrig Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included), trip tank volume probes (1 probe included), and return flow paddle.

**28. ACCEPTANCE OF CONTRACT:**

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this _8th_ day of _Sept_, 20_10_.

OPERATOR: _Penn Virgina MC Energy, LLC_

By: _____

Title: _Regional Mgr_

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this ___3rd___ day of ___September___, 20_10_, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within ___Seven (7)___ days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR: _Nabors Drilling USA, LP By: NDUSA Holdings Corp., its General Partner_

By: _E. Nelson_

Title: _Vice President Contracts_

# EXHIBIT "A"

To Daywork Contract dated ___September 3___ , 20 _10_

Operator __Penn Virginia MC Energy, LLC__      Contractor __Nabors Drilling USA, LP__

Well Name and Number __To be advised by Operator__

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in. | lbs/ft. | | ft. | hrs |
| Surface | in. | in. | lbs/ft. | | ft. | hrs |
| Protection | in. | in. | lbs/ft. | | ft. | hrs |
| | in | in. | lbs/ft. | | ft. | hrs |
| Production | in. | in. | lbs/ft. | | ft. | hrs |
| Liner | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 6.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

### 3. INSURANCE (See Paragraph 13)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million___ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million___ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3 Automobile Public Liability Insurance with limits of $___one (1) million___ for the death or injury of each person and $___one (1) million___ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___one (1) million___ for each accident.

3.4 In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.

3.5 Other insurance: __Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.__

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services end labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ___F26*___, the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof.___

Engines: Make, Model, and H.P. _____

     No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

     No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size ___5"___ in. weights and grades as necessary to maintain 100,000 lbs overpull ft ; Size: _____ in. _____ ft.

Drill Collars: Number and Size ___43-6 3/8" (nominal); 10-9" (nominal)___

Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|------|--------------------|--------------|--------|
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____

B.O.P. Accumulator: _____

4.2   Derrick timbers.

4.3   Normal strings of drill pipe and drill collars specified above.

4.4   Conventional drift indicator.

4.5   Circulating mud pits.

4.6   Necessary pipe racks and rigging up material.

4.7   Normal storage for mud and chemicals.

4.8   Shale Shaker.

4.9   _____

4.10  _____

4.11  _____

4.12  _____

4.13  _____

4.14  _____

4.15  _____

4.16  _____

4.17  _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1   Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2   Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.

5.3   Test tanks with pipe and fittings.

5.4   Mud storage tanks with pipe and fittings.

5.5   Separator with pipe and fittings.

5.6   Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7   Labor to disconnect and clean test tanks and mud gas separator.

5.8   Drilling mud, chemicals, lost circulation materials and other additives.

5.9   Pipe and connections for oil circulating lines.

5.10  Labor to lay, bury and recover oil circulating lines.

5.11  Drilling bits, reamers, reamer cutters, stabilizers and special tools.

5.12  Contract fishing tool services and tool rental.

5.13  Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14  Conventional core bits, core catchers and core barrels.

5.15  Diamond core barrel with head.

5.16  Cement and cementing service.

5.17  Electrical wireline logging services.

5.18  Directional, caliper, or other special services.

5.19  Gun or jet perforating services.

5.20  Explosives and shooting devices.

5.21  Formation testing, hydraulic fracturing, acidizing and other related services.

5.22  Equipment for drill stem testing.

5.23  Mud logging services.

5.24  Sidewall coring service.

5.25  Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26  Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.

5.27  Casing scratchers and centralizers

5.28  Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.

5.29  Special or added storage for mud and chemicals.

5.30  Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31  Blowout preventer testing packoff and testing services.

5.32  Replacement of BOP rubbers, elements and seals, if required, after initial test

5.33  Casing Thread Protectors and Casing Lubricants.

5.34  $H_2S$ training and equipment as necessary or as required by law.

5.35  Site septic systems.

5.36  __Ditching around rig and location.__

5.37  __Third party BOP testing service.__

5.38  _____

5.39  _____

5.40  _____

5.41  _____

5.42  _____

5.43  _____

5.44  _____

5.45  _____

5.46  _____

5.47  _____

5.48  _____

5.49  _____

5.50  _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| Item | To Be Provided By and At The Expense Of Operator | Contractor |
|------|------|------|
| 6.1 Cellar and Runways | X | |
| 6.2 Ditches and sumps | X | |
| 6.3 Fuel (located at _____) | X | |
| 6.4 Fuel Lines (length ___ of rig only ___) | | X |
| 6.5 Water at source, including required permits | X | |
| 6.6 Water well, including required permits | X | |
| 6.7 Water lines, including required permits | X | |
| 6.8 Water storage tanks _____ capacity (Per rig Inventory) | | X |
| 6.9 Potable water and bottled water | X | |
| 6.10 Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 Maintenance of water well, if required | X | |
| 6.12 Water Pump | X | |
| 6.13 Fuel for water pump | X | |
| 6.14 Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 Transportation of Contractor's property: | | |
| Move in | See Paragraph 4.1 | |
| Move out | See Paragraph 4.2 | |
| 6.16 Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 Special strings of drill pipe and drill collars as follows: Any required | X | |
| 6.18 Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 Rate of penetration recording device (Canrig electronic) | | X |
| 6.22 Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 Casing tools | X | |
| 6.24 Power casing tongs | X | |
| 6.25 Laydown and pickup machine | X | |
| 6.26 Tubing tools | X | |
| 6.27 Power tubing tong | X | |
| 6.28 Crew Boats, Number | N/A | N/A |
| 6.29 Service Barge | N/A | N/A |
| 6.30 Service Tug Boat | N/A | N/A |
| 6.31 Rat Hole | X | |
| 6.32 Mouse Hole | X | |
| 6.33 Reserve Pits | X | |
| 6.34 Upper Kelly Cock | | X |
| 6.35 Lower Kelly Valve | | X |
| 6.36 Drill Pipe Safety Valve | | X |
| 6.37 Inside Blowout Preventer | | X |
| 6.38 Drilling hole for or driving for conductor pipe | X | |
| 6.39 Charges, cost of bonds for public roads | X | |
| 6.40 Portable Toilet | X | |
| 6.41 Trash Receptacle | X | |
| 6.42 Linear Motion Shale Shaker (Per rig Inventory) | | X |
| 6.43 Shale Shaker Screens | X | |
| 6.44 Mud Cleaner | X | |
| 6.45 Mud/Gas Separator | X | |
| 6.46 Desander | | X |
| 6.47 Desilter | | X |
| 6.48 Degasser (Per rig Inventory) | | X |
| 6.49 Centrifuge | X | |
| 6.50 Rotating Head | X | |
| 6.51 Rotating Head Rubbers | X | |
| 6.52 Hydraulic Adjustable Choke | X | |
| 6.53 Pit Volume Totalizer | X | |
| 6.54 Communication, type ___ (Cellular phone for rig use only) | | X |
| 6.55 Forklift, capacity ___ Model JLG G9-43A (NDUSA, LP preferred model) or a JLG G10-55A (10,000 lb lift with outriggers) with a Star Industries Quick-Tach Truss boom Model 1302-JLG | X | |
| 6.56 Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | |
| 6.58 | | |
| 6.59 | | |
| 6.60 | | |

7.    OTHER PROVISIONS:

*(U.S. Daywork Contract - "Exhibit A" - Page 4)*
Copyright © 2003 International Association of Drilling Contractors

Form provided by **Forms On-A-Disk**
(214) 340-9429 · FormsOnADisk.com



Revised April, 2003

## EXHIBIT "B"

### (See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

*(U.S. Daywork Contract - "Exhibit B" - Page 1)*
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9428 · FormsOnADisk.com

## EXHIBIT "C"

### CONTRACTORS SPECIAL PROVISIONS

1.  Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2.  Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3.  Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4.  Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5.  Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6.  Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7.  Operator shall furnish all screens for shale shakers.

8.  Operator shall furnish all potable water for Operator and Contractor personnel.

9.  Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10.  Operator will be responsible for the provision and maintenance of any site septic systems.

11.  Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12.  All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13.  The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14.  Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15.  In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 *et seq.*, Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16.  Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17.  In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Oklahoma_May04



**DRAWWORKS:** 1,500 horsepower AC drawworks featuring regenerative AC braking. Drawworks is driven by two (2) 800 horsepower AC motors. Autodrill functionality utilizing AC motor.

**POWER GENERATION:** Three (3) – Caterpillar 3512B engines rated at 1,476 horsepower each, driving one (1) Kato 1365 KW generator, for a total of 4,428 horsepower. AC power generation, Variable Frequency Drive (VFD) and MCC unitized in a single house.

**MAST:** Pyramid Fast Moving Land Rig 152' three section mast manufactured to API-4F specification. Static hook load of 1,000,000 lbs. on 12 lines. Mast is raised and lowered utilizing hydraulic cylinders. Mast has integrated top drive rails (enables top drive to travel in mast during rig move).

**SUBSTRUCTURE:** Pyramid hydraulically elevated substructure with 30' floor height and 26' clear height under rotary beams. Substructure is rated for 1,000,000 lbs rotary load simultaneous with a 600,000 lbs setback load.

**DRILLER'S CONTROL:** Climate controlled driller's cabin provides integrated joystick control utilizing PLC technology. Touch screen controls provide state-of-the-art monitoring, control of rig equipment and drilling parameters.

**MUD PUMPS:** Two (2) 1,600 horsepower mud pumps. Each powered by one (1) 1600 horsepower AC motor, pumps are equipped with hydraulic liner retention and pump rod systems.

**MUD TANKS:** Three (3) tank system total capacity approximately 1,500 BBL; four (4) 6" x 8" centrifugal pumps powered by 100 horsepower electric motors. 100 BBL trip tank.

**SOLIDS CONTROL:** Three (3) Swaco Mongoose shale shakers
One (1) Swaco mud cleaner with desander / desilter.

**WATER STORAGE:** One (1) 500 BBL water tank.

**FUEL STORAGE:** One (1) 20,000 gallon diesel fuel tank.

**TRAVELING BLOCK** 500 ton traveling block, grooved for 1 3/8" drill line.

**TOP DRIVE** Canrig 1250 AC, 500 ton integrally mounted top drive system.

**ROTARY:** 37-1/2" rotary table, independently driven by AC motor.

**ACCUMULATOR:** Six (6) station accumulator unit with one (1) electric triplex and two (2) air operated pumps. Unit will be designed in accordance with API 16D. Remote panel will be mounted at drill floor.

**BLOWOUT PREVENTERS:**
Annular: 13-5/8" x 5000 psi.
Double Ram: 13-5/8" x 10,000 psi.
Single Ram: 13-5/8" x 10,000 psi.
Manifold: 4-1/16" x 3-1/16" 10,000 psi.

**DRILL PIPE:** As per contract.

**DRILL COLLARS:** As per contract.

**ADD. EQUIPMENT:**
Dedicated man-rider winch
Varco ST-80 Iron Roughneck
BOP Handling system
Rotating mousehole
Intercom system

Automated catwalk / pipe handling system
Two (2) air operated hoists
Air operated slips
Camera system
Vacuum degasser

EXHIBIT "C"

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 *et seq.*, Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

# EXHIBIT "1-E"

Exhibit_C_01_Oklahoma_May04



## Applicant Must Read And Verify With Signature

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me. _____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _____ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. _____ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay _____ - INITIALS

This application will be considered active for thirty (30) days.

_____
Applicant's Signature

_____1-2-13_____
Date

**EXHIBIT "1-F"**

## <u>NOTICE TO APPLICANTS REGARDING</u>
## <u>DISPUTE RESOLUTION PROGRAM</u>

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1.  I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.  By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_John Paul Adams_
_____
Name of Applicant

_Signature of Applicant_
_____
Signature of Applicant

_1-2-13_
_____
Date


## <u>AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN</u>
## <u>DE CONFLICTOS</u>

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todos los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Solo proporcione este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.  Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4.  Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____
Nombre del Aspirante

_____
Firma del Aspirante

_____
Fecha

HR-106



## Applicant Must Read And Verify With Signature

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me.

_____Adlg_____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. ___Adlg___ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

___Adlg___ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. ___Adlg___ - INITIALS

This application will be considered active for thirty (30) days.

_____Alfredo De La Haya_____          ___7-16-13___
Applicant's Signature                        Date

HR-105 (01/07/11)

## EXHIBIT "1-G"

## NOTICE TO APPLICANTS REGARDING
## DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1.  I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.  By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_Alfredo De la Garza_
Name of Applicant

_Alfredo De la Garza_
Signature of Applicant

_7-16-13_
Date

Alfredo De La Garza

## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
## DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todos los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.  Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4.  Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

Nombre del Aspirante

Firma del Aspirante

Fecha

HR-106

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_____
Name of Employee (Print)

_____
Signature of Employee

_____
1-7-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

_____
Nombre del Empleado (Letra de Imprenta/Molde)

_____
Firma del Empleado

_____
Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

**EXHIBIT "1-H"**

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_Alfredo De la Garza_
Name of Employee (Print)

_Alfredo De la Ga_
Signature of Employee

_7-22-13_
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

Nombre del Empleado (Letra de Imprenta/Molde)

Firma del Empleado

Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

**EXHIBIT "1-I"**

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED and REDACTED minors | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§<br>§ | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 281ST JUDICIAL DISTRICT |

## AFFIDAVIT OF KATHERINE RYAN

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

Before me, the undersigned notary, on this day personally appeared Katherine Ryan, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1.  "My name is Katherine Ryan. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.  I am an in house attorney for Penn Virginia Corporation. Penn Virginia Corporation is the parent company to Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC (collectively, "Penn Virginia").

3.  In my capacity as in house attorney, I am familiar with Penn Virginia's corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also familiar with the Nabors Dispute Resolution Program ("DRP").

4.  As evidence of Penn Virginia's intent that it participate in the DRP, on September 23, 2008, Penn Virginia Oil & Gas, L.P., on behalf of itself, its parent, subsidiary, and affiliated corporations agreed to be bound by the DRP as an "Electing Entity" pursuant to the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as

**EXHIBIT "2"**

Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

5.  As further evidence of Penn Virginia's intent that it participate in the DRP, on September 8, 2010, Penn Virginia MC Energy, LLC, on behalf of itself, its parent, subsidiary, and affiliated corporations agreed to be bound by the DRP as an "Electing Entity" pursuant to the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E.

6.  As an "Electing Entity," Penn Virginia is required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

7.  At all times relevant to this matter, Penn Virginia was engaged in interstate commerce as it is in the business of producing oil and gas resources in both Texas and other states of the United States."

FURTHER AFFIANT SAYETH NOT.

_____
Katherine Ryan

Sworn to and subscribed before me by Katherine Ryan on the 17 day of June, 2015.

_____
Notary Public in and for the State of Texas
My Commission expires:

_Sept 3, 2016_

VIRGINIA B SILVER
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT. 3, 2016

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED and REDACTED minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § | 281ST JUDICIAL DISTRICT |

## ORDER ON DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP, LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE

On the _____ day of _____, 2015, the Court considered Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel Arbitration and to Abate, pending such arbitration. After considering the motion, the Court GRANTS Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel Arbitration and to Abate.

Therefore, Plaintiff, Alfredo "Freddie" De La Garza, Individually and as Next Friend of REDACTED and Intervenor, John Paul "J.P." Adame, Individually and as Next Friend of REDACTED REDACTED are ORDERED to arbitrate their claims against Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC in accordance with the Nabors Dispute Resolution Program.

It is further ORDERED that this case shall be ABATED until the resolution of such arbitration.

_____
PRESIDING JUDGE

## CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA,<br>INDIVIDUALLY and AS NEXT FRIEND<br>FOR REDACTED and<br>REDACTED , minors<br><br>v.<br><br>PENN VIRGINIA OIL & GAS, L.P., PENN<br>VIRGINIA OIL & GAS GP LLC,<br>MIKE FERGUSON, TRIFECTA OILFIELD<br>SERVICES, LLC, CUDD PRESSURE<br>CONTROL, INC., ROYWELL<br>SERVICES, INC., and OAKS PERSONNEL<br>SERVICES, INC. d/b/a THE OAKS GROUP | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br>215th JUDICIAL DISTRICT |

**PLAINTIFFS' RESPONSE TO DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P.
AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION TO COMPEL ARBITRATION
AND TO ABATE**

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Plaintiff Alfredo De La Garza, individually and as next friend for REDACTED

REDACTED minors, and files this Plaintiffs' Response to Defendants,

Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel

Arbitration and to Abate, and in support thereof would respectfully show the Court the following:

### I. SUMMARY OF ARGUMENT

There is no valid agreement to arbitrate between Plaintiff Alfredo De La Garza and

Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC (hereinafter

referred to collectively as the Penn Virginia defendants). The incident made the basis of this

lawsuit occurred on April 29, 2014 on the Welhausen A2H well in Lavaca County, Texas. The

work done between Nabors Completion & Production Services Co. (hereinafter referred to as

Plaintiffs' Response to Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's     Page 1
Motion to Compel Arbitration and to Abate

## EXHIBIT "B"

"NCPS"), and Penn Virginia Oil & Gas, L.P. , the operator of the well, was performed pursuant to a Master Service Contract (hereinafter referred to as the "MSC") dated March 28, 2013. A copy of this MSC is attached as **Exhibit "A"**. This MSC does not reference Nabors Industries, Inc.'s Dispute Resolution Program (hereinafter referred to as the "DRP"), and does not provide that either Penn Virginia Oil & Gas, L.P. or Penn Virginia Oil & Gas GP LLC is an "electing entity" or would participate in Nabors Industries, Inc.'s DRP. A copy of the DRP is attached as **Exhibit "B"**. The Penn Virginia defendants' argument that Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC are "electing entity[ies]" under the DRP is not a valid argument. The Penn Virginia defendants rely on a 2008 drilling contract between Penn Virginia Oil & Gas, L.P. and Nabors Drilling USA, LP for a well in Jefferson County, Texas, attached as **Exhibit "C"**, and a 2010 drilling contract between Penn Virginia MC Energy, LLC and Nabors Drilling USA, LP for a well in Oklahoma, attached as **Exhibit "D"**, as the basis for their argument that they were an "electing entity" under the Nabors Industries, Inc.'s DRP. Both of these contracts were only valid for the term for completion of operations for drilling those wells. Those contracts did not control any of the work done on the Welhausen A2H well or the relationship between NCPS and the Penn Virginia entities for the work done on the Welhausen A2H well in April, 2014.

The drilling contracts relied on by the Penn Virginia defendants only apply to "present and former" employees and applicants of Nabors' entities at the time of the contracts. Plaintiff Alfredo De La Garza was not a "present or former" employee of any Nabors entity as of 2008 or 2010, as noted in Keith Nicholson's affidavit, attached as **Exhibit "E"**.

Furthermore, arbitration cannot be compelled in this matter because claims asserted by Plaintiffs Alfredo De La do not fall within the scope of the DRP and its arbitration provisions. Additionally, Defendants have failed to establish that Plaintiffs REDACTED                              ,

minors, are subject to any valid arbitration agreement. Plaintiffs further contend that arbitration should not be compelled in this matter because Defendants have waived any right to compel arbitration in this matter.

For the foregoing reasons, Plaintiffs respectfully request that the Penn Virginia defendants' Motion to Compel Arbitration and to Abate be denied. In the alternative, Plaintiffs request that their continuance of Defendants' motion be granted; that they be allowed to conduct discovery as to arbitrability; that they be allowed to participate in a full evidentiary hearing as to the Penn Virginia defendants' Motion to Compel Arbitration and to Abate; and that upon hearing the arguments and evidence, that Defendants' Motion to Compel Arbitration and to Abate be denied.

Plaintiffs request that their claims against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group be severed from any claims against the Penn Virginia defendants and that these claims be tried on October 19, 2015. While Defendant Mike Ferguson has pled for arbitration, he has not filed a motion for arbitration, a notice of arbitration, nor has he joined in the Penn Virginia defendants' motion for arbitration. Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group has not asserted a claim or plead that it is entitled to arbitration in connection with Plaintiffs' claims.

## II. INTRODUCTION & FACTUAL BACKGROUND

On April 29, 2014, Plaintiff Alfredo De La Garza was an employee of Nabors Completion & Production Services Co. (hereinafter referred to as "NCPS"). NCPS is a subsidiary of Nabors Industries, Inc. On this date, Plaintiff was working on Nabors Rig No. 1480, outside of Shiner, Texas. Penn Virginia Oil & Gas, L.P. was the operator of the well and was directing workover and completion operations on the well.

The well service operations on the Welhausen A2H well were being conducted pursuant to a MSC between Penn Virginia Oil & Gas, L.P. and NCPS dated March 28, 2013. The MSC is attached to this response as **Exhibit "A"**. By its terms, the MSC supersedes all prior agreements between the parties. The agreement states in part that, "This Contract shall become effective the date first hereinabove written and shall supersede all prior service contracts between the parties hereto with respect to new work or services commenced during the term of this Contract to be performed in connection with this Contract." Exhibit "A", page 2. There is no reference in the MSC to Nabors Industries, Inc.'s DRP. The MSC does not contain an agreement that either of the Penn Virginia defendants and NCPS agree that Penn Virginia Oil & Gas, L.P. or Penn Virginia Oil & Gas GP LLC will be an "electing entity" in Nabors Industries, Inc.'s DRP.

During the operations, there was a pressure control failure that caused serious and permanent injuries to Plaintiff Alfredo De La Garza. As a result of the serious, permanent, and disabling injuries to Plaintiff Alfredo De La Garza, minors Plaintiffs REDACTED

have suffered a loss of consortium.

Plaintiffs filed this action against the Penn Virginia defendants on July 24. 2014. A copy of this petition is attached as **Exhibit "F"**. Plaintiffs' filed their First Amended Original Petition on September 8, 2014. A copy of Plaintiffs' First Amended Original Petition is attached as **Exhibit "G"**. Plaintiffs filed their Second Amended Original Petition on October 1, 2014. A copy is of this petition is attached as **Exhibit "H"**.

On June 18, 2015, the Penn Virginia defendants filed their Motion to Compel Arbitration and to Abate. A copy of the Nabors Industries, Inc.'s DRP is attached as **Exhibit "B"**. In this motion, the Penn Virginia defendants contend that Plaintiffs' claims against Defendants fall within

the scope of a valid arbitration agreement governed by Nabors Industries, Inc.'s DRP and the Federal Arbitration Act.

The Nabors' DRP states that"[t]he Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment related to and arising out of a current, former, or potential employment relationship with the Company." **Exhibit "B"** at p. 2. Nabors' DRP further provides the following definitions:

> " 'Company' means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity of Sponsor, any Electing Entity... provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program."

> " 'Dispute' means all legal and equitable claims, demand, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to: ... any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment."

> " 'Electing Entity' means any legal entity that has agreed to be bound by the Program as provided herein."

> " 'Employee' means any person who is or has been in the employment of the Company on or after the effective date of this Program..."

> " 'Party' means, with respect to a particular Dispute, affected person and/or entities bound by this Program."

> " 'Sponsor' means Nabors Industries, Inc., a Delaware corporation."

*Id.* at pp. 2-4.

As to "Electing Entities", the Nabors' DRP provides: "[c]orporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor."

*Id.* at p. 7. The DRP further provides that: "[e]lection may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity." *Id.*

The Penn Virginia defendants rely on the 2008 International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract – U.S. (hereinafter referred to as the "2008 drilling contract"), attached as **Exhibit "C"**. NCPS was not a party to this contract. The 2008 drilling contract between Penn Virginia Oil & Gas, L.P. and Nabors Drilling USA, LP was only in force and effect until drilling operations were completed for the well which was being drilled in Jefferson County, Texas in 2008. The term of that agreement is defined in Paragraph 6.1:

> "Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of~~ _____, commencing on the date specified in Paragraph 2 above." Exhibit "C", p. 1.

By its terms, the provisions relied on by the Penn Virginia defendants relating to Nabors Industries, Inc.'s DRP only apply to "the present and former Employees and Applicants of Nabors" as of the date of this drilling contract in 2008:

> "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and **the present and former Employees and Applicants of Nabors** pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time [emphasis added]. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them." Exhibit C, page 1 of the 2008 drilling contract's Exhibit "C": Contractors Special Provisions.

The Penn Virginia defendants also rely on the 2010 International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract – U.S. (hereinafter referred to as the "2008 drilling contract"), attached as **Exhibit "D"**. NCPS was also not a party to this contract. The 2010 drilling contract between Penn Virginia MC Energy, LLC and Nabors Drilling USA, LP was only in force and effect until drilling operations were completed for the well which was being drilled in Logan County, Oklahoma in 2010. The term of that agreement is defined in Paragraph 6.1:

> "Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of~~ _____, commencing on the date specified in Paragraph 2 above." Exhibit D, page 1.

By its terms, the provisions relied on by the Penn Virginia defendants relating to Nabors Industries, Inc.'s DRP only apply to "the present and former Employees and Applicants of Nabors" as of the date of this agreement in 2010:

> "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and **the present and former Employees and Applicants of Nabors** pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time [emphasis added]. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them." Exhibit D, page 1 of the 2010 drilling contract's Exhibit "C": Contractors Special Provisions.

Plaintiff Alfredo De La Garza was not a present or former employee of NCPS in 2008 or in 2010. Plaintiff Alfredo De La Garza initially applied for employment with NCPS on July 16,

2013. Mr. De La Garza's application is attached as **Exhibit "I"**. Further, per Mr. Keith Nicholson's sworn affidavit, Mr. De La Garza executed a document entitled "Application for Hourly and Daily Employment." His affidavit is attached as **Exhibit "E"**.

There is no written agreement purporting to bind the minor Plaintiffs REDACTED to arbitration.

There is no written agreement purporting to bind Defendant Mike Ferguson or Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group to arbitration.

### III. APPLICABLE LEGAL STANDARDS

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., a party seeking to compel arbitration must first establish the existence of an arbitration agreement subject to the FAA. *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001) (orig. proceeding). If one party denies that there is a binding arbitration agreement, the trial court may summarily decide whether to compel arbitration on the basis of uncontroverted affidavits, pleadings, discovery, and stipulations. *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex.1992) (orig. proceeding). However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts. *Id.*; TEX. CIV. PRAC. & REM. CODE § 171.021.

When deciding whether the parties agreed to arbitrate under the FAA, court should apply ordinary state law principles regarding the formation of contract. *In re D. Wilson Const. Co.,* 196 S.W.3d 774, 781 (Tex. 2006); 9 U.S.C. § 1, et. seq.; TEX. CIV. PRAC. & REM. CODE § 171.001 et seq. An arbitration agreement must meet all the requisite contract elements, and even though there is a strong presumption favoring arbitration, the presumption only arises after the part seeking to compel arbitration proves that a valid arbitration agreement exists. *J.M. Davidson, Inc. v.*

*Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *In re Halliburton*, 80 S.W.3d 566, 570 (Tex. 2002). The policy in favor of arbitration agreements does not apply when a court is examining the threshold question of whether an arbitration agreement exists. *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 130 S. Ct. 2847 (2010); *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 183 (Tex. 2009). If the trial court finds there is a valid agreement to arbitrate, the burden shifts to the party opposing arbitration to prove his defenses. *J.M. Davidson, Inc.*, 128 S.W.3d at 227. An agreement to arbitrate may be avoided on a ground that exists at law or in equity for the revocation of a contract. TEX. CIV. PRAC. & REM. CODE § 171.001; *Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013).

Once a valid agreement to arbitrate has been established, the court must further determine whether the non-movant's claims fall within the scope of the arbitration agreement. *In re First Merit Bank, N.A.*, 52 S.W.3d at 753. Federal policy embodied in the FAA favors agreements to arbitrate and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. *Id.* at 753. But those public policies favoring arbitration do not extend to any favorable inclination one way or the other with regard to the questions of who is bound by the arbitration agreement because the purpose of the FAA is to "make arbitration agreement as enforceable as other contracts, but not more so." *In re SSP Partners d/b/a Circle K and Jose Almaguer*, 241 S.W.3d 162, 167-168 (Tex. App. – Corpus Christi 2007, orig. proceeding [mand. denied]).

## IV. ARGUMENT & AUTHORITIES

### A. Defendants have failed to prove the existence of an agreement to arbitrate between Plaintiff Alfredo De La Garza and the Penn Virginia defendants.

The Court cannot properly compel arbitration of Plaintiffs claims in this matter because the Penn Virginia defendants have failed to prove that an agreement to arbitrate exists between either Penn Virginia entity and Plaintiffs.

In Defendants' Motion to Compel Arbitration, there is no contention that there is any direct arbitration agreement between Plaintiffs and the Penn Virginia defendants. Rather, the Penn Virginia defendants rely entirely on Nabors' Dispute Resolution Program relating to Plaintiff Alfredo De La Garza's employment with Nabors Industries, Inc.'s subsidiary, NCPS.

The initial burden of the party seeking to compel arbitration – to establish the arbitration agreement's existence – includes proving the entity seeking to enforce the arbitration agreement was a party to it or had the right to enforce the agreement notwithstanding. *See Pepe Int'l Dev. Co. v. Pub Brewing Co.,* 915 S.W.2d 925, 931 (Tex. App. – Houston [1st Dist.] 1996, no writ).

The MSC specifically provides that it will govern work by and among Penn Virginia Oil & Gas Corporation, Penn Virginia Oil & Gas, L.P., Penn Virginia MC Energy L.L.C., and Nabors Completion & Production Services Co. The parties to that agreement did not choose to include any reference to the Nabors Industries, Inc.'s DRP. The contract did not include any agreement that either Penn Virginia defendant would be an "electing entity" in the Nabors Industries, Inc.'s DRP. As a matter of law, there is no agreement to arbitrate between Plaintiffs and the Penn Virginia defendants based on the MSC.

Despite their contentions, the Penn Virginia defendants have not established their right to enforce any arbitration agreement that may exist between Plaintiff Alfredo De La Garza and NCPS. The Penn Virginia defendants cannot avail themselves of the Nabors Dispute Resolution Program as an "Electing Entity", as any agreement entered into by Defendants to be bound by Nabors' DRP fails by the express terms of the DRP.

As dictated by the terms of Nabors' DRP, an Electing Entity "may elect to be bound by this Program by written agreement with Sponsor." *Id.* at p. 7. The Sponsor under the DRP is Nabors Industries, Inc. *Id.* at p. 4. Although Defendants state that it is an "undisputed fact" that they are Electing Entities of Nabors' DRP, no written agreement between the Penn Virginia defendants and Nabors Industries, Inc., as a signatory, is attached to Defendants' motion establishing such status. Instead, Defendants attached two "IADC contracts" to its motions: (1) a 2008 contract executed by Defendant Penn Virginia Oil & Gas, LP and Nabors Drilling USA, LP. **Exhibit "C"**; and, (2) a 2010 contract executed by Penn Virginia MC Energy and Nabors Drilling USA, LP. **Exhibit "D"**. Neither contract establishes a written agreement with Nabors Industries, Inc., the Sponsor of Nabors' DRP; therefore, the Penn Virginia defendants cannot take advantage of any agreement to arbitrate that may exist between Plaintiff Alfredo De La Garza and his employer NCPS because Defendants do not qualify as an Electing Entity under the Program. Each of these contracts would certainly have expired by its own terms years before the incident made the basis of the suit occurred.

Plaintiffs should not be compelled to arbitrate their claims against the Penn Virginia defendants in absence of an agreement to do so. *Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Services, Inc.,* 73 S.W.3d 545, 548 (Tex. App. - Houston [1st Dist.] 2002, orig. proceeding [mand. denied]). The burden is upon the party seeking to compel arbitration to establish the existence of an arbitration agreement. *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex. 1999). Because Defendants have failed to meet this burden, Defendant's Motion to Compel Arbitration and to Abate should be denied as to the claims of Plaintiffs Alfredo De La Garza and minor Plaintiffs REDACTED

**B. Defendants have failed to establish that Plaintiff Alfredo De La Garza's claims are within the scope of any arbitration agreement.**

Defendants have failed to establish that Plaintiff Alfredo De La Garza's claims fall within the scope of any agreement to arbitrate.

If a valid arbitration agreement is found to exist, the Court would then need to determine if the claims asserted by Plaintiffs fall within the scope of the arbitration agreement. *Personal Sec. & Safety Sys., Inc. v. Motorola, Inc.,* 297 F.3d 388, 392 (5th Cir. 2002); *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d at 573. Only matters subject to the covenant of arbitration should be arbitrated. *See Wee Tots Pediatrics, P.A. v. Morohunfola,* 268 S.W.3d 784, 793 (Tex. App.—Fort Worth 2008, no pet. & orig. proceeding). In determining whether a claim falls within the scope of an arbitration agreement, looks at the facts alleged, rather than the legal causes of actions presented, and considers whether the facts touch matters covered by the underlying arbitration agreement. *Rachal v. Reitz,* 403 S.W.3d at 846. Here, Plaintiff Alfredo De La Garza's claims are outside the express scope of the purported arbitration agreement and elections allegedly made by the Penn Virginia defendants in 2008 and 2010.

In Defendants' Motion to Compel Arbitration, the Penn Virginia defendants contend that Plaintiff Alfredo De La Garza's claims "clearly fall within the scope of the arbitration agreement" because "the DRP clearly and unequivocally states that it applies to and binds the Company, each Employee and Applicant." Defendants argue that Plaintiff Alfredo De La Garza was an employee of NCPS at the time of the incident giving rise to Plaintiffs' claims and therefore is subject to Nabors' DRP. Defendants' contentions fail to take into account the specific terms of the election made by Defendants its written agreements to be bound by the Nabors' DRP. Specifically, in the agreements the Penn Virginia defendants elected to be bound by Nabors' DRP as to current and former employees of Nabors Industries, Inc.

In their motion, Defendants attached two "IADC contracts": (1) the 2008 contact executed by Defendant Penn Virginia Oil & Gas, LP and Nabors Drilling USA, LP (Exhibit "C"); and, (2) the 2010 contract executed by Penn Virginia MC Energy and Nabors Drilling USA, LP (Exhibit "D"). Defendants contend that a provision in the "Contractors Special Provisions" of these contracts constitutes Defendants' agreement to be bound to Nabors' DRP. In both contracts, the provision states:

> "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the *present and former* Employees and Applicants of Nabors".

Exhibit "C", page 1 of the 2008 drilling contract's Exhibit "C": Contractors Special Provisions (emphasis added); Exhibit "D", page 1 of the 2008 drilling contract's Exhibit "C": Contractors Special Provisions (emphasis added).

Under the express terms of the "Contractors Special Provisions" that Defendants contend binds them to Nabors' DRP, Defendants elected to limit its participation in the DRP as to only current and former employees of Nabors Industries, Inc. Nabors' DRP specifically provides for such an election, stating that: "[e]lection may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity." **Exhibit "B"**, page 7.

Here, it is undisputed that Plaintiff Alfredo De La Garza was hired by NCPS as a crew worker on July 22, 2013. Exhibit "E" at 3. Further, it is undisputed that Plaintiff Alfredo De La Garza was an employee of NCPS at the time of the incident giving rise to his claims against Defendants. *Id.* at 3. As such, Plaintiff Alfredo De La Garza was not a current or former employee of Nabors Industries, Inc. or any subsidiary during or prior to 2010. The drilling contracts were entered into on September 23, 2008 and September 8, 2010, years before Plaintiff Alfredo De La

Garza applied to or was ever employed by NCPS, a subsidiary of Nabors Industries, Inc. Plaintiff Alfredo De La Garza's claims fall outside the scope of the arbitration agreement alleged to exist by the Penn Virginia defendants. Defendants' Motion to Compel Arbitration and to Abate should be denied as to the claims of Plaintiff Alfredo De La Garza or his minor children.

**C. Defendants have failed to establish that Plaintiffs <span style="color:red">REDACTED</span> loss of consortium claims are subject to arbitration.**

Defendants have failed to establish a valid arbitration agreement that encompasses the loss of consortium claims of the minor children of Plaintiff Alfredo De La Garza, <span style="color:red">REDACTED</span>

A child can recover for loss of parental consortium when the parent suffered serious, permanent, and disabling injury or death. *In re SSP Partners,* 241 S.W.3d at 171 (citing *Reagan v. Vaughn*, 804 S.W. 2d 463, 467 (Tex. 1990)). Although a claim for loss of parental consortium is derivative to the extent that liability for the parent's injury must be established, the claim is separate and independent and not automatically extinguished merely because, for instance, the injured parent settled his claim for personal injuries. *Id.* (citing *Lehamn v. Har-Con Corp.,* 76 S.W.3d 555, 564 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). Because Defendants have provided no evidence of a written agreement signed by the children, an express provision of Nabors' DRP binding the children to arbitration, or the application of direct-benefits estoppel, Defendants have failed to demonstrate that Plaintiffs <span style="color:red">REDACTED</span> claims are subject to arbitration.

Arbitration is a matter of contract and should not be compelled without an agreement. *Trico Marine Servs., Inc.,* 73 S.W.3d at 548. As previously addressed, public policies favoring arbitration do not extend to any favorable inclination one way or the other with regard to the questions of who is bound by the arbitration agreement because the purpose of the FAA is to "make arbitration agreement as enforceable as other contracts, but not more so." *In re SSP Partners,* 241 S.W.3d at

167-168 (court refused to enforce an arbitration agreement in connection with claims for loss of parental consortium by minor children of an employee who was injured on the job and who has signed an enforceable agreement to arbitrate all disputes relating to her employment). In this case, the Penn Virginia defendants contend that the claims of Plaintiffs REDACTED , minors, are "subject to the arbitration agreement as they are derivative of De La Garza['s] claims." Defendants provide no other basis or support for this contention.

Under Nabors' DRP, a "dispute" is defined as "all legal and equitable claims, demand, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to: … any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment." *Id.* at p. 3. This provision does not expressly bind the minor children of any person bound by the Program, unless the children are found to be "otherwise entitled to [the Program's] benefits." *Id.* Here, the Penn Virginia defendants have provided no evidence that Plaintiffs REDACTED are third-party beneficiaries of the purported arbitration agreement between their father and NCPS. *In re SSP Partners*, 241 3d at 170-171 (court refused to apply direct benefits estoppel because minor children were not bringing claims that sought direct benefits from a contract containing an arbitration clause, nor were they seeking and obtaining substantial benefits from the contact itself outside the litigation). Moreover, Plaintiffs REDACTED REDACTED did not individually sign any written agreement that would bind them to the Nabors' DRP. "Texas law does not ordinarily bind children to the contracts their parents sign. *In re SSP Partners,* 241 S.W.3d at 170 ((quoting *Fleetwood Enterprises, Inc. v. Gaskmap,* 280 F.3d 1069,

1076 (5th Cir. 2002) (applying Texas law), opinion supplemented on denial of reh'g, 303 F.3d 570 (5th Cir. 2002)(court held minor children were not bound by arbitration agreement where children did not personally sign the arbitration agreement and there was no provision expressly stating that parents, on behalf of their children, agreed to submit the children's claims to arbitration)). Plaintiff Alfredo De La Garza did not sign any agreement or document acknowledging the Nabors' DRP on behalf of his minor children or as representative of his children. Additionally, there is no provision within any executed documents or the Nabors' DRP stating that Plaintiff Alfredo De La Garza agreed to submit his children's claims to arbitration. Absent express agreement, Texas law does not require that minors arbitrate "simply because they are minors and their claims are related to that of their parent." *Id.* at 170. Defendants have failed to establish that minor Plaintiffs REDACTED REDACTED parental consortium claims are bound by any valid arbitration agreement. Defendants' Motion to Compel Arbitration and to Abate should be denied as to the claims of the minor children.

### D. The Penn Virginia defendants waived their right to compel arbitration

Even if the Penn Virginia defendants had established that a valid arbitration agreement exists and Plaintiffs' claims fall within its scope, Defendants have substantially invoked the judicial process and have waived their right to compel arbitration in this matter.

A party seeking to enforce an arbitration agreement can lose their right to do so through waiver. The right to have a dispute submitted to arbitration, like any other contractual right, may be waived either expressly or implicitly. *Perry Homes v. Cull*, 258 S.W.3d 580, 593 (Tex. 2008), cert. denied, 129 S. Ct. 952 (2009). Express waiver arises when a party affirmatively indicates that it wishes to resolve the case in the judicial forum, rather than through arbitration. *In re Citigroup*

*Global Markets, Inc.*, 258 S.W.3d 623, 626 (Tex. 2008). Implied waiver arises when a party acts inconsistently with the right to arbitrate and prejudices the opposing party. *Id.*

The legal test for a waiver of arbitration requires conduct or activity inconsistent with the right to arbitration and prejudice to the party claiming waiver. *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (orig. proceeding) (per curiam). A party waives an arbitration clause when it substantially invokes the judicial process to the other party's detriment. *Perry Homes*, 258 S.W.3d at 590. To invoke the judicial process, a party must engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration. *Pilot Travel Centers, LLC v. McCray*, 416 S.W.3d 168, 187 (Tex. App.—Dallas 2013, no pet.). As it applies to waiver, "prejudice" relates to inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party attempts to have it both ways by switching between litigation and arbitration to its own advantage. *Kennedy Hodges, L.L.P. v. Gobellan*, 433 S.W.3d 542, 545 (Tex. 2014) (per curiam); *Perry Homes*, 258 S.W.3d at 597.

The issue of whether there has been a waiver of arbitration rights is to be decided case by case based on the totality of the circumstances. *Gobellan*, 433 S.W.3d at 545; *Perry Homes*, 258 S.W.3d at 591. In assessing the totality of the circumstances, the court will consider the following factors:

(1) whether the movant was the plaintiff, who chose to file in court, or the defendant, who merely responded;
(2) how long the movant delayed before seeking arbitration;
(3) when the movant knew of the arbitration clause;
(4) whether the movant sought or opposed arbitration earlier in the case;
(5) how much time and expense had been incurred in litigation;
(6) whether activity in court would be duplicated in arbitration;
(7) whether the movant filed affirmative claims or dispositive motions or sought judgment on the merits;
(8) how much discovery had been conducted and who initiated it;
(9) how much of the discovery would be useful in arbitration; and
(10) how much pretrial activity related to the merits, rather than arbitrability or jurisdiction.

*Perry Homes*, 258 S.W.3d at 591–592.

Plaintiffs filed this case against the Penn Virginia defendants on July 24, 2014. **Exhibit "F".** Plaintiffs' filed their First Amended Original Petition on September 8, 2014. **Exhibit "G".** Plaintiffs filed their Second Amended Original Petition on October 1, 2014. **Exhibit "H".**

On August 25, 2014, the Penn Virginia defendants filed their Original Answer which was not subject to a motion to compel arbitration. Defendants filed a First Amended Answer to Plaintiffs' Second Amended Petition on April 10, 2015. Defendants waited until the filing of this answer to plead in the alternative that Defendants would assert the affirmative defenses of arbitration and award. On April 20, 2015, Defendants filed their Second Amended Answer to Plaintiffs' Second Amended Petition. It was not until this answer that Defendants specifically plead that Plaintiffs' claims are "subject to mandatory binding arbitration and as such this suit must be abated and/or dismissed. On this same date, Defendants sent a notice of arbitration. A copy of this notice is attached as Exhibit "J".

This case has been pending before this Court for over a year. Defendants waited until June 18, 2015, to file their Motion to Compel Arbitration and to Abate. In the meantime, Defendants have propounded interrogatories on Plaintiffs; submitted requests for production and requests for admissions; participated in numerous depositions; and, responded to Plaintiffs' written discovery. Defendants did not raise the issue of arbitration in any motions, pleadings, or filings made before their amended answer filed on April 10, 2015. Defendants delayed in filing a motion to compel arbitration until approximately four months before the date scheduled for trial of October 19, 2015. This delay wasted judicial resources and disadvantaged Plaintiffs who are preparing for an October 19, 2015 trial. Defendants have caused detriment and prejudice to Plaintiffs through their delay in seeking arbitration to the extent that Plaintiffs' trial setting may be delayed.

While Defendant Mike Ferguson has pled for arbitration, he has not filed a motion for arbitration, a notice of arbitration, nor has he joined in the Penn Virginia defendants' motion for arbitration. Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group has not asserted a claim or plead that it is entitled to arbitration in connection with Plaintiffs' claims. This case should proceed to trial against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group on October 19, 2015.

## V. <u>CONCLUSION & PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Penn Virginia defendants' Motion to Compel Arbitration and to Abate be denied. In the alternative, Plaintiffs request that their continuance of this motion be granted, that they be allowed to conduct discovery as to arbitrability, and that they be allowed to participate in a full evidentiary hearing as to the Penn Virginia defendants' Motion to Compel Arbitration and to Abate; and upon hearing the arguments and evidence, that Defendants' Motion to Compel Arbitration and to Abate be denied. Plaintiffs request that their claims against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group be severed from any claims against the Penn Virginia defendants and that these claims be tried on October 19, 2015.

Respectfully submitted,

_John David Hart_

JOHN DAVID HART

State Bar No. 09147700
THE LAW OFFICES OF JOHN DAVID HART

Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
(817) 870-2102 - Telephone
(817) 332-5858 – Facsimile
johnhart@hartlaw.com

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the above and foregoing instrument has been forwarded on this ___30th___ day of July, 2015, to the following attorneys of record pursuant to the Texas Rules of Civil Procedure as indicated below:

**VIA CMRRR & FACSIMILE**
Mr. Thomas J. Smith
Mr. Kelly C. Hartmann
Ms. Alexis Butler Hester
Galloway, Johnson, Tompkins,
Burr & Smith
1301 McKinney, Suite 1400
Houston, Texas 77010

**VIA CMRRR & FACSIMILE**
Mr. J. Javier Gutierrez
Ms. Ana Laura Gutierrez
The Gutierrez Law Firm, Inc.
700 East Third Street
Alice, Texas 78332

**VIA CMRRR & FACSIMILE**
Mr. Benjamin A. Escobar, Jr.
Mr. Brit T. Brown
Beirne, Maynard & Parsons, L.L.P.
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056

_John David Hart_

JOHN DAVID HART

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR REDACTED and | § | |
| REDACTED ., minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, L.P., PENN | § | |
| VIRGINIA OIL & GAS GP LLC, | § | |
| MIKE FERGUSON, TRIFECTA OILFIELD | § | |
| SERVICES, LLC, CUDD PRESSURE | § | |
| CONTROL, INC., ROYWELL | § | 215th JUDICIAL DISTRICT |
| SERVICES, INC., and OAKS PERSONNEL | § | |
| SERVICES, INC. d/b/a THE OAKS GROUP | § | |

## AFFIDAVIT OF JOHN DAVID HART

**STATE OF TEXAS** §

**COUNTY OF TARRANT** §

Before me, the undersigned notary, on this day personally appeared John David Hart, a person whose identity is known to me. After I administered an oath to him, upon his oath he stated the following:

"My name is John David Hart. I am over 18 years of age, of sound mind, and capable of making this affidavit. I am counsel for the Plaintiffs in the above styled case."

"I certify that the Master Service Contract between Penn Virginia Oil & Gas, L.P. and Nabors Completion & Production Services Co. referenced in the above response is a true and correct copy of the Master Service Contract between these entities as produced by Defendants."

"These documents were produced to Plaintiffs in response to Requests for Production that were served on the Penn Virginia defendants."

"I certify that the Affidavit of Keith Nicholson referenced in the above response is a true and correct copy of the Affidavit of Keith Nicholson as produced by the Penn Virginia defendants in their motion for arbitration."

"I certify that the Notice of Arbitration referenced in the above response is a true and correct copy of the Notice of Arbitration as produced by the Penn Virginia defendants on April 20, 2015."

"Further, I certify that on January 13, 2015, pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC were advised that Plaintiffs intend to use the documents produced by these Defendants in connection this cause of action."

"I certify that the Nabors Dispute Resolution Program and Rules referenced in the above response is a true and correct copy of the Nabors Dispute Resolution Program and Rules as produced by Nabors Completion & Production Services Co. in response to a subpoena request."

"I certify that the 2008 International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract – U.S. referenced in the above response is a true and correct copy of the 2008 International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract – U.S. as produced by Nabors Completion & Production Services Co. in response to a subpoena request."

"I certify that the 2010 International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract – U.S. referenced in the above response is a true and correct copy of the 2010 International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract – U.S. as produced by Nabors Completion & Production Services Co. in response to a subpoena request."

"I certify that the Application for Hourly and Daily Employment for Alfredo De La Garza with Nabors Completion & Production Services Co. that is referenced in the above response is a true and correct copy of the Application for Hourly and Daily Employment for Alfredo De La Garza with Nabors Completion & Production Services Co. as produced by Nabors Completion & Production Services Co. in response to a subpoena request."

"I certify that Plaintiffs' Original Petition and any amendments thereof that are referenced in the above response are true and correct copies of all petitions filed by Plaintiffs with the Court in this matter."

John David Hart

SWORN TO AND SUBSCRIBED TO before me on this 29ᵗʰ day of July, 2015.

CELINA DAVILA
MY COMMISSION EXPIRES
March 22, 2018

My Commission Expires: 3-22-18

Notary Public, State of Texas

MASTER SERVICE CONTRACT

DATED AS OF MARCH 28, 2013

BY AND AMONG

PENN VIRGINIA OIL & GAS CORPORATION,

PENN VIRGINIA OIL & GAS, L.P.,

PENN VIRGINIA MC ENERGY L.L.C.

AND

NABORS COMPLETION & PRODUCTION SERVICES CO.



EXHIBIT

A

Nabors MSA (PV cmts 3-28-13).docx

## TABLE OF CONTENTS

Page

I. WORK OR SERVICES COVERED ........................................................... 1
II. WARRANTIES AND OTHER MATTERS REGARDING MANNER OF
    PERFORMANCE OF WORK OR SERVICES ............................................ 2
III. RELATIONSHIP OF THE PARTIES ..................................................... 4
IV. LAWS AND REGULATIONS ................................................................. 5
V. INSURANCE REQUIRED ..................................................................... 6
VI. INDEMNIFICATION ............................................................................ 7
VII. ENVIRONMENTAL MATTERS ........................................................... 12
VIII. FIDELITY ........................................................................................... 14
IX. TERM .................................................................................................. 15
X. NOTICES ............................................................................................. 15
XI. ASSIGNMENT .................................................................................... 15
XII. AUTHORITY OF EXECUTING PARTIES .......................................... 15
XIII. AUDIT PROVISION ............................................................................ 15
XIV. APPLICABLE LAW ............................................................................. 16
XV. WAIVER OF LIEN ............................................................................... 16
XVI. AFFILIATED COMPANIES ................................................................ 16
XVII. CONFIDENTIALITY ........................................................................... 17
XVIII. ARBITRATION .................................................................................... 17
XIX. MISCELLANEOUS .............................................................................. 18

EXHIBITS

EXHIBIT "A"    MINIMUM INSURANCE REQUIREMENTS
EXHIBIT "B"    WAIVER OF LIEN AGREEMENT
EXHIBIT "C"    JOINDER TO MASTER SERVICE CONTRACT
EXHIBIT "D"    ADDITIONAL PROVISIONS

# MASTER SERVICE CONTRACT

THIS MASTER SERVICE CONTRACT (this "Contract"), made and entered this 28TH day of March, 2013, by and among (i) PENN VIRGINIA OIL & GAS CORPORATION, a Virginia corporation ("PVOG Corp."), PENN VIRGINIA OIL & GAS, L.P., a Texas limited partnership ("PVOG LP"), and PENN VIRGINIA MC ENERGY L.L.C., a Delaware limited liability company ("PVMCE"), herein collectively referred to as "Company", and (ii) Nabors Completion & Production Services Co., a Delaware corporation, herein referred to as "Contractor."

## IMPORTANT NOTICE: SECTIONS VI AND VII OF THIS CONTRACT CONTAIN OBLIGATIONS TO INDEMNIFY AND RELEASE THE OTHER PARTY FOR DAMAGES CAUSED BY ITS OWN NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL FAULT

WITNESSETH, that:

For and in consideration of the mutual covenants and agreements herein contained and of the payments which may be made by Company to Contractor pursuant to the provisions hereof, the parties hereto mutually agree as follows:

## I.    WORK OR SERVICES COVERED

A.    This Contract is for operations conducted by (i) PVOG Corp. in Kentucky, Mississippi, New York, Pennsylvania, Virginia and/or West Virginia, (ii) PVOG LP in Louisiana and/or Texas and (iii) PVMCE in Oklahoma and/or Texas. For the purposes of this Contract, the term "Company" shall refer to the applicable Company entity that requests that Contractor perform work or services as set forth in Section I(B) of this Contract. Contractor shall be in privity of contract with respect to specific work or services only with the Company entity requesting such work or services. The liability of each Company entity under this Contract shall be several, and not joint. Accordingly, the obligations, representations, covenants and agreements of each Company entity under this Contract are several and relate only to the work or services requested by such Company to be performed by Contractor under this Contract.

B.    Company desires to establish and maintain an approved list of contractors and to offer work or contracts only to those contractors who are included on such approved list. It is contemplated that, from time to time during the term of this Contract, Company may request, either orally or in writing, that Contractor perform work or render services for the benefit or account of Company. In the event that Contractor agrees to undertake the performance of such work or services for Company, then, in each instance, the designation of work or services to be performed and the consideration to be paid by Company to Contractor shall be as agreed by the parties in writing and incorporated herein by reference; *provided, however*, that: (i) the provisions of this Contract shall govern and be fully applicable to the performance of all such work or services and the relationship of the parties relating to or arising out of the performance of such work and services shall be controlled and regulated hereby; and (ii) in the event of a dispute or conflict between this Contract and any writing (including, without limitation, any

1

work order, work ticket, manifest or other writing between the parties) entered into or executed subsequent to the date first set forth above, this Contract shall govern in all instances. In the event that there is no written agreement on pricing between the parties, then pricing will be at the rates agreed to at the time such services are provided. However, any work or services provided by Contractor to Company shall be governed by this Contract even if no such writing is generated. This Contract shall become effective the date first hereinabove written and shall supersede all prior service contracts between the parties hereto with respect to new work or services commenced during the term of this Contract to be performed in connection with this Contract.

C.      The words "work" and "services", as used herein, contemplate any business activity of Contractor which requires that its employees, servants, agents or representatives, or the employees, servants, agents or representatives of its subcontractor(s), enter upon or utilize any property or premises owned (in whole or in part), leased or operated by Company or which requires that Contractor or its subcontractor(s) construct, install, recondition, maintain or repair, for the benefit of Company, any property owned (in whole or in part), leased or operated by Company. All work or services will be subject to the availability of excess personnel and equipment at Contractor's facility in the area such services are to be provided.

D.      This Contract does not obligate Company to order or request any work or services from Contractor, nor does it obligate Contractor to accept orders or request for work or services from Company, but this Contract shall govern the parties' rights and obligations concerning all work or services provided by Contractor to Company.

## II.     WARRANTIES AND OTHER MATTERS REGARDING MANNER OF PERFORMANCE OF WORK OR SERVICES

Contractor warrants as follows:

A.      Contractor will perform, and will cause its subcontractors to perform, all work or services contemplated by this Contract with due diligence and in a good, workmanlike and timely manner, all in strict conformity with the specifications of Company, generally accepted industry practices, all Laws (as defined in Section IV(A)) and this Contract. The term "workmanlike manner" means services performed in a manner deemed proficient by those with the special knowledge, training and experience to judge such services.

B.      Contractor shall furnish, at its sole expense and risk, all necessary personnel, equipment, materials, tools, supplies, expertise and supervision reasonably necessary for the safe performance of the work or services. Contractor has adequate equipment in good working order and adequate numbers of fully trained personnel capable of safely operating such equipment and performing the work or services. Contractor shall test its equipment to ensure the same is in good working order prior to delivery to the work site and regularly conduct training and safety programs for such personnel. Contractor shall not employ in any work for Company any employee whose employment violates any labor, employment or other applicable Laws. Contractor shall not employ in any work for Company any employee who is a minor.

2

C.    All Contractor supplied products and equipment shall meet Company's specifications with respect to the services for which such products and equipment are used. All such products and equipment shall be selected and used with good oilfield practices for their respective purposes and shall be in good working condition and free from defects in design, workmanship and materials and shall comply with all Laws. Any portion of the work found defective or unsuitable shall be removed, replaced or corrected by Contractor without additional cost or risk to Company. Contractor agrees to inspect all materials and equipment furnished by Company directly employed in the course of operations conducted hereunder and shall notify Company of any defects therein before using such materials and equipment. Should Contractor use such materials and equipment without notifying Company of any defect, Contractor shall be deemed to have assumed all risk and liability for any mishap that may occur in the operations conducted hereunder by reason of failure or defect in such materials and equipment. Unless otherwise stated in writing, the risk of loss remains with Contractor until Company has care, custody and control of such products, equipment or other goods; *provided, however*, that title to such products shall pass upon delivery of such products to Company. Contractor shall provide Company and its other applicable subcontractors all Material Safety Data Sheets applicable to all products, equipment and other goods delivered to Company's work site. Contractor agrees to maintain its equipment in good operating condition at all times and shall use all reasonable means to control and prevent fires and blowouts, protect the hole and protect Company's property, equipment and other goods. If Contractor provides rental products or equipment, such products or equipment shall be (and shall be kept) in good working order and condition, shall include all appropriate safety and emissions control devices, shall include all emergency and environmental placards and warnings and shall meet Company's specifications with respect to the services for which such products and equipment are used. All consumable goods provided by Contractor shall meet the specifications when delivered and for their normal shelf life. For shelf life, Contractor warrants that the represented quality, composition and effectiveness of the goods shall not be materially lessened during storage. This warranty requires that such storage complies in material respects with the manufacturer's or supplier's recommended storage conditions and storage period. The product or material must meet the specifications on the date of use and on the last day of its shelf life.

D.    Contractor and its subcontractors and their respective employees, agents and representatives shall be familiar with and comply with Company's "Health and Safety Policy" (the "Manual"), a copy of which has been given to Contractor. Contractor agrees to ensure that its employees, subcontractors, agents and representatives performing work or services under this Contract have been supplied with a copy of the Manual and shall comply with it.

E.    Contractor shall comply with (i) Company's requirements with respect to drug testing programs under U.S. Department of Transportation regulations (if applicable) and (ii) Company's written policies, if any, concerning a drug free workplace.

F.    Contractor shall comply with the requirements of Company for maintaining and providing daily records of work or services performed under this Contract.

G.    Contractor shall promptly cure or begin to cure, if not curable within 5 days, all defects described in Company's written notices within 5 days of notice from Company. If Contractor fails to so cure such defects within a reasonable time after being notified, Company

3

may cure such defects directly or through another contractor, vendor or supplier. What is a "reasonable time" shall depend upon the circumstances, but in no event shall it exceed thirty (30) days. Within thirty (30) days after receipt of a written invoice, Contractor shall reimburse Company for the reasonable cost of such warranty work; provided, that, the amount of such warranty work is uncontested by Contractor. Contractor shall not be required to pay such amount if Contractor is disputing its warranty obligation in good faith and has provided notice of such dispute in writing to Company within 10 business days of Company's written notice to a Corporate Officer of Contractor of the defect with sufficient detail in Company's notice to provide Contractor the ability to understand the location of the defect, the general estimated amount of the reimbursement required, the location and date such defective work was performed and that such notice references that there is a limitation of 10 business days for Contractor to respond per the provisions of this Contract. The provisions of this Paragraph G shall be subject to Article I, Paragraph C above.

H.      In addition to Contractor's warranties, Contractor shall obtain, to the maximum extent reasonably possible, assignable warranties from its subcontractors, vendors and suppliers that are no less favorable than the general product warranty and general service warranty provided herein. Whatever warranty is obtained, however, shall be assigned to Company. If no formal assignment is made, such warranties shall be deemed assigned when the applicable services hereunder have been performed. If the foregoing warranty is breached, Contractor, if necessary to enforce the warranty, shall accept return of the goods and present the manufacturer or supplier with a demand that the warranty be honored.

I.      EXCEPT AS IS OTHERWISE EXPRESSLY PROVIDED PURSUANT TO THE TERMS OF THIS CONTRACT, CONTRACTOR MAKES NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), REGARDING THE MATERIALS SUPPLIED BY AGREEMENT OR WORK PERFORMED BY CONTRACTOR.

III.    RELATIONSHIP OF THE PARTIES

A.      It is expressly understood that Contractor shall perform work or services as an independent contractor, with the authority and right to direct and control all of the details of the work. Company shall exercise no control over Contractor's employees, servants, agents or representatives, nor those of its subcontractor(s), nor the methods or means employed by Contractor in the performance of such work or services, Company being solely interested in the attainment of the desired results. Company shall only have the right of inspection and supervision in order to secure the satisfactory completion of the work or services. Contractor is not authorized to enter into or commit Company to any agreements or contracts, and Contractor shall not represent itself as the agent or legal representative of Company.

B.      In all cases where Contractor's or its subcontractors' employees (defined to include, without limitation, direct, borrowed, special or statutory employees) are subject to the Louisiana Worker's Compensation Act, La. R.S. 23:1021 *et seq.*, the parties agree and recognize, and Contractor stipulates, that all work and operations performed by Contractor and its employees pursuant to this Contract and any orders are an integral part of and are essential to the

4

ability of Company to generate Company's goods, products and services for purposes of La. R.S. 23:1061 (A)(1). Furthermore, the Parties agree and recognize, and Contractor stipulates, that Company is the principal or statutory employer of Contractor's employees for purposes of La. R.S. 23:1061 (A)(3) and Company shall be entitled to the protections that are afforded a statutory employer under Louisiana law. Irrespective of Company's status as the statutory employer or special employer [as defined in La. R.S. 23:1031 (C)] of Contractor's employees, Contractor agrees to remain solely and primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees and shall not be entitled to seek contribution for any such payments from Company. Contractor and/or Contractor's insurers agree that they shall have no right to seek, and shall not seek, any contribution or indemnity from Company for any compensation benefits paid by Contractor and/or its insurers.

C. In all cases where Contractor's or its subcontractors' employees are covered by the Longshore and Harbor Workers' Compensation Act, the parties agree and recognize, and Contractor stipulates, that all work and operations performed by Contractor and its subcontractors and its and their employees pursuant to this Contract are an integral part of and are essential to the ability of Company to generate Company's goods and services at Company's work site for the duration of the project pursuant to Company's health and safety policies, that Company is the temporary or special employer of such employees for purposes of the Longshore and Harbor Workers' Compensation Act, that Company may direct such employees beyond necessary cooperation but not to the extent of control required by the doctrine of *respondeat superior*, that remuneration received by Contractor from Company for services rendered will be used directly or indirectly to pay such employees and that Contractor will remove any of such employees from the project and replace the same when required by Company. Claims made against Company by such employees of Contractor or its subcontractors based upon the doctrine of "borrowed servant" shall, for the purposes of Longshore and Harbor Workers' Compensation Act insurance of Contractor, be treated as a claim arising under said insurance against Contractor or its subcontractor as the case may be, and Company shall have benefit of said insurance to that extent. Irrespective of Company's status as the temporary or special employer of Contractor's or its subcontractors' employees, between Contractor and Company, Contractor agrees to remain primarily responsible through its or its subcontractors' insurance for the payment of benefits under the Longshore and Harbor Workers' Compensation Act to its employees and its subcontractors' employees and Contractor and its subcontractors and its and their insurance carriers shall not be entitled to seek contribution for any such payments from Company.

## IV. LAWS AND REGULATIONS

A. In connection with the performance of work and services contemplated by this Contract, Contractor agrees to comply with all laws, statutes, rules and regulations, Federal, State, County/Parish and Municipal, which are now, or during the term of this Contract may be, applicable to its business, equipment and employees engaged in, or in any manner connected with, Contractor's performance of work or services for Company (collectively, "Laws"), including, but not limited to, Laws pertaining to protection or conservation of the air, land, water, human health, industrial hygiene or other aspects of the environment, including, without limitation, the following statutes, as supplemented and amended: the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Resource Conservation and Recovery

5

Act, the Safe Drinking Water Act, the Toxic Substances Control Act, the Hazardous Materials Transportation Act, the Federal Oil Pollution Act of 1990, Articles 15, 17, 27 and 40 of the New York State Environmental Conservation Law; Article 12 of the New York State Navigation Law, the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.103, and any other comparable federal, state or local laws, statutes, ordinances and codes and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and/or local governmental agencies and authorities with respect thereto (collectively, "Environmental Laws").

B.    In particular, Contractor shall fully comply with the following statutes and executive orders as well as the regulations, orders and rules promulgated under such statutes and executive orders, where required by applicable Laws, and such statutes and executive orders, as they may be hereafter amended, are hereby incorporated in this Contract by reference as if fully set out: (1) Equal Opportunity Clause (Applicable to all work or purchase orders in excess of $10,000, 41 CFR 60-1.4); (2) Affirmative Action Compliance Programs (Applicable to work or purchase orders of $50,000 or more and if Contractor has 50 or more employees, 41 CFR 60-1.40); (3) Equal Employment Opportunity Reporting Requirements (Applicable to work or purchase orders of $50,000 or more and if Contractor has 50 or more employees, 41 CFR 60-1.7); (4) Affirmative Action Regarding Individuals with Disabilities (Applicable to work or purchase orders of $2,500 or more, 41 CFR 60-741); (5) Employment of Disabled Veterans and Veterans of the Vietnam Era (Applicable to work or purchase orders of $10,000 or more, 41 CFR 60-250); (6) Utilization of Minority Business Enterprises (Applicable to work or purchase orders of $10,000 or more, 41 CFR 1-1.13); (7) Utilization of Small Business Concerns (Applicable to work or purchase orders of $10,000 or more, 41 CFR 1-1.710-3); (8) Utilization of Labor Surplus Area Concerns (Applicable to work or purchase orders of $10,000 or more, 41 CFR 1-1.805-3(a)); (9) Minority Business Enterprise Subcontracting, Small Business Subcontracting and Labor Surplus Area Subcontracting Programs (Applicable to work or purchase orders of $500,000 or more, 41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805.3); and (10) Clean Air and Water (Applicable to work or purchase orders of $100,000 or more, 40 CFR 15.4 and 15.5, 41 CFR 1-1.2303). If Company is required to pay any fine or penalty resulting from Contractor's failure to comply with applicable Laws and/or Environmental Laws, then Contractor shall immediately reimburse Company for such payment.

C.    Contractor certifies that it does not and will not (i) maintain or provide for its employees any segregated facilities at any of its establishments and (ii) permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.    Contractor agrees that it will obtain identical certifications from proposed subcontractors.

V.    INSURANCE REQUIRED

A.    Contractor and Company each agrees to procure and maintain at its sole expense during the entire term of this Contract the policies of insurance in the specified minimum amounts set forth in Exhibit "A" attached hereto and made a part hereof. Such insurance shall support each party's indemnity obligations to the other and other potential liabilities hereunder.

6

B.     Prior to the commencement of any work or services contemplated by this Contract, Contractor shall furnish to Company certificates, in duplicate, on a form acceptable to Company, signed by an authorized representative of the insurance companies providing the coverage, evidencing all coverages, extensions and limits required to be carried by Contractor under the provisions of this Contract. Upon request, Company shall have the right to examine or inspect the originals or certified copies of such insurance policies in the offices of Contractor during its normal business hours.

C.     Failure to secure the insurance coverages, or the failure to comply fully with any of the insurance provisions of this Contract, shall in no way act to relieve any party from the obligations of this Contract, any provisions hereof to the contrary notwithstanding. If a party fails to maintain any of the insurance herein required, such party shall release, protect, defend, indemnify and hold harmless the other party's Group, including their insurers, from and against any and all Claims (as defined in Section VI(A)), which would otherwise be covered by such insurance.     Unless expressly stipulated to the contrary herein, a party's indemnification obligations under this Contract (express or implied) shall not be limited to the amount or scope of coverage provided by the insurance which is required to be maintained by such party under the terms hereof.  "Group" means Company Group or Contractor Group, as applicable (each as defined in Section VI(A)).

D.     Contractor shall require all of its subcontractors to secure and maintain the insurance described in Exhibit "A".

## VI.     INDEMNIFICATION

The parties recognize that in connection with the performance of the work or services and/or the provision of goods, equipment and facilities contemplated by this Contract, there is some risk that accidents and events may occur in which property is lost, damaged or destroyed and/or in which persons may be killed or injured. The parties desire to allocate these risks between them and to require that these risks be adequately insured so as to minimize the possibility of disputes and to engage in effective risk management. For these reasons, the parties agree to the indemnities and defense obligations set forth below.

A.     Mutual Release, Defense and Indemnity.

1.     Company Group shall not be liable for and Contractor agrees to release, protect, defend, indemnify and hold harmless Company Group from and against any and all claims, damages, liabilities, losses, demands, liens, encumbrances, causes of action of any kind (including, without limitation, actions *in rem* or *in personam* (civil or criminal) and those concerning personal injury, death or property loss or damage), obligations, costs (including, without limitation, reasonable attorney's fees), judgments, interest and awards, whether created by law, contract, tort, or otherwise (collectively, "Claims") for personal injury, illness, death, property (whether real or personal, owned or leased) damage and loss arising out of or resulting from the performance of this Contract or any breach hereof by any member(s) of Contractor Group suffered by any member(s) of Contractor Group (including Claims of spouses, heirs, survivors or legal representatives, successors and assigns of any member(s) of Contractor Group), **even if such are contributed to or caused by the sole, joint, comparative,**

7

concurrent, active or passive negligence or gross negligence of any member(s) of Company Group. The release, protection, defense, indemnity and hold harmless obligations assumed by Contractor, and the limitations afforded Company Group, in this Section VI(A)(1) include any liability for employment discrimination, medical, compensation or other benefits owed to employees of Contractor Group as a result of the direct employment relationship of such individuals with a member of Contractor Group even if such individuals are determined to be the borrowed or statutory employee of any member(s) of Company Group. "Company Group" means Company, its contractors (other than Contractor and its subcontractors of any tier), subcontractors, co-interest owners, joint venturers, co-lessees and invitees, and its/their affiliates, shareholders, partners, members, officers, directors, employees (including the Company representative at the work site whether a consultant or not), agents, consultants, servants and insurers.

2. Contractor Group shall not be liable for and Company agrees to release, protect, defend, indemnify and hold harmless Contractor Group from and against any and all Claims for personal injury, illness, death, property (whether real or personal, owned or leased) damage and loss arising out of or resulting from the performance of this Contract or any breach hereof by any member(s) of Company Group suffered by any member(s) of Company Group (including Claims of spouses, heirs, survivors or legal representatives, successors and assigns of any member(s) of Company Group), **even if such are contributed to or caused by the sole, joint, comparative, concurrent, active or passive negligence or gross negligence of any member(s) of Contractor Group.** The release, protection, defense, indemnity and hold harmless obligations assumed by Company, and the limitations afforded Contractor Group, in this Section VI(A)(2) include any liability for employment discrimination, medical, compensation or other benefits owed to employees of Company Group as a result of the direct employment relationship of such individuals with a member of Company Group even if such individuals are determined to be the borrowed or statutory employee of any member(s) of Contractor Group. "Contractor Group" means Contractor, its contractors and subcontractors, co-interest owners, joint venturers, co-lessees and invitees, and its/their affiliates, shareholders, partners, members, officers, directors, employees, agents, consultants, servants and insurers.

B. Indemnification: Savings Clauses

1. The indemnities in this Contract shall only be effective to the maximum extent permitted by applicable Laws. If any Law is enacted in any state that limits in any way the extent of which indemnification may be provided to an indemnitee and such Law is applicable to this Contract, then this Contract shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Laws, but shall extend to such maximum extent.

2. In the event that this Contract is interpreted under the Laws of the State of Texas for a particular occurrence, then Sections VI(A)(1) and VI(A)(2) shall apply, but for the purposes of Title 6, Chapter 127 of the Texas Civil Practice and Remedies Code, commonly known as the Texas Oilfield Anti-Indemnity Act, the indemnity and insurance provisions of this Contract applicable to property damage and the indemnity and insurance provisions applicable to personal injury, bodily injury and death shall be deemed separate for interpretation, enforcement and other purposes. All indemnities in this Contract shall only be effective to the maximum

8

extent permitted by applicable Laws. If the Laws of the State of Texas govern this Contract, then Contractor and Company incorporate Title 6, Chapter 127 of the Texas Civil Practice and Remedies Code (Texas Oilfield Anti-Indemnity Act) and agree to the limits of that statute.

The parties will each support their respective mutual indemnity obligations by furnishing liability insurance coverage (or qualified self-insurance) of the types set forth above obtained by each of the parties for the benefit of the other party and its respective Group as indemnitee(s).

The parties will each support their respective unilateral indemnity obligation by furnishing liability insurance coverage (or qualified self-insurance) of the types set forth above in the applicable statutory amounts.

If the foregoing provisions do not meet the criteria for either a mutual or unilateral indemnity obligation under such statutory provision, then the same shall be modified by the court to the extent necessary to so comply.

3. In the event that this Contract is interpreted under the Laws of the State of Louisiana for a particular occurrence, then Sections VI(A)(1) and VI(A)(2) shall apply, but for the purposes of La. R.S. 9:2780, commonly known as the Louisiana Oilfield Anti-Indemnity Act, the indemnity and insurance provisions of this Contract applicable to property damage and the indemnity and insurance provisions applicable to personal injury, bodily injury and death shall be deemed separate for interpretation, enforcement and other purposes. All indemnities in this Contract shall only be effective to the maximum extent permitted by applicable Laws. If the Laws of the State of Louisiana govern this Contract, then Contractor and Company incorporate La. R.S. 9:2780 (Louisiana Oilfield Anti-Indemnity Act) and agree to the limits of that statute. For any services for which such statute would apply, Company agrees that it will, on behalf of Company Group, pay the premium for the extension of Contractor's insurance to cover Company Group as an additional insured to the extent of the liabilities assumed by Contractor herein, and Contractor agrees that its insurers will invoice Company the premium for such extension of coverage in favor of Company Group. Contractor warrants that such premium shall constitute all material costs for such extension of coverage. At each subsequent renewal, Contractor shall advise Company as respects the amount for the premium required for such extension of coverage and shall arrange to have Company billed for the material costs of the premium for such extension of coverage to Company Group. For any services for which such statute would apply, Contractor agrees that it will, on behalf of Contractor Group, pay the premium for the extension of Company's insurance to cover Contractor Group as an additional insured to the extent of the liabilities assumed by Company herein, and Company agrees that its insurers will invoice Contractor the premium for such extension of coverage in favor of Contractor Group. Company warrants that such premium shall constitute all material costs for such extension of coverage. At each subsequent renewal, Company shall advise Contractor as respects the amount for the premium required for such extension of coverage and shall arrange to have Contractor billed for the material costs of the premium for such extension of coverage to Contractor Group.

4. In the event that New York General Obligations Law § 5-322.1, W.Va. Code § 55-8-14 or any other or similar Law purporting to limit indemnity obligations in construction or similar contracts, is found to be applicable with respect to this Contract or any services provided hereunder, then this Section VI is hereby modified to the extent necessary for

9

compliance with and enforceability under such Law or Laws. Notwithstanding the foregoing, however, no modification of this Section VI pursuant hereto shall cause any change to or modification of the liability insurance coverage required by Section V or Exhibit A hereto, which coverage Contractor confirms and agrees to ensure shall continue to fully support Contractor's indemnity obligations above as and to the full extent set forth in this Contract.

C.    Indemnity Not Altered by Third Party Obligations

All indemnities in this Contract shall apply even though an insurer or other person or entity is required to pay for any Claim or to make a contribution to such Claim. Even though insurance may be arranged or other persons or entities may have certain liabilities or obligations, each party hereto remains responsible for its indemnity and other obligations under this Contract, even if such insurer or such other person or entity, for any reason, does not pay.

D.    Third Party Liability

1.    Except as provided in this Contract to the contrary, Contractor shall release, protect, defend, indemnify and hold harmless Company Group for personal injury, illness, death, property (whether real or personal or owned or leased) damage and other loss to the extent that third party claims arising out of or resulting from the performance of this Contract are contributed to or caused by the negligence, gross negligence or willful or wanton misconduct of any member(s) of Contractor Group.

2.    Except as provided in this Contract to the contrary, Company shall release, protect, defend, indemnify and hold harmless Contractor Group for personal injury, illness, death, property (whether real or personal or owned or leased) damage and other loss to the extent that third party claims arising out of or resulting from the performance of this Contract are contributed to or caused by the negligence, gross negligence or willful or wanton misconduct of any member(s) of Company Group.

3.    For the purposes of this Section VI, the phrase "arising out of or resulting from the performance of this Contract" shall be broadly construed to include, but not be limited to, not only formal work, but also any occurrences at the work site, including transportation to and from the work (other than personal or public transportation to the work site), breaks, recreation, rest periods and any other presence at the work site.

E.    Consequential Damages

Notwithstanding anything to the contrary in this Contract, neither party shall be liable to the other for special, indirect or consequential damages, including, without limitation, loss of use, loss of data, loss of assets, loss of business, loss of profit or business interruptions, resulting from or arising out of this Contract, however same may be caused and **regardless of the sole, joint, comparative, concurrent, active or passive negligence or gross negligence of the other party.** In no event, however, shall the provisions of this Section VI(E) limit the indemnities given in this Contract with respect to actions brought by third parties.

F.    Intellectual Property

10

Contractor shall indemnify, defend and hold harmless Company from and against any and all Claims arising from or by reason of any infringement or alleged infringement of any patent, trademark, copyright or other like right protected by law in respect of any property, equipment, services, work, methods or process furnished or used by Contractor in connection with this Contract.

G.    Radioactivity, Wild Well, Reservoir Damage, and Subsurface Trespass

Contractor Group shall not be liable for and Company agrees to protect, defend, indemnify, and hold harmless Contractor and its subcontractors from and against any and all claims for personal injury, illness, death, property (whether real or personal, owned or leased) loss and damage, excluding that suffered by any employee of Contractor or its subcontractors, incidental to or resulting from (a) radioactivity where the release is caused, in whole or in part, by conditions or events below the rotary table, (b) loss of well control ("a wild well"), including (without limitation) the costs of controlling a wild well, (c) reservoir or underground damage, including (without limitation) the costs of oil, gas, other mineral substances, water, and the well bore, and (d) subsurface trespass or any action in the nature thereof, **even if the Claims are contributed to or caused by the sole, joint, comparative, concurrent, active or passive negligence of any member(s) of Contractor Group.**

H.    General

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE, AND HEREBY INTEND TO CLEARLY AND UNEQUIVOCALLY AFFIRM, THAT THE APPLICATION OF THE PROVISIONS OF THIS SECTION VI MAY INVOLVE (I) INDEMNIFICATION FOR CLAIMS/LOSSES DUE TO THE INDEMNITEE'S OWN NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, AS WELL AS (II) INDEMNIFICATION FOR CLAIMS/LOSSES DUE TO THE NEGLIGENCE OF OTHERS (i.e., THIRD PARTIES). BOTH PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE "EXPRESS NEGLIGENCE RULE," TO EXPRESSLY STATE IN A CONSPICUOUS MANNER THAT ONE PARTY (THE INDEMNITOR) HAS RESPONSIBILITY FOR THE NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF ANOTHER PARTY (THE INDEMNITOR).

Notwithstanding any other provision of this Contract to the contrary, Company agrees to repair or replace any equipment which is (a) lost or damaged (other than ordinary wear and tear) while being used in the well below the rotary table level, (b) damaged due to abnormal abrasion or corrosion due to exposure to well effluents, or (c) lost or damaged during marine transportation at any time after delivery to Company or Company's other contractors at the landing, until returned to the landing (d) lost or damaged for whatever reason when such equipment is provided on a rental basis without a crew. Company's responsibility for such loss of or damage to any down hole, marine transported, or rental equipment shall apply even if the loss or damage is due to the joint, comparative, or concurrent negligence of Contractor. If the down hole or rental equipment cannot be repaired or the costs of repair exceed the replacement value of the damaged equipment,

11

Company agrees to pay Contractor the full replacement cost of such equipment. Company has the option to replace the equipment in kind if Contractor approves the offered replacement.

## VII.   ENVIRONMENTAL MATTERS

### A.   Mutual Release, Defense and Indemnity for Pollution

1.   Subject to Sections VI(A)(1) and VI(A)(2), but notwithstanding any other provision of this Contract to the contrary, Company Group shall not be liable for and Contractor agrees to release, protect, defend, indemnify and hold harmless Company Group from and against any and all Claims (including, without limitation, the cost of control and cleanup) arising out of pollution or contamination, including, but not limited to, fuels, lubricants, motor oils, paints, solvents, garbage, chemicals and other pollutants (produced fluids, solids and gases, drilling/completion fluids and cuttings are specifically excluded), originating from Contractor Group's property which is (1) used in the performance of this Contract or any order, and (2) in its care, custody and control, **even if such is contributed to or caused by the sole, joint, comparative, concurrent, active or passive negligence or gross negligence of any member(s) of Company Group**.

2.   Subject to Sections VI(A)(1) and VI(A)(2), but notwithstanding any other provision of this Contract to the contrary, Contractor Group shall not be liable for and Company agrees to release, protect, defend, indemnify and hold harmless Contractor Group from and against any and all Claims (including, without limitation, the cost of control and cleanup) for all other pollution or contamination such as that originating from a pipeline (other than due to Contractor Group's anchor) or storage facility or from produced fluids, solids or gases, drilling/completion fluids or cuttings or from a blowout or loss of well control, **even if such is contributed to or caused by the sole, joint, comparative, concurrent, active or passive negligence of any member(s) of Contractor Group, but NOT when caused by the gross negligence or willful misconduct of a member of Contractor Group**.

### B.   Hazardous Material and Waste Disposal and Clean Up

1.   Contractor shall, at its sole expense and risk, transport and dispose of (except as otherwise mutually agreed) any spent or used chemicals or other hazardous waste or materials supplied by any member(s) of Contractor Group and used by any member(s) of Contractor Group in the performance of this Contract or any order. Contractor is not responsible for any materials on the location or at the work site where title has been transferred to any member(s) of Company Group or which has passed through the well head or below the level of the rotary table, whichever is applicable, including, without limitation, material returns from the well.

2.   With respect to the materials Contractor is not responsible for under Section VII(B)(1), Company shall, at its sole expense and risk, transport and dispose of (except as otherwise mutually agreed) any spent or used chemicals or their empty packages, drums or containers or other hazardous waste or materials even if such materials have resulted from or were incident to the performance by any member(s) of Contractor Group of this Contract; *provided, however*, that no provisions of this Contract shall relieve a transporter of hazardous

12

waste of its obligation to safely transport the hazardous waste to its agreed upon destination. Contractor Group shall not be liable for and Company agrees to release, protect, defend, indemnify and hold harmless Contractor Group from and against any and all Claims (including, without limitation, cost of control and cleanup) incurred by any member(s) of Contractor Group under any statute, regulation or otherwise arising from Company's failure to properly transport and/or dispose of such hazardous waste or materials, <u>even if such is contributed to or caused by the sole, joint, comparative, concurrent, active or passive negligence or gross negligence of any member(s) of Contractor Group.</u>

3.      As used in Sections VII(B)(1) and VII(B)(2), the reference to hazardous materials and/or hazardous waste, whether in upper or lower case, refers to the following:

(i)      any chemical, material or substance at any time defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous waste", "acutely hazardous waste", "radioactive waste", "biohazardous waste", "pollutant", "toxic pollutant", "contaminant", "restricted hazardous waste", "infectious waste", "toxic substances", or any other term or expression intended to define, list or classify substances by reason of properties harmful to health, safety or the indoor or outdoor environment (including harmful properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, "TCLP toxicity" or "EPA toxicity" or words of similar import under any applicable Environmental Laws);

(ii)     any oil, petroleum, petroleum fraction or petroleum derived substance;

(iii)    any drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources;

(iv)     any flammable substances or explosives;

(v)      any radioactive materials;

(vi)     any asbestos-containing materials;

(vii)    urea formaldehyde foam insulation;

(viii)   electrical equipment which contains any oil or dielectric fluid containing polychlorinated biphenyls;

(ix)     pesticides; and

(x)      any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or which may or could pose a hazard to the health and safety of the owners, occupants or any persons in the vicinity of any work site or to the indoor or outdoor environment.

13

4.    In conducting its operations hereunder, Contractor agrees to comply with all Environmental Laws.  Contractor agrees to report to Company, as soon as reasonably practicable, all the details of every environmental upset or spillage and to fully cooperate in all clean up and reclamation activities by providing labor and equipment in order to restore and protect the environment.  Clean up and reclamation activities by Company Group shall not relieve Contractor of its duties or liabilities under this Contract.  Contractor shall reimburse Company Group for all such costs related to clean up and reclamation by Company Group to the extent that such risk is allocated to Contractor herein.

C.    General

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE, AND HEREBY INTEND TO CLEARLY AND UNEQUIVOCALLY AFFIRM, THAT THE APPLICATION OF THE PROVISIONS OF THIS SECTION VII MAY INVOLVE (I) INDEMNIFICATION FOR CLAIMS/LOSSES DUE TO THE INDEMNITEE'S OWN NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, AS WELL AS (II) INDEMNIFICATION FOR CLAIMS/LOSSES DUE TO THE NEGLIGENCE OF OTHERS (i.e., THIRD PARTIES). BOTH PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE "EXPRESS NEGLIGENCE RULE," TO EXPRESSLY STATE IN A CONSPICUOUS MANNER THAT ONE PARTY (THE INDEMNITOR) HAS RESPONSIBILITY FOR THE NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF ANOTHER PARTY (THE INDEMNITOR).

VIII.  FIDELITY

Neither Contractor nor any of its subcontractors performing work or services hereunder shall pay any commissions or fees or grant any rebates or other remuneration or gratuity to any employee, director, agent or representative of Company or to any member of the immediate family of any of the foregoing persons.  Neither Contractor nor any of its subcontractors performing work or services hereunder shall pay any commissions or fees or grant any rebates or other remuneration or gratuity to any employee, director, agent or representative of the other or to any member of the immediate family of any of the foregoing persons.  Gifts of nominal value and entertainment, meals and social invitations that are customary and proper under the circumstances and do not place the recipient under obligation are acceptable.  If any employee of Company should solicit a gift or gratuity from Contractor, then Contractor hereby agrees to notify an officer of Company of such act, and Company agrees to hold such notification in confidence.  Failure by Contractor to comply with this Section VIII may, at the Company's option, result in the termination of this Contract and may preclude any further dealings between the parties.  Company shall have the right to inspect and audit all records of Contractor, of whatsoever nature, relating to any gifts or gratuities furnished to any member of Company Group at any time, and from time to time, while this Contract remains in effect and for a period of two (2) years thereafter.

14

## IX. TERM

This Contract shall have a term of one (1) year from and after the date hereof and shall continue in full force and effect thereafter, on a year-to-year basis, unless sooner terminated by the parties as hereinafter provided. It is understood and agreed, however, that either party hereto may terminate this Contract at any time by giving the other party at least thirty (30) days' prior written notice of such termination and that Company may terminate this Contract immediately if Contractor is in breach of any of the terms hereof. Notwithstanding the foregoing, (i) the provisions of Sections II, VI, VII, XIII, XIV, XVII, XVIII and XIX and Exhibit "D" shall survive the termination of this Contract, and (ii) all of the terms and conditions hereof shall survive the termination of this Contract for all completed and current orders.

## X. NOTICES

Any and all notices required or permitted to be given hereunder shall be deemed to have been properly given when delivered via Federal Express or similar courier, via telecopy to the address shown on the signature page hereto or via mail addressed, postage prepaid, to the addresses shown on the signature page hereto. Either party may change its address shown by giving written notice thereof to the other party.

## XI. ASSIGNMENT

Contractor may not alienate, transfer or assign any rights hereunder to any third party without the express written approval of Company, which approval may be withheld in Company's sole discretion. Any purported assignment without such written approval shall be null and void. Except as limited by the foregoing, this Contract shall be binding upon the transferees, successors and assigns of the parties hereto.

## XII. AUTHORITY OF EXECUTING PARTIES

Each of the persons executing this Contract represents and warrants that he or she has full right and authority to execute this Contract on behalf of Company or Contractor, as the case may be, and to bind such party to the fulfillment of all of the provisions hereof.

## XIII. AUDIT PROVISION

Contractor shall maintain a true and correct set of records pertaining to its performance of services hereunder for a period of not less than two (2) calendar years following the end of the calendar year in which the final invoice for such services was sent. This two-year period is not a limitation on Company's right to audit. Any representative or representatives authorized by Company may inspect and audit any and all records of Contractor pertaining to the goods and services provided under this Contract. Such inspection shall be conducted at Contractor's offices during normal business hours after reasonable notice. Contractor shall make a good faith effort to include a similar audit provision in its subcontracts. Contractor shall promptly reimburse Company for any overpayments discovered in the audit, and Contractor hereby waives any statute of limitations or laches concerning the same. In addition, all safety, environmental and health information furnished by Contractor to Company will be subject to audit and shall be retained by Contractor for the same period or as otherwise required by Law.

15

## XIV. APPLICABLE LAW

This Contract may govern goods and services supplied by Contractor to Company in several different jurisdictions. With respect to the selection of the governing law in this Section XIV, the parties stipulate that certainty of enforcement is an important expectation negotiated between the parties in entering this Contract. Where any goods or service are to be provided in a geographic location covered by the General Maritime law, General Maritime law shall apply and shall govern the validity, interpretation and performance of this Contract. In those instances where the General Maritime law does not apply, the Laws of the State where the principal work site is located shall apply and govern the validity, interpretation and performance of this Contract. With respect to any governing Laws that the parties select, the parties agree that the Laws of the selected jurisdiction shall apply exclusive of any principles of conflicts of laws that would require application of the substantive laws of another jurisdiction. References in this Contract to any Law shall be deemed to include references to such as the same may be amended, replaced or reenacted from time to time.

## XV. WAIVER OF LIEN

To the extent permitted by Law, Contractor shall not encumber and shall not allow its subcontractors to encumber Company's property. Whether a claim is valid or invalid, no lien, privilege, charge or similar encumbrance shall become fixed upon Company's leases, wells, equipment, lands, fixtures, improvements or other property because of the failure of any member of Contractor Group to be paid for goods or services provided for hereunder. After being notified of the existence of any such lien, privilege, charge or encumbrance, Contractor shall take all necessary steps to obtain the release of such lien, privilege, charge or encumbrance. Contractor shall ensure that all subcontractors, as a condition of providing work or services for Contractor covered by this Contract, shall execute a Waiver of Lien Agreement in the form set forth in Exhibit "B" hereto. Contractor shall provide Company with a list of subcontractors, together with documents evidencing that all laborers, subcontractors and suppliers of materials and equipment have been paid and are not claiming liens on Company's property for such labor, services or materials under the provisions of applicable Laws.

## XVI. AFFILIATED COMPANIES

Affiliates of Contractor may join this Contract (any such joining affiliate, a "Joining Contractor") by executing a joinder hereto in the form set forth in Exhibit "C" hereto and forwarding it to Company. Any and all references to "Contractor" in this Contract shall be deemed to refer to Contractor or any Joining Contractor, as applicable to the particular work or services performed hereunder. The liability of Contractor and any Joining Contractor under this Contract shall be several, and not joint. Accordingly, the obligations, representations, covenants and agreements of Contractor and any Joining Contractor under this Contract are several and relate only to the work or services performed or to be performed by Contractor or such Joining Contractor under this Contract.

16

## XVII. CONFIDENTIALITY

A. Information provided by Company to Contractor while performing services (including, without limitation, information regarding Company's operations, a well being drilled, or geological and/or geophysical information, such as the depth of a well, the formations penetrated, the results of coring, logging, testing and surveying) is proprietary to Company, and such information and the existence and terms and conditions of this Contract or any work or services performed under this Contract ("Confidential Information") are confidential. Contractor shall use Confidential Information only in connection with the work or services to be performed under this Contract, and Contractor shall not divulge Confidential Information and shall take all reasonable steps to assure that Contractor's and its subcontractors, and their respective officers, directors, employees, agents, representatives, consultants and subcontractors, will not divulge Confidential Information to any person or entity other than Company's representatives. Contractor shall safeguard and protect all Confidential Information in its custody or control. Contractor's confidentiality obligation shall survive the termination of this Contract for five (5) years.

B. Contractor agrees that no adequate remedy at law exists for a breach or threatened breach of any of the provisions of this Section XVII, the continuation of which, if not remedied, will cause the non-breaching party to suffer irreparable harm. Accordingly, Company and Contractor agree that Company shall be entitled, in addition to other remedies that may be available to Company, to immediate injunctive relief from any breach of any of the provisions of this Section XVII and to specific performance of its rights hereunder, as well as to any other remedies available at law or in equity.

## XVIII. ARBITRATION

A. Any disputes and claims arising out of or resulting from the performance of this Contract shall be resolved by binding arbitration, to be held in Houston, Texas, as set forth below. If at any time any party shall desire to bring a claim against any the other party, and the parties cannot agree upon the resolution of such claim, then such claim shall be referred to a board of arbitrators (the "Board"). The Board shall be composed of one representative chosen by each party, and a third arbitrator who shall be chosen by the two arbitrators herein provided for. Each arbitrator shall be independent of the parties and shall have at least ten (10) years experience in the oil and gas business. In the event that the two arbitrators are unable to agree within ten (10) days upon a third arbitrator, then the American Arbitration Association shall designate a disinterested person to act as such arbitrator; and, in the event that the Receiving Party (as defined below) should, for a period of ten (10) days after receipt of an Arbitration Notice (as defined below), fail to select and make known in writing to the Notifying Party (as defined below) the arbitrator selected by the Receiving Party, the Board shall be comprised of the one sole arbitrator chosen by the Notifying Party. Either party (the "Notifying Party") may at any time serve upon the other (the "Receiving Party") a notice (an "Arbitration Notice") setting forth the point or points upon which the decision of the Board is desired and the identity of the arbitrator chosen by the Notifying Party. Within ten (10) days after the date of such Arbitration Notice, the Receiving Party shall deliver a counter-notice to the Notifying Party which shall identify the arbitrator chosen by the Receiving Party, respond to the claim in the Arbitration

17

Notice and specify any additional points or differences arbitrable hereunder upon which the Receiving Party may desire a decision.

B. Promptly after the composition of the Board has been identified, the Board shall give the respective parties written notice of the time and place of arbitration hearing, which hearing must take place within six (6) months of the date of the Arbitration Notice. The parties may then commence with and exchange requests for documents in accordance with Rule 34 of the Federal Rules of Civil Procedure. No other form of discovery, including, but not limited to, interrogatories, requests for admissions, or depositions, shall be permitted. The Board (or the sole arbitrator, as the case may be) shall conduct the arbitration hearing for as long as the Board deems reasonably necessary and the parties shall be entitled to submit expert testimony and/or written documentation in such hearing. The Board shall, by majority vote taken within two (2) days after such hearing, select the position of one party with respect to the claim(s) and notify both parties in writing of such selection. The decision of the Board (or the sole arbitrator, as the case may be) shall be final, conclusive and obligatory upon the parties and their successors and assigns, and without appeal, and each party agrees to abide by and comply with every such decision. Judgment on the decision of the Board may be entered and enforced by a court of competent jurisdiction. The costs of both parties in connection with any such arbitration shall be paid by the losing party. Notwithstanding the requirement to arbitrate any dispute, any party hereto may apply to a court for interim measures, such as injunctions, attachments and conservation orders, which measures may be immediately enforced by court order. Any decision with respect to such interim measures shall promptly be referred to the Board for review and final decision.

## XIX. MISCELLANEOUS

A. The parties may, by mutual written agreement, amend this Contract in any respect, and either party, as to such party, may (i) extend the time for the performance of any of the obligations of the other party; (ii) waive any inaccuracies in representations and warranties by the other party; (iii) waive compliance by the other party with any of the covenants or agreements contained herein and performance of any obligations by the other party; and (iv) waive the fulfillment of any condition that is precedent to the performance by such party of any of its obligations under this Contract. To be effective, any such extension or waiver must be in writing and be signed by the party providing such waiver or extension, as the case may be. No such extension or waiver by any party, nor any waiver by any Party of any breach of any provision of this Contract, shall operate or be construed as a waiver of any subsequent breach, whether or not similar. No failure or any delay by any party in exercising any right, power or privilege under this Contract shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. Except as otherwise provided in this Contract, the rights and remedies herein provided are cumulative and are not alternative.

B. The headings, sub-headings and other subdivisions of this Contract are inserted for convenience of reference only. The parties do not intend them to be an aid in legal construction.

18

PVOG 20

C. All references to cash or monetary amounts refer to U.S. Dollars only unless specifically stated to be in the currency of another government. The words "this Contract," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Contract as a whole and not to any particular subdivision, unless expressly so limited. The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to the Articles, Sections or subsections, respectively, hereof in which such words occur. The word "including" (in its various forms) means "including without limitation." Any reference to any federal, state or local Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise expressly requires. Unless the context otherwise requires, all defined terms contained herein shall include the singular and plural and the conjunctive and disjunctive forms of such defined terms.

D. Except for the designation of the work or service to be performed and the consideration provided for in Section I, it is understood and agreed between the parties hereto that this Contract constitutes the sole and complete basis for the agreement between the parties and that no other representations of any kind, oral or otherwise, have been made to Contractor.

E. In the event one or more of the provisions contained in this Contract shall be held, for any reason, to be invalid, void, illegal or unenforceable in any respect, such invalidity, voidness, illegality or unenforceability shall not affect the remaining provisions hereof, and this Contract shall remain unaffected and shall be construed as if such invalid, void, illegal or unenforceable provision never had been contained herein.

F. No consideration shall be given to the fact or presumption that one party has a greater or lesser hand in drafting this Contract.

G. This Contract represents a final, complete and exclusive statement of the agreement between the parties, supersedes any prior oral or written representation, agreement or understanding between the parties, and may not be modified, supplemented, explained or waived, except in writing signed by an authorized representative of both parties.

H. This Contract may be executed in any number of counterparts, and each such counterpart shall be deemed an original of this Contract for all purposes. No party shall be bound to this Contract unless and until all parties have executed a counterpart. A signature page signed by a party and sent by facsimile or other electric transmission to the other party shall be deemed to be valid as an original and shall be binding as between the parties.

I. IN SIGNING THIS CONTRACT, CONTRACTOR EXPRESSLY ACKNOWLEDGES THAT IT IS AWARE OF ITS RIGHT TO OBTAIN LEGAL COUNSEL TO REVIEW THIS CONTRACT. FURTHERMORE, CONTRACTOR EXPRESSLY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS ALL OF THE PROVISIONS CONTAINED IN THIS CONTRACT, INCLUDING WITHOUT LIMITATION, THE INDEMNITY AND RELEASE PROVISIONS, AND AGREES TO

ALL SUCH PROVISIONS, AS INDICATED BY THE SIGNATURE OF ITS AUTHORIZED REPRESENTATIVE BELOW.

Additional provisions, if any, are attached hereto as Exhibit "D".

*[Signature Pages Follow]*

20

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Contract effective as of the date first hereinabove shown.

COMPANY:

PENN VIRGINIA OIL & GAS CORPORATION

By:_____

Name:     Nancy M. Snyder
Title:      Executive Vice President

Address:      840 Gessner, Suite 800
                 Houston, TX 77024
Telephone:    (713) 722-6500
Telecopy:     (713) 722-6600

*WITNESS OR ATTEST:*

_____

Name:     Jean M. Whitehead
            (Please Print)

PENN VIRGINIA OIL & GAS, L.P
By:     Penn Virginia Oil & Gas GP LLC,
        its general partner

By:_____

Name:     Nancy M. Snyder
Title:      Executive Vice President

Address:      840 Gessner, Suite 800
                 Houston, TX 77024
Telephone:    (713) 722-6500
Telecopy:     (713) 722-6600

*WITNESS OR ATTEST:*

_____

Name:     Jean M. Whitehead
            (Please Print)

Signature Page to Master Service Contract

PENN VIRGINIA MC ENERGY L.L.C.

By: _____

    Name:    Nancy M. Snyder
    Title:     Executive Vice President

Address:    840 Gessner, Suite 800
                    Houston, TX 77024
Telephone:  (713) 722-6500
Telecopy:   (713) 722-6600

*WITNESS OR ATTEST:*

Name: _____ Jean M. Whitehead _____
                (Please Print)

CONTRACTOR:

_____

By: _____
Name: _____
Title: _____

Address:    _____

               _____

Telephone:
Telecopy:

*WITNESS OR ATTEST:*

_____

Name: _____
                (Please Print)

Signature Page to Master Service Contract

PENN VIRGINIA MC ENERGY L.L.C.

By:_____
    Name:    Nancy M. Snyder
    Title:     Executive Vice President

Address:      840 Gessner, Suite 800
                 Houston, TX  77024
Telephone:  (713) 722-6500
Telecopy:   (713) 722-6600

*WITNESS OR ATTEST:*

Name:_____Jean M. Whitehead_____
               (Please Print)

CONTRACTOR:

NABORS COMPLETION & PRODUCTION
SERVICES CO.

By: _____
Name: _Ronnie Witherspoon_____
Title: _Executive Vice President___

Address:      515 W. Greens Road, Suite 1170
                Houston, Texas 77067
Telephone:  281-775-5124
Telecopy:   281-775-4855

*WITNESS OR ATTEST:*

Name:__Jennifer Steppien_____
               (Please Print)

Signature Page to Master Service Contract

## MINIMUM INSURANCE REQUIREMENTS

The following minimum insurance requirements shall be complied with by Contractor and Company:

A. General Requirements (Applicable to all policies of Contractor and Company)

1.  Contractor agrees that all of Contractor's insurance policies (with the exception of Workers' Compensation policies and only with respect to coverages and applicable minimum limits required in this Contract) shall be endorsed to specifically name the Company Group as Additional Insureds thereunder. As used herein, "Company Group" shall have the meaning set forth in Section VI(A)(1) of the Contract. Company agrees that all of Company's insurance policies (with the exception of Workers' Compensation policies and only with respect to coverages and applicable minimum limits required in this Contract) shall be endorsed to specifically name the Contractor Group as Additional Insureds thereunder. As used herein, "Contractor Group" shall have the meaning set forth in Section VI(A)(2) of the Contract. For all insurance policies where an additional insured has been named, such insurance policies shall also contain a separation or severability of interest clause (sometimes called cross liability coverage) so that each insured shall be treated separately under the policy. This provision shall not cause any change of the insured risks or any change in the amount of insurance provided.

2.  All policies shall contain a waiver of subrogation in favor of Company Group or Contractor Group, as the case may be, including their respective insurers.

3.  All policies carried by each party shall provide thirty days' written notice to the other party of cancellation or any material changes.

4.  Coverage under all insurance required to be carried by Contractor or Company shall be primary to, and receive no contribution from, any other insurance maintained by or on behalf of, or benefiting Company Group or Contractor Group. In addition, neither Contractor Group nor Company Group shall be responsible or liable for any deductibles, self-insured retentions and/or premiums of the other Group's insurance.

5.  All policies required to be carried by the parties shall have adequate territorial and navigational limits for the location of the work.

6.  In all cases where either party has assumed responsibility through an indemnity obligation or other promise, its insurance coverage shall be deemed primary.

7.  Company will maintain, at Company's expense, Operators Extra Expense (OEE) or Energy Exploration and Development (EED) insurance covering the liabilities

A-1

specifically assumed by Company in this Agreement, including but not limited to those related to well control issues (including Underground Control of Well); Re-drilling/Extra Expense (including Unlimited Re-drill); Seepage and Pollution; Cleanup and Containment; and such other extensions of coverage as may be considered appropriate in the amounts listed below:

(a)     For work outside of cased hole:

$10 million for work outside of cased hole

(b)     For work inside of cased hole:

$10 million for work inside cased hole in wells with a total measured depth greater than 15,000;

$5 million for work inside cased hole in wells with a total measured depth greater than 9,500' but equal to or less than 15,000';

$3 million for work inside cased hole in wells with a total measured depth of 9,500' or less;

(c)     Notwithstanding the above, $5 million for stimulation, cementing, wireline, or coil tubing services.

B.     Worker's Compensation and Occupational Disease Insurance in accordance with the statutory requirements of the state in which work is to be performed, the state in which the insured party's employees reside and the state in which the insured party is domiciled; Employer's Liability insurance with limits of not less than $1,000,000 per accident or occurrence including:

(i)     Coverage amended to provide that a claim *In Rem* shall be treated as a claim against the employer.
(ii)    Borrowed Servant/Alternate Employer endorsement
(iii)   Other States coverage.
(iv)    Stop Gap Liability - monopolistic states (if applicable)
(v)     Territorial extensions to cover all work areas including, when applicable, the Gulf of Mexico

In the event any watercraft or offshore services are to be provided by Contractor, Contractor shall also obtain:

(i)     Protection for liabilities under the United States Longshore and Harbor Workers' Compensation Act and the Outer Continental Shelf Lands Act.
(ii)    Coverage for liability under the Merchant Marine Act of 1920, commonly known as Jones Act; the Admiralty Act; and the Death on High Seas Act with limits of not less than $1,000,000 per accident.
(iii)   Protection against maritime liability of employer to provide transportation, wages, maintenance and cure with a minimum of $1,000,000.

A-2

(iv)    Voluntary Compensation Maritime endorsement.

If either party obtains its employees from any employee leasing company or similar type arrangement, such party shall require that the employee leasing company provide all of the same coverages and endorsements enumerated in this Exhibit A in accordance with all of the General Requirements of this Exhibit A.

C.    Comprehensive General Liability Insurance, with limits of $2,000,000 per occurrence combined single limit for both Bodily Injury and Property Damage, including the following coverages:

    (i)    Premises and operations coverage
    (ii)    Independent Contractors coverage
    (iii)    Contractual Liability coverage
    (iv)    Products/Completed Operations coverage
    (v)    Liability for "X", "C" and "U" (Explosion, Collapse and Underground)
    (vi)    Broad Form Property Damage Liability
    (vii)    Personal Injury liability
    (viii)    *In Rem* endorsement
    (ix)    Territorial extensions to cover all work areas including, when applicable, the Gulf of Mexico
    (x)    Actions Over Indemnity buyback coverage
    (xi)    Underground Resources and Equipment coverage
    (xii)    Punitive Damages coverage
    (xiii)    Seepage and pollution coverage - sudden and accidental basis
    (xiv)    Blowout and cratering coverage

In the event any watercraft or offshore services are to be provided by Contractor, Contractor shall ensure that the watercraft exclusion is deleted.

D.    Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles, including broadened pollution coverage, with a minimum combined single limit of $1,000,000 per occurrence for both bodily injury and property damage.

If the insured party is a motor carrier, then such party shall carry those limits and types of coverages as specified by applicable federal, state and local laws and regulations. Further, if the insured is a motor carrier, then it shall name the other party's Group as additional insured and waive subrogation against the other party's Group only to the extent permitted by applicable Laws.

E.    If Contractor is a professional services firm, Profession Liability Insurance, with limits of not less than $5,000,000 per occurrence.

F.    If either party owns or operates vessels to provide services or conduct operations for Company, such party shall carry:

A-3

(i) Hull and Machinery Insurance with coverage equal to that provided by the American Institute Hull Clause (6/77) including limits of liability at least equal to the full value of the vessel and with navigation limits adequate for contractor to perform the contracted work. Where the vessel is engaged in towing operations, the insurance shall include full Tower's Liability with the sistership clause unamended.

(ii) Protection and Indemnity Insurance with limits of $1,000,000 combined single limit per occurrence, including, but not limited to, coverage for contractual liability for those liabilities assumed by the insured party, liability for pollution and cleanup on a sudden and accidental basis as per WQIS policy form or equivalent, full crew coverage, Collision and Tower's Liability and Cargo Legal Liability. The parties shall also carry Voluntary Removal of Wreck/Debris Insurance covering their equipment in an amount not less than $10,000,000 per occurrence.

(iii) All policies and coverages required under this Paragraph F shall be endorsed as follows:

(a) to provide full coverage to the other party's Group as additional insured without limiting coverage to liability "as the owner of the vessel" and to delete any "as owner" clause and any other language purporting to limit coverage to liability of an insured "as owner of the vessel".

(b) to delete any language limiting coverage for the other party's Group in the event of the applicability of a limitation of liability statute.

G. If either party owns or operates aircraft, including helicopters, to provide services to or conduct operations for Company, such party shall carry:

(i) Aircraft liability insurance covering all owned, non-owned and hired aircraft with a minimum combined single limit of $10,000,000 per occurrence. Such policy shall be endorsed to provide coverage in all territories where Contractor provides services to or conducts operations for Company.

(ii) General/airport liability insurance including premises/operations, products, contractual, independent contractors and hangers' keepers' liability with a minimum combined single limit of $10,000,000 per occurrence.

(iii) All Risks Hull Insurance for an agreed value, including, without limitation, coverage for collision liability.

H. Umbrella/Excess Liability Insurance with limits not less than $5,000,000 each occurrence/aggregate where applicable to be excess of coverage and limits required in Paragraphs A through G.

I. Physical Damage Insurance on the insured's own property to the extent of its replacement cost.

A-4

J.    The foregoing Minimum Insurance Requirements are subject to change at the direction of Company, and Company reserves the right to require certified copies of any or all policies.

A-5

## WAIVER OF LIEN AGREEMENT

STATES OF _____

COUNTIES/PARISHES OF _____

KNOW ALL MEN BY THESE PRESENTS THAT:

WHEREAS, _____, a _____ corporation, whose address is _____ (hereinafter referred to as "Contractor"), and PENN VIRGINIA OIL & GAS CORPORATION, a Virginia corporation with offices in Houston, Texas, PENN VIRGINIA OIL & GAS, L.P., a Texas limited partnership with offices in Houston, Texas, and PENN VIRGINIA MC ENERGY L.L.C., a Delaware limited liability company with offices in Houston, Texas (hereinafter collectively referred to as "Company"), have entered into a Master Service Contract (the "Master Service Contract") whereby Contractor has agreed to provide work and services in various counties in the State(s) of _____; and

WHEREAS, under the Master Service Contract, Contractor must submit to Company a list of subcontractors to be used in the performance of such work and services, together with documents evidencing that all laborers, subcontractors and suppliers of materials and equipment have been paid and are not claiming liens on Company's property for such labor, services or materials under the provisions of the applicable Constitution, Statutes, Rules and Regulations of such State(s); and

WHEREAS, the undersigned _____, a _____ corporation (hereinafter referred to as "Subcontractor"), has performed and/or furnished or agreed to perform and/or furnish labor, services, equipment, material or supplies or any combination of the foregoing for the work or services; and

WHEREAS, Subcontractor wishes to be considered by Contractor for some of the labor, services or materials to be performed and/or furnished to Contractor for the work or services.

NOW, THEREFORE, for and in consideration of $10 in hand paid to Subcontractor by Contractor on behalf of Company, and in consideration of the purposes and objectives hereinabove expressed, Subcontractor hereby agrees with Contractor for the benefit of Company, as follows:

1. Subcontractor hereby waives and relinquishes all rights to assert each and every mechanics, materialmen, laborers and other liens provided for by the Constitution, Statutes, Rules and Regulations of the State of _____ which it may otherwise be entitled to for the labor, services, materials or supplies performed and furnished or to be performed and furnished in the performance of work or services insofar only as such liens (or any of them) apply to property or equipment of Company and/or proceeds therefrom owned by Company up to the full amount due for labor, services or supplies, principal and interest, and any

B-1

statutory attorney's fees due Subcontractor. Notwithstanding the foregoing, Contractor and Subcontractor hereby agree that all remedies of Subcontractor against Contractor shall remain in effect and are not waived or impaired by execution of this waiver.

2.      Subcontractor agrees that Company may pay the full Contract price to Contractor and that Subcontractor relieves Company of any responsibility for seeing to the distribution of such Contract funds and Subcontractor indemnifies Company from any loss, cost or expense for having paid the Contract price to Contractor and agrees that it will look solely to Contractor for payment.

3.      Subcontractor recognizes and agrees that Contractor and Company are not joint venturers nor a partnership and that debts due and owing to Subcontractor by Contractor for the work or services are exclusively the debts of Contractor contracted by Contractor on its own behalf and not as an agent, representative or partner of Company.

4.      Contractor hereby agrees that it will be liable to Subcontractor only in accordance with the contract between Contractor and Subcontractor and represents that it is not acting as agent or as a partner or joint venturer with or for Company.

5.      Notwithstanding the foregoing, if for any reason Subcontractor shall acquire a lien on the property or equipment of Company, then Subcontractor agrees to subordinate such lien to Company's ownership interests within ten (10) days after request therefor by Contractor or Company.

*[Signature Page Follows]*

B-2

PVOG 32

IN WITNESS WHEREOF this agreement is executed by Subcontractor and Contractor on this _____ day of _____, 201___.

SUBCONTRACTOR:

_____

By:_____
     Name:
     Title:

*WITNESS OR ATTEST:*

_____
Name:_____
          (Please Print)

CONTRACTOR:

_____

By:_____
     Name:
     Title:

*WITNESS OR ATTEST:*

_____
Name:_____
          (Please Print)

B-3

## EXHIBIT "C"

## JOINDER TO MASTER SERVICE CONTRACT

_____, a _____ corporation ("Joining Contractor") hereby joins in that certain Master Service Contract dated _____, 201__, by and among (i) Penn Virginia Oil & Gas Corporation, a Virginia corporation, Penn Virginia Oil & Gas, L.P., a Texas limited partnership, and Penn Virginia MC Energy L.L.C., a Delaware limited liability company, and (ii) _____, a _____ corporation ("Contractor"), as amended or supplemented prior to the date hereof and in effect on the date hereof (as amended or supplemented, the "Master Service Contract"). Joining Contractor hereby ratifies, confirms and adopts the Master Service Contract and agrees to be bound by all of the obligations, covenants, terms and conditions contained therein that apply to "Contractor" as though an original party thereto.

Executed effective as of _____, 201__.

JOINING CONTRACTOR:

_____

By:_____
    Name:
    Title:

_WITNESS OR ATTEST:_

_____

Name:_____
          (Please Print)

C

PVOG 34

# EXHIBIT "D"

## ADDITIONAL PROVISIONS

FORCE MAJEURE

Except for the indemnification provisions under this Contract and the duty to make payments for services already provided along with force majeure or standby payments during the Force Majeure Event, neither Company nor Contractor shall be responsible to the other for any delay, damage or failure caused by or occasioned by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes acts of God, action of the elements, warlike action, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes, differences with workers, acts of public enemies, acute and unusual labor, material or equipment shortages, or any other causes (except financial) beyond the control of either party. Delays due to the above causes, or any of them shall not be deemed to be a breach of or failure to perform under this Contract. Neither Company nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law.

BREACH SHALL NOT IMPAIR

TO THE EXTENT ALLOWED BY APPLICABLE LAW, IT IS THE INTENT OF THE PARTIES THAT ALL INDEMNITY OBLIGATIONS AND LIABILITIES ASSUMED BY SUCH PARTIES UNDER TERMS OF THIS AGREEMENT, BE WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF (INCLUDING BUT NOT LIMITED TO PREEXISTING CONDITIONS), STRICT LIABILITY, REGULATORY OR STATUTORY LIABILITY, ANY BREACH OF CONTRACT, BREACH OF REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED), OR THE WILLFUL MISCONDUCT OR NEGLIGENCE OF ANY KIND OR CHARACTER OF ANY INDEMNIFIED PARTY OR PARTIES (INCLUDING, WITHOUT LIMITATION, WHETHER SUCH NEGLIGENCE BE ORDINARY OR GROSS; SOLE, JOINT, OR CONCURRENT; OR ACTIVE OR PASSIVE).

D-1

# NABORS DISPUTE RESOLUTION
# PROGRAM and RULES



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors*



# THE I 3ORS DISPUTE RESOLUTION PI GRAM

## 1. Purpose and Construction

The Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment, related to or arising out of a current, former or potential employment relationship with the Company. The Program is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Program contractually modifies the "at-will" employment relationship between the Company and its Employees, but only to the extent expressly stated in the Program. The Program should be interpreted in accordance with these purposes.

## 2. Definitions

A. "AAA" means the American Arbitration Association.

B. "JAMS" means Judicial Arbitration and Mediation Services.

C. The "Act" means the Federal Arbitration Act, 9 U.S.C.§1, et seq., as amended from time to time.

D. "Company" means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the successors and assigns of all such entities, plans and persons; provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.

E. "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes

der the Program, or between a person and by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1. this Program;

2. the employment or potential reemployment of an Employee, including the terms, conditions, or termination of such employment with the Company;

3. employee benefits or incidents of employment with the Company;

4. any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress, antitrust claim concerning wages or otherwise, or status, claim or membership with regard to any employee benefit plan;

5. an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6. any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Program (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

F. "Electing Entity" means any legal entity that has agreed to be bound by the Program as provided herein.

G. "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Program, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to

laws of the United States or any state, ·      nicipality, or other political subdivision of the United States.

H. "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Program.

I. "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Program.

J. "Program" means this Nabors Dispute Resolution Program, as amended from time to time.

K. "Rules" means the Nabors Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

L. "Sponsor" means Nabors Industries, Inc., a Delaware corporation.

3. **Name, Application and Coverage**

A. The Program shall be referred to as the "Nabors Dispute Resolution Program." Alternatively, it may be referred to as the "Dispute Resolution Program."

B. Until revoked by Sponsor pursuant to this Program, this Program applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Program shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C. Except as provided for herein, this Program applies to any Dispute.

D. Notwithstanding anything to the contrary in this Program, the Program does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E. Mediation and arbitration are only available for Disputes involving legally protected rights.

F. Notwithstanding any other provision hereof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Program. Furthermore, an action under The Limitation of Ship Owners Liability Act, 46 U.S.C. §§181-189, shall not be subject to this Program.

## 4. Resolution of Disputes

All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules.

## 5. No Retaliation

No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Program.

## 6. Amendment

A. This Program may be amended by Sponsor at any time by giving at least 10 days' notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules, unless otherwise agreed.

B. Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules unless otherwise agreed.

## 7. Termination

This Program may be terminated by Sponsor at any time by giving at least 10 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination unless otherwise agreed.

## 8. Applicable Law

A. The Act shall apply to this Program, the Rules, and any proceedings under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules.

B.  ' arbitrations held pursuant to this Prog    n shall be convened as near as possible to the worksite where the events in dispute occurred if Nabors continues to perform work at that location.  Otherwise the arbitration will occur at the place most convenient for the majority of the witnesses.

C. Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are preserved.  In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

D. Other than as expressly provided herein, or in the Rules, the Program shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Program.

E. Notwithstanding the provisions of the preceding subsection, in any proceeding before an arbitrator, the arbitrator, in his or her discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award.  The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law.  If the arbitrator awards attorney fees without authorization for such an award by statute or contract, such award will be limited to $2,500.00.

9. **Administrative Proceedings**

A. This Program shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B. Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Program to any such Dispute upon termination of the administrative or judicial proceedings.  A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Program as it would in a court of competent jurisdiction.

## 10. Exclusive Remedy

Proceedings under the Program shall be the exclusive, final and binding method by which Disputes are resolved.

## 11. Electing Entities

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

## 12. Effective Date

The Effective Date of this Program shall be April 15, 2001.

## 13. Severability

The terms of this Program and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Program, any otherwise invalid provision of the Program or the Rules may be reformed and, as reformed, enforced.

## 14. Assent

Employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Program.

# NABORS DISPUTE RESOLUTION RULES

## 1. Definitions

All definitions included in the Nabors Dispute Resolution Program apply to these Rules.

## 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

B. [...]se Rules apply in the form existing [...] the time proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS also apply to all proceedings governed by these Rules.

3. **Initiation of the Process**

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS, and tendering the appropriate administrative fee.

C. Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

D. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Program Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA or JAMS.

E. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

4. **Administrative Conference**

AAA or JAMS shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA or JAMS will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA or JAMS will implement the procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the

Par have previously attempted and failed to resolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

## 5. Appointment of Arbitrator

Immediately after payment of the arbitration fee, AAA or JAMS shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA or JAMS. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA or JAMS shall invite the acceptance of the arbitrator or arbitrators to serve. In those cases where more than $2,000,000 is in controversy, either Party shall have the right to require that the arbitration proceed before a three member panel rather than a single arbitrator. The Party who elects for a panel in these circumstances shall notify the other Parties during the administrative conference described in Section 4 of the Program. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA or JAMS shall issue a new list of arbitrators consistent with the above procedures.

## 6. Qualifications of the Arbitrator

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

## 7. Vacancies

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

8. **Da⸱ Time and Place of Hearings**

A. The arbitrator shall set the date, time and place of any proceeding pursuant to the requirements of Section 8B of the Program.

B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

9. **Conferences**

At the request of AAA or JAMS, or of a Party or on the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A. venue,

B. clarification of issues,

C. determination of preliminary issues, including summary determination of dispositive legal issues,

D. discovery,

E. the time and location of proceedings or conferences,

F. interim legal or equitable relief authorized by applicable law,

G. pre- or post-hearing memoranda,

H. stipulations; and/or

I. any other matter of substance or procedure.

10. **Mode of Hearings and Conferences**

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

## 11. Preparing Discovery

A. On any schedule determined by the arbitrator, each Party shall submit in advance the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B. The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C. Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

## 12. Representation

Any Party may be represented by counsel or by any other authorized representative.

## 13. Attendance at Hearings

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

## 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The pendency of court proceedings related to the same matter is not good cause for postponement.

## 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

## 16. Rec____ ] of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

## 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

## 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

## 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses. by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

## 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

## 21. Clo    g and Reopening of Proceedings

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

## 22. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

## 23. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

## 24. Communications with the AAA, JAMS, and the Company

A. Any Party may notice, serve or communicate with AAA by contacting:

Regional Administrator
American Arbitration Association
1001 Fannin St., Suite 1005
Houston, Texas 77002
(713) 739-1302
Fax: (713) 739-1702

B. Any Party may notice, serve or communicate with JAMS by contacting:

JAMS
345 Park Avenue, 8th Floor
New York, NY 10154
(212) 751-2700
Fax: (212) 751-4099

C.  y notice, service or communicati  with the Company will be to:

Legal Department
Nabors Industries, Inc.
515 West Greens Road, Suite 1200
Houston, Texas 77067-4525
(281) 874-0035
Fax: (281) 775-8431

## 25. Communication with the Arbitrator

There shall be no communication between the Parties and the arbitrator other than at any oral hearings or conferences. Any other oral or written communications from the parties to the arbitrator shall be directed to the AAA or JAMS (and copied to the Parties) for transmission to the arbitrator, unless the Parties and the arbitrator agree otherwise.

## 26. Time of Award

The award shall be promptly made by the arbitrator, unless otherwise agreed by the Parties or specified by applicable law, no later than thirty (30) days from the date of the closing of the proceeding or, if applicable, the closing of a reopened proceeding.

## 27. Form of Award

The award shall be in writing and shall be signed by the arbitrator. The arbitrator shall write a statement of reasons for the award if requested to do so in the request to initiate proceedings or in the answering statement. The award shall be executed in any manner required by applicable law.

## 28. Modification of Award

On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.

## 29. Set    nent

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

## 30. Scope of Arbitrator's Authority

The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

## 31. Judicial Proceedings and Exclusion of Liability

A. Neither AAA, JAMS, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules.

B. Neither AAA, JAMS, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met, pending the institution of proceedings under these Rules.

## 32. Fee  id Expenses

A. The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B. All attorneys' fees shall be borne by the Party incurring them except as otherwise provided by law, by the Program, or in the award of the arbitrator.

C. Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D. The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E. The Employee or Applicant shall pay a $150 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules, including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F. If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G. Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

## 33. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be in interpreted and applied by the AAA or JAMS.

## 34. Applicable Law

A. Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B. Except where otherwise expressly provided in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

## 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

## 36. Spanish

A copy of this Program is available in Spanish.



January 17, 2007

TO:   All Employees of Nabors Industries, Inc. and Subsidiaries

RE:   Nabors Dispute Resolution Program

Dear Employee:

Effective ten (10) days after the date of this notice, pursuant to Section 6 of the Nabors Dispute Resolution Program, Nabors Industries, Inc. ("Nabors") and its subsidiaries are amending the Nabors Dispute Resolution Program and Rules for the determination of all disputes between employees and Nabors or one of its subsidiaries.

The amendments to the Program and Rules are enclosed on the back of this page. Nabors is amending one (1) section of the Nabors Dispute Resolution Program and one (1) section of the Nabors Dispute Resolution Rules. You should already have a copy of the current Program and Rules, or they may be found on the Nabors Intranet under policy number 200.80.1 at http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

As before, the Nabors Dispute Resolution Program, as amended, gives you the most effective and efficient means of resolving any disputes you may have through a process which encourages resolution at the earliest opportunity. Employees do not waive any substantive legal rights under the Program. Rather, the Program, as amended, provides that any substantive legal issues you may have will be resolved on an individual basis in mediation or before a neutral arbitrator, whose decision will be final and binding on you and the Company. Under the Program, as amended, however, you waive any procedural rights you may have to bring a court action, on an individual or on a class, collective or representative basis; and you waive your right to a jury trial concerning any dispute you may have with the Company or any Electing Entity (as defined in the Program), including any personal injury claims or claims of discrimination based on race, national origin, gender, religion, age or disability under any federal or state civil rights statute.

Every individual who works for Nabors Industries, Inc. or a subsidiary is subject to the Program, as amended, except that the amended provisions will affect only disputes initiated after the effective date of the amendments, and not any matters pending before the effective date. Your continued employment after the date you receive this notice will constitute your acceptance of the amendments to the Program, both during and after your employment with the Company.

We look forward to continuing to work together. If you have any questions about the amendments to the Program and Rules or any other term of your employment, please do not hesitate to contact the Human Resources Department of your employer.

Sincerely,

NABORS INDUSTRIES, INC.

*A copy of this notice is available in Spanish, upon request,
from any Nabors subsidiary's Human Resources Department.

* Una copia de esta noticia está disponible en español con solo requerirla
al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.



## Amendment to THE NABORS DISPUTE RESOLUTION PROGRAM:

### 4. Resolution of Disputes

A. All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules. The Parties forego any right either may have to a jury trial on claims relating in any way to any Dispute.

B. Each Dispute shall be arbitrated on an individual basis. The Parties forego and waive any right to join or consolidate claims in arbitration with others or to make claims in arbitration as a representative or as a member of a class or in a private attorney general or similar capacity, unless such procedures are agreed to by all Parties. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Program shall have no authority to conduct the matter as a consolidated, class, collective or representative action.

C. If the procedural limitation in Paragraph B of this Section is held unenforceable by a court in a proceeding in which a party seeks to pursue a consolidated, class or collective action or otherwise act in a representative capacity, then this Program shall apply to such proceeding only to the following extent. The court will decide whether the Dispute should proceed on a consolidated, class, collective or other representative basis and, if so, will define the scope of the class. None of the foregoing determinations shall be submitted to the arbitrator, and in no event shall the arbitrator have the power to determine class, collective or representative action certification. The court's decisions will be subject to appeal pursuant to the applicable rules of procedure. If the court certifies a class, collective or other representative action, then all other determinations in or related to the Dispute shall be made by the arbitrator. The arbitrator shall determine questions of liability to or of the class as a whole and remedies available to or from the class as a whole. The arbitrator shall also decide the relief, if any, to which a party or class member may be entitled individually. If the court, however, ultimately denies a party's request to proceed on a consolidated, class, collective or representative basis, then that party's individual claim(s) shall still be subject to this Program and referable to arbitration pursuant to its terms.

## Amendment to NABORS DISPUTE RESOLUTION RULES:

### 30. Scope of Arbitrator's Authority

A. The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

B. The arbitrator shall not have the power to hear any claims in arbitration as a class or collective action, or in a private attorney general or similar capacity, or on any other representative capacity basis, or, absent the consent of all parties, on a consolidated basis. The arbitrator shall be authorized to decide only the disputed claims between the individual parties.

# PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidaria de Nabors*

PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE
NABORS

l.   1. Propósito y Diseño

El Programa está diseñado con el fin de proporcionar un medio para la resolución rápida, justa, accesible y económica de conflictos entre la Compañía y los Empleados actuales y anteriores de la Compañía y los Aspirantes para puestos de empleo, con respecto a o como consecuencia de una relación de empleo actual, anterior o potencial con la Compañía. El Programa está diseñado para facilitar un proceso para la resolución definitiva de todas los Conflictos descriptos en los términos del mismo. No está diseñada para limitar o aumentar los derechos fundamentales disponibles bajo las leyes aplicables. El Programa modifica en forma contractual la relación de empleo efectuado entre la Compañía y sus Empleados, pero sólo en la medida en que esté expresamente establecido en el Programa. El Programa deberá ser interpretado de acuerdo con esta intención.

2.   Definiciones

A.   "AAA" significará la Asociación Americana de Arbitraje (the American Arbritration Association).

B.   "JAMS" significará los Servicios de Mediación y Arbitraje Judiciales (Judicial Arbitration and Mediation Services)

C.   La "Ley" significará la Ley Federal de Arbitraje (the Federal Arbitration Act)

D.   La "Compañía" significará el patrocinador del Programa y las filiales directas o indirectas (ya sean una corporación, una compañía de responsabilidad limitada, una sociedad u otra entidad legal) del patrocinador, la Entidad que Selecciona el Programa, la entidad o persona que se alega tiene responsabilidad asociada o separada con respecto a cualquier Conflicto, y todos sus directores, funcionarios, empleados y agentes, plan de beneficios, ya sea exento o no-exento de impuestos, establecido o mantenido por dicha entidad, los fiduciarios, agentes y empleados de dichos planes, y los sucesores y beneficiarios de dichas entidades, planes y personas; siempre y cuando, en el caso de la Entidad que selecciona el Programa, "La Compañía" deberá incluir la Entidad que Selecciona el Programa solamente en la medida establecida en el contrato de dicha Entidad en la que estará obligada por el Programa.

E.  "Conflicto" significará todas las demandas legales y justas, los reclamos y controversias, de cualquier índole o tipo, ya fueren contractuales, o de responsabilidad extracontractual, de acuerdo con el derecho escrito o las regulaciones o alguna otra ley, entre las partes obligadas por el Programa o por un contrato para resolver los Conflictos de acuerdo al Programa, o entre una persona obligada por el Programa y una persona o entidad con derecho a recibir sus beneficios, incluyendo pero sin limitarse a lo siguiente:

1.  este Programa;

2.  la contratación o la posible recontratación de un Empleado, incluyendo los términos, condiciones o el cese de dicho empleo con la Compañía;

3.  los beneficios o incidentes de empleo con la Compañía;

4.  todo asunto relacionado con la relación entre el Empleado y la Compañía incluyendo, por ejemplo pero sin limitarse a: la discriminación basada en la raza, el sexo, la religión, el origen nacional, la edad, la condición de veterano de guerra o cualquier incapacidad; el acuso sexual u cualquier otro tipo de acoso; las represalias por concepto de compensación laboral; la difamación, la imposición de un agravio emocional, la reclamación de antimonopolio relacionado con sueldos o el estado de, una reclamación por o una membresía relacionado con los planes de beneficios para empleados;

5.  la solicitud de un Aspirante para un puesto de empleo y las acciones y decisiones de la Compañía con respecto a dicha solicitud; y

6.  cualquier lesión personal supuestamente incurrida en o alrededor del sitio de trabajo de una Compañía o durante el término y alcance de las actividades laborales de un Empleado,

El "Conflicto" incluye todo lo anteriormente mencionado, independientemente del momento en que hayan ocurrido los eventos en los cuales estén basados, incluyendo los asuntos basados en eventos que hayan sucedido antes de que el Empleado estuviera sujeto a este Programa (siempre y cuando dichos conflictos no fueren establecidos con anterioridad en un tribunal jurídico) o después de la terminación de la relación de empleo

F. La "Entidad que Selecciona el Programa" significará toda entidad legal que hubiera acordado una obligación por medio el Programa de acuerdo a las disposiciones de este documento.

G. El "Empleado" significará toda persona que estuviera o hubiera sido empleada por la Compañía a la fecha o después de la fecha de vigencia de este Programa, incluso si estuviera o no estuviera empleado por la Compañía en el momento en que una demanda fuera presentada en relación con un Conflicto, y que residiera en los Estados Unidos de América, o que estuviera sujeto a las leyes de los Estados Unidos o de cualquier estado, municipalidad u otra subdivisión política de los Estados Unidos.

H. El "Aspirante" significará toda persona que estuviera buscando o que haya buscado empleo con la Compañía después de la fecha de vigencia de este Programa.

I. Las "Partes" significarán, las personas perjudicadas en relación con un Conflicto particular, y/o las entidades que obligadas y vinculadas por este Programa.

J. El "Programa" significará este Programa de Resolución de Conflictos de Nabors, y como fuere modificado de tiempo en tiempo.

K. Las "Reglas" significarán las Reglas para la Resolución de Conflictos de Nabors, según fueran modificadas de tiempo en tiempo, que sean aplicables a la mediación y el arbitraje.

L. El "Patrocinador" significará Nabors Industries, Inc., una corporación del estado de Delaware.

## 3. Nombre, Aplicación y Cobertura

A. El Programa será denominado el "Programa de Resolución de Conflictos de Nabors". De forma alternativa, podrá ser referido como el "Programa de Resolución de Conflictos".

B. Hasta que sea revocado por la entidad Patrocinadora de acuerdo con lo dispuesto en este Programa, dicho Programa se aplica y obliga la Compañía, cada Empleado y cada Aspirante y sus herederos, los beneficiarios y los cesionarios de dicha persona o entidad; siempre que este Programa no se aplique a un Empleado que sea parte de un grupo de Empleados representados por una organización laboral o a la Compañía relacionada con dichos empleados, excepto

en la medida permitida en un convenio de negociación colectiva (entre patronos y sindicatos obreros) o legalmente impuesto por la Compañía cuando ningún convenio de negociación colectiva estuviera vigente.

C. Este Programa se aplica a todo Conflicto, salvo se estipule lo contrario en este documento.

D. Sin perjuicio de lo estipulado en este Programa, el mismo no se aplica a las reclamaciones por concepto de indemnización o compensación de beneficios para obreros o de beneficios por concepto de desempleo.

E. La mediación y el arbitraje están solamente disponibles para los Conflictos que involucren derechos que estuvieren protegidos legalmente.

F. Sin perjuicio de otras disposiciones establecidas en este documento, todo tribunal con jurisdicción sobre las Partes puede emitir órdenes judiciales (incluyendo requerimientos judiciales preliminares) si los requerimientos legales y equitativos de acuerdo a las leyes aplicables se cumplieran durante la institución de las demandas bajo el Programa. Adicionalmente, una demanda bajo la Ley denominada The Limitation of Ship Owners Liability Act, 46 U.S.S §§181-189, no estará sujeta a este Programa.

4. **Resolución de Conflictos**

Los conflictos que no fueren resueltos por las Partes serán definitivamente resueltos de acuerdo con este Programa y sus Reglas.

5. **Artículo referente a Represalias**

No se podrá imponer ninguna forma de disciplina, ni se deberá tomar represalias con los empleados por haber iniciado o participado de buena fe en un proceso o una demanda de acuerdo con este Programa.

6. **Enmienda**

A. Este Programa puede ser modificado por el Patrocinador en cualquier momento mediante una notificación previa a los empleados actuales de por lo menos 10 días. Sin embargo, no se deberá aplicar ninguna enmienda a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas salvo se convenga lo contrario

B. El Patrocinador puede modificar las Reglas en cualquier momento por medio de la notificación de las enmiendas en AAA y JAMS. Sin embargo, ninguna enmienda de

las Reglas deberá aplicar a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas, salvo se acuerde lo contrario.

7.  **Terminación del Programa**

Este Programa podrá ser terminado por el Patrocinador en cualquier momento mediante la notificación a los Empleados actuales en un plazo no mayor de 10 días previo a la terminación antedicha. Sin embargo, la terminación no entrará en vigencia para los Conflictos para los cuales una demanda haya sido iniciada de acuerdo con las Reglas antes de la fecha de terminación, salvo se acuerde lo contrario.

8.  **Ley Aplicable**

A.  La Ley se aplicará a este Programa, las Reglas y cualquier demanda realizada de acuerdo al Programa o las Reglas, incluyendo las demandas para obligar, hacer cumplir, anular o confirmar demandas, adjudicaciones, órdenes de un árbitro, o resoluciones de acuerdo al Programa o las Reglas.

B.  Todos los arbitrajes efectuados de acuerdo con este Programa deberán ser convocados tan cerca como fuera posible del sitio de trabajo donde sucedieron los eventos en disputa, en caso que Nabors continúe realizando labores en esa ubicación. De lo contrario, el arbitraje tomará lugar en el sitio más conveniente para la mayor parte de los testigos.

C.  Salvo se establezca de manera expresa en las Reglas contenidas en este documento, se conservan los derechos legales fundamentales, los recursos y los mecanismos de defensa de todas la Partes. En caso de arbitraje, el árbitro tendrá la autoridad para determinar las leyes aplicables y de ordenar las compensaciones legales o equitativas, que una Parte pudiera obtener de un tribunal de jurisdicción competente en base a las reclamaciones presentadas en la demanda.

D.  Salvo se estipule de forma expresa en este documento, o en las Reglas del mismo, no se deberá interpretar el Programa con el propósito de otorgar derechos, recursos o mecanismos de defensa fundamentales, legales o contractuales adicionales, los cuales no podrían ser aplicados por un tribunal de una jurisdic-

ción competente en ausencia del Programa.

E. Sin perjuicio de las disposiciones establecidas en la subcláusula anterior, en toda demanda presentada ante un árbitro, el árbitro, a su total discreción, podrá permitir que un Empleado o Aspirante prevaleciente reciba los honorarios para el pago de abogados como parte del fallo dictado. La discreción para permitir la concesión de una asignación de honorarios de acuerdo a esta subcláusula será adicional a toda discreción, derecho o autoridad que el árbitro pudiera tener de acuerdo a las leyes aplicables. Si el árbitro concede los honorarios de abogado sin la autorización para dicha asignación por derecho escrito o contrato, dicha asignación estará limitada a $2,500.00.

## 9. Procesos Administrativos

A. Este Programa se deberá aplicar a un Conflicto que estuviera pendiente ante toda entidad administrativa o tribunal local, estatal o federal, a menos que estuviera prohibido por la ley.

B. La participación en todo proceso administrativo o judicial por la Compañía no deberá afectar la aplicabilidad del Programa a dicho Conflicto una vez que fuere terminado el proceso administrativo o judicial. Un fallo, una recomendación o una decisión efectuada por una entidad administrativa en base a los méritos de un Conflicto deberá tener el mismo peso o efecto legal de acuerdo al Programa como si hubieran sido dictados por un tribunal de una jurisdicción competente.

## 10. Recurso Exclusivo

Los procesos efectuados de acuerdo al Programa deberán ser el método exclusivo, inapelable y vinculante por medio de los cuales se resolverán los Conflictos.

## 11. Las Entidades que Seleccionen el Programa

A. Las Corporaciones u otras entidades legales, que no fuesen Partes del mismo, tienen la opción de decidir si quisieren estar vinculadas y obligadas por este Programa mediante un contrato escrito con el Patrocinador.

B. Dicha opción para participar en este Programa puede ser efectuada en relación con algunos tipos de Conflictos, o en relación con algunas personas, a discreción de la Entidad que Seleccione el Programa.

## 2. La Fecha de Vigencia

La Fecha de Vigencia de este Programa será el 15 de abril de 2001.

## 3. Atribución de Separación

Los términos de este Programa y las Reglas son separables. La falta de validez o de la obligación para que se cumplieran algunas de las disposiciones en este documento no afectará la aplicación de las otras disposiciones. Donde fuere posible, y en forma consistente con los propósitos del Programa, toda disposición que fuera invalidada en el Programa o en las Reglas se podrá modificar y después de modificada, se podrá obligar su cumplimiento.

## 14. Asentimiento

El empleo o la continuación del empleo después de la Fecha en Vigencia de este Programa constituyen el consentimiento por parte del Empleado y la Compañía para estar obligados por las disposiciones de este Programa, durante la duración del empleo y después del cese del mismo. La presentación de una solicitud de empleo, independientemente del formulario utilizado, constituye el consentimiento por parte del Aspirante y la Compañía para estar obligados por las disposiciones de este Programa.

# REGLAS PARA LA RESOLUCIÓN DE CONFLICTOS DE NABORS

## 1. Definiciones

Todas las definiciones incluidas en el Programa de Resolución de Conflictos de Nabors se aplicarán a estas Reglas.

## 2. Aplicación

A. Si hubieran reglas diferentes que fueran aplicables a una determinada clase específica de Conflicto, y éstas hubieran sido adoptadas por el Patrocinador y notificadas a AAA y JAMS, estas Reglas no se aplicarán a dicha clase de Conflictos.

B. Estas Reglas se aplican de la forma en que existieran en el momento en que se iniciaran los procesos establecidos de acuerdo con las mismas.

A. En la medida que fuera consistente con estas

las Reglas de Resolución de Conflictos Laborales de AAA o JAMS también se aplicarán a todos los procesos reglamentados por estas Reglas.

i. **El Inicio del Proceso**

A. Una Parte puede iniciar la demanda de acuerdo con lo establecido por estas Reglas en cualquier momento, sujeto a los mecanismos de defensa e incluyendo aquellos que apliquen en el tiempo oportuno de la reclamación, incluyendo las limitaciones y demoras indebidas.

B. Una Parte puede iniciar la demanda mediante la entrega de una solicitud escrita para iniciar la demanda en AAA o JAMS y después del pago de cargo administrativo correspondiente.

C. Las copias de la solicitud deberán ser entregadas a todas las otras Partes del Conflicto por AAA o JAMS. La solicitud deberá describir la índole del Conflicto, el monto involucrado, si lo hubiese, el recurso que se solicita y el sitio solicitado para el proceso.

D. Las demandas también pueden ser iniciadas por un Empleado o Aspirante mediante la entrega de una solicitud escrita para iniciar los procesos al Administrador del Programa de Resolución de Conflictos de la Compañía. En dicho caso, la Compañía deberá entregar en la brevedad posible a AAA o JAMS toda solicitud que hubiera recibido y que hubiera sido entregada en forma apropiada.

E. Las Partes contra quienes se haya presentado una demanda deberán presentar una declaración en respuesta a dicha demanda dentro del plazo de 21 días de la fecha a partir de la que se recibió la notificación de la intención de arbitrar o la descripción de las reclamaciones, la cual deberá incluir las contrademandas y las solicitudes para que el árbitro (si lo hubiera) prepare una declaración fundamentando las razones por las cuales se concede la indemnización.

4. **Junta Administrativa**

AAA o JAMS deberán convocar una junta administrativa tan pronto como sea posible después de haber recibido la declaración de respuesta o después del vencimiento del plazo para la presentación de la declaración de respuesta, si

dicha declaración no hubiera sido presentada. La junta puede ser sostenida en persona o por teléfono. En la junta,

A.      En la medida que fuera consistente con estas

AAAo JAMS determinarán si las Partes han acordado un método para resolver el Conflicto. Si las Partes estuvieran de acuerdo, AAA o JAMS implementarán el proceso de acuerdo con sus reglas una vez que se haya efectuado el pago del cargo correspondiente. Si las Partes no pueden llegar a un acuerdo, o si las Partes hubieran intentado llegar a un acuerdo y no pudieron resolver el Conflicto por medio de la mediación u otro mecanismo que no fuera vinculante u obligatorio, el Conflicto deberá ser arbitrado de acuerdo con estas Reglas.

5. El Nombramiento de un Árbitro

Inmediatamente después del pago del cargo por concepto de arbitraje, AAA o JAMS deberán enviar simultáneamente a cada Parte involucrada una lista idéntica de los nombres de las personas que fueron escogidas de un panel de árbitros calificados que AAA o JAMS deberá seleccionar y mantener. Cada una de las Partes del Conflicto tendrá catorce (14) días a partir de la fecha del comunicado para tachar los nombres que no prefiere, numerar en orden de preferencia los nombres restantes y devolver la lista a AAA o JAMS. Si una de las Partes no regresara la lista dentro del plazo especificado, todas las personas en la misma serán consideradas como aceptables. Entre las personas que hayan sido aprobadas en ambas listas, y de acuerdo con el orden de preferencia mutua, AAAo JAMS deberán invitar a que uno de ellos o más de uno ejerza/n de árbitro/s. En los casos en los cuales más de $2,000,000 esté en controversia, cualquiera de las partes tendrá el derecho de solicitar que el arbitraje proceda delante de un panel de tres miembros en vez de un solo árbitro. La Parte que escoja un panel en estas circunstancias deberá notificar a las otras Partes durante la junta administrativa descrita en la Cláusula 4 del Programa. Cualquiera de las Partes tendrá el derecho de tachar una lista de árbitros en su totalidad. Cuando una de las Partes ejercita este derecho, AAAo JAMS deberá emitir una nueva lista de árbitros de manera consistente con los procesos anteriormente mencionados.

6. Requisitos para la designación de un Árbitro

Ninguna persona deberá ejercer como árbitro en ningún caso en el cual dicha persona tuviera un interés financiero o personal. Antes de aceptar el nombramiento, el posible candidato deberá revelar cualquier circunstancia que posiblemente pudiera impedir una audiencia oportuna o crear la presunción de parcialidad. Una vez recibida dicha información por parte del árbitro o de cualquier otra fuente, AAA o JAMS tendrá que sustituir esa persona o comunicar la información a las Partes involucradas para que

puedan formular sus comentarios. A partir de entonces, AAA o JAMS podrán descalificar dicha persona y su decisión será concluyente.

## 7. Vacantes

Si hubiera una vacante por cualquier razón o si un árbitro designado no pudiera ejercer en forma oportuna, se deberá aplicar el proceso para determinar nombramientos descripto en la Cláusula 5 para la selección de un árbitro substituto.

## 8. Fecha, Hora y Sitio para las Audiencias

A.   El árbitro deberá fijar la fecha, hora y sitio de cualquier proceso efectuado de acuerdo con las disposiciones de la Cláusula 8B del Programa.

B.   Se proporcionará la notificación de la audiencia con un plazo no mayor de diez (10) días de anticipación, salvo que el árbitro determinara o que las Partes convengan que un periodo más corto fuera necesario.

C.   El árbitro deberá realizar su labor, sin incurrir en gastos indebidos, para acomodar el Empleado o el Aspirante en la selección de un sitio para el proceso.

## 9. Juntas

A pedido de AAA o JAMS, o de una de las Partes o por iniciativa del árbitro, el árbitro de AAA o JAMS podrá convocar a juntas previa notificación para la discusión y la determinación de cualquier asunto que agilice el proceso, incluyendo:

A.   la jurisdicción,

B.   la aclaración de asuntos de especial interés

C.   la determinación de asuntos preliminares, incluyendo el sumario de las consideraciones y disposiciones legales

D.   la junta previa a la audiencia

E.   el tiempo y sitio para los procesos o juntas de arbitraje

F.   los recursos equitativos o legales interinos autorizados por las leyes aplicables

G.   los memorandums anteriores o posteriores a la audiencia

H. las disposiciones, y/o

I. cualquier otro asunto o proceso fundamental

## 0. La modalidad para realizar Audiencias y Juntas

A discreción del árbitro o por común acuerdo entre las Partes, se podrán realizar juntas y audiencias por teléfono o por escrito, así como en persona.

## 1. La Junta previa a la Audiencia

A. En un horario que será determinado por el árbitro, cada una de las partes deberá entregar por adelantado los nombres y direcciones de los testigos que se pro-pone presentar y también los documentos que tiene planeado presentar.

B. El árbitro tendrá la discreción para determinar el formato, la cantidad y la frecuencia de las juntas con las Partes involucradas.

C. Las juntas antedichas podrán tomar el formato permitido por las Reglas Federales para Procesos Civiles, ser modificadas de tiempo en tiempo, y estar sujetas a las restricciones impuestas por el árbitro.

## 2. Representación

Cualquiera de las Partes podrá ser representada por un abogado o por cualquier otro representante autorizado.

## 3. La Asistencia a las Audiencias

El árbitro deberá guardar la privacidad de los procesos hasta donde fuera permitido por la ley. Todas aquellas personas que tienen un interés personal en el caso a ser tratado tendrán el derecho de asistir a los procesos de arbitraje.

El árbitro deberá tener la autoridad de excluir a cualquier testigo que no fuera una de las Partes u otra persona esencial, durante del testimonio de otros testigos. El árbitro deberá determinar si alguna otra persona podrá asistir al proceso. A pedido de cualquiera de las Partes, el árbitro deberá excluir cualquier testigo durante el testimonio de otros testigos.

## 4. Aplazamiento de los procesos o juntas de arbitraje

A. El árbitro, debido a una causa justificada demostrada por una de las Partes, o de común acuerdo con las Partes, podrá postergar cualquier proceso o junta de

arbitraje.

B. La realización de procesos judiciales pendientes y relacionados con el mismo asunto no constituye una causa justificada para su aplazamiento.

## 15. Declaración Jurada

Antes de proseguir con la primera audiencia, cada árbitro podrá tomar el juramento para el ejercicio de su cargo y así lo hará si fuera requerido por la ley. El árbitro puede requerir que los testigos testifiquen bajo juramento conducido por una persona debidamente calificada y así lo hará si fuera requerido por la ley o requerido por alguna de las Partes.

## 16. Registro de los Procesos de Arbitraje

No habrá ningún registro estenográfico, de audio o video de los procesos de arbitraje salvo que fueran solicitados por alguna de las Partes o determinado por el árbitro. La Parte que solicite el registro deberá pagar el costo total de su producción. Se suministrarán copias del registro a pedido de las otras Partes y una vez que se haya pagado el costo de la reproducción.

## 17. Proceso

El Proceso deberá ser dirigido por el árbitro en el orden y de la manera que permita la más rápida presentación de la evidencia y de los argumentos de las Partes.

## 18. El Arbitraje en Ausencia de una de las Partes

El árbitro podrá proseguir en ausencia de una de las Partes o representantes que, después de la debida notificación, no se presentaran o no obtuvieran un aplazamiento. No se alcanzará un fallo solamente en base a la falta de asistencia de una de las Partes. El árbitro deberá requerir que cualquiera de las Partes presentes presente toda la evidencia que el árbitro requiriera con el fin de alcanzar un fallo o conceder una asignación.

## 19. Evidencia

A. El árbitro será el único que juzgará la relevancia, la importancia, y la admisibilidad de la evidencia que fuera presentada. La conformidad con las reglas legales referentes a evidencia no será necesaria.

B. El árbitro puede citar con una orden de comparecencia a testigos o documentos a pedido de una de las Partes o

por la iniciativa propia del árbitro.

C. El árbitro puede considerar la evidencia de los testigos mediante una declaración jurada o una declaración, pero le deberá dar el peso que el árbitro considere apropiado después de haber considerado cualquier objeción hecha para su admisión al proceso de arbitraje.

## 20. Presentación de la Evidencia después de la Audiencia

La evidencia documentada a ser considerada por el árbitro deberá ser presentada en la audiencia salvo que el árbitro encuentre una justificación para que se permita una presentación posterior a dicha audiencia. Se les deberá proporcionar a todas las Partes la oportunidad para examinar y comentar sobre cualquier evidencia que fuera presentada posteriormente a la audiencia. El árbitro deberá permitir la presentación de expedientes a pedido de una de las Partes y deberá determinar el proceso y el momento oportuno de dicha presentación.

## 21. El Cierre y la Reapertura de los Procesos de Arbitraje

A. Cuando el árbitro esté satisfecho que el registro está completo, incluyendo los expedientes que hayan sido presentados con su permiso después de la audiencia, el árbitro deberá declarar el cierre del proceso.

B. Se podrá reabrir el proceso por iniciativa del árbitro o mediante la solicitud de una de las Partes en cualquier momento anterior al fallo del árbitro.

## 22. Renuncia al Derecho de Objetar en el Proceso de Arbitraje

Después de haber tenido conocimiento de que no se hubiera cumplido con las disposiciones o requerimientos relacionados con estos procesos y reglas de arbitraje, cualquiera de las Partes que no se oponga por escrito será considerada como que hubiera renunciado al derecho de objetar.

## 23. Notificaciones

Cualquier comunicado, notificaciones o procesos necesarios o apropiados para la iniciación o la continuación de cualquier proceso de arbitraje efectuado de acuerdo con estas Reglas (incluyendo el fallo del árbitro, cualquier demanda judicial en relación con el mismo, o la adjudicación de una indemnización efectuada de acuerdo con estos procesos) puede ser enviado por correo dirigido a la Parte o su representante a la dirección más reciente de la cual se

tuviera conocimiento o entregado mediante un servicio de mensajería. AAAo JAMS, las Partes, y el árbitro también podrán usar la transmisión por facsímile, telex, telegrama, u cualquier otra forma escrita de comunicación electrónica con el fin de entregar cualquier notificación requerida por esta Reglas.

4. **La Comunicación con AAA, JAMS y la Compañía**

    A.   Cualquiera de las Partes podrá notificar o comunicarse con AAA, comunicándose con:

> Regional Administrador
>   (Administrador Regional)
> American Arbitration Association
> (Asociación Americana de Arbitraje)
> 1001 Fannin St. Suite 1005
> Houston, Texas 77002
> (713) 739-13022
> Fax: (713) 739-1702

    B.   Cualquiera de las Partes podrá notificar o comunicarse con JAMS, comunicándose con:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

    C.   Cualquier notificación o comunicado con la Compañía deberá ser dirigido a:

> Legal Department (Departamento Legal)
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

25. **Comunicación con el Árbitro**

No habrá ninguna comunicación con las Partes y el árbitro aparte de la comunicación en las audiencias o juntas de arbitraje. Cualquier otra forma de comunicación ya sea oral o escrita de las partes al árbitro deberán ser dirigidas a AAA o JAMS (y su copia enviada a las Partes) para ser transmitidas al árbitro, salvo que las Partes y el árbitro acuerden lo contrario.

26. **Plazo para efectuar el Fallo de Arbitraje**

El fallo se efectuará rápidamente por el árbitro, salvo que se hubiera acordado lo contrario por las Partes o que estu-

viera estipulado por las leyes aplicables, en un plazo no mayor de treinta (30) días a partir de la fecha del cierre de los procesos o, si fuera aplicable, del cierre de un proceso de arbitraje que haya sido reabierto.

## 27. El Formato del Fallo de Arbitraje

El fallo del arbitraje deberá ser por escrito y deberá ser firmado por el árbitro. El árbitro deberá redactar una declaración de las razones para el fallo, si fuera requerido en la solicitud para iniciar los procesos o en la declaración de respuesta que se hubieran presentado. El fallo del árbi - tro deberá ser ejecutado de la manera requerida por las leyes aplicables.

## 28. Modificaciones del Fallo del Árbitro

Como consecuencia de un mandato de un tribunal de jurisdicción competente, o por común acuerdo entre las Partes, el árbitro deberá modificar cualquier fallo que se hubiera dictado. El árbitro podrá modificar un fallo mediante la moción de alguna de las Partes si el árbitro considera que el fallo fuera ambiguo o presentara algún defecto, o si el fallo requiriera un acto ilegal o imposible de realizar. Estas son las únicas circunstancias por medio de las cuales un árbitro tendrá jurisdicción para retirar o modificar un dictamen o fallo.

## 29. Resolución

Si las Partes resuelven su Disputa durante el transcurso del arbitraje, el árbitro podrá describir los términos de la resolución en un fallo de consentimiento.

## 30. Alcance de la Autoridad del Árbitro

La autoridad del árbitro deberá estar limitada a la resolución de Conflictos legales entre las Partes. Como tal, el

árbitro deberá estar obligado por y deberá aplicar las leyes aplicables, incluyendo las que estén relacionadas con la determinación del peso de la prueba, así como las leyes fundamentales. El árbitro tendrá la autoridad para limitar o extender los derechos fundamentales protegidos por las leyes aplicables. El árbitro podrá también conceder un recurso de emergencia o provisional que esté o que podría estar autorizado por las leyes aplicables. El árbitro deberá estar obligado a cumplir con las disposiciones del Programa y las Reglas.

## 31. Los Procesos Judiciales y la Exclusión de Responsabilidad

A. Ni AAA, JAMS o ningún árbitro deberán constituir

ninguna de las Partes de ningún proceso judicial en relación con los procesos de arbitraje efectuados de acuerdo con estas Reglas.

B. Ni AAA, JAMS o ningún árbitro será responsable ante ninguna de las Partes por ningún acto de omisión en relación con cualquier proceso que se encuentre dentro del alcance de estas Reglas.

C. Cualquier tribunal con jurisdicción sobre las Partes podrá obligar a alguna de las Partes a proceder de acuerdo con estas Reglas en cualquier lugar y podrá hacer cumplir cualquier fallo que se haya dictado.

D. Se considerará que las Partes bajo estas Reglas consienten en que el fallo del árbitro podrá ser admitido y que dicho fallo se podrá hacer cumplir en cualquier tribunal federal o estatal que tuviera jurisdicción sobre las Partes.

E. La iniciación de, la participación en, o la eliminación de un proceso legal no constituirá una renuncia al derecho a proceder de acuerdo con estas Reglas.

F. Cualquier tribunal con jurisdicción sobre las Partes podrá presentar órdenes judiciales (incluyendo órdenes preliminares) si se cumplieran los requisitos legales necesarios y equitativos de acuerdo con las leyes aplicables, en espera de la institución de los procesos de arbitraje efectuados de acuerdo con estas Reglas.

## 32. Honorarios y Gastos

A. Los gastos de los testigos deberán ser pagados por la Parte que presenta dichos testigos, salvo se indique lo contrario en las leyes aplicables o en el fallo del árbitro.

B. Todos los honorarios de los abogados deberán ser pagados por la Parte que los contrató, salvo se indique lo contrario en las leyes aplicables, en el Programa o en el fallo del árbitro.

C. Los costos de las juntas a realizarse (por ejemplo: los honorarios del relator para la transcripción original) deberán ser pagados por la Parte que inicia la junta. El costo de las copias de la transcripción de la declaración jurada y cualquier otro costo deberá ser pagado por la Parte que solicite la copia.

D. Los honorarios y los gastos de los peritos, asesores y demás que fueren presentados o consultados por una de las Partes, deberán ser pagados por la Parte que utilice dichos servicios.

E. El Empleado o Aspirante deberá pagar un cargo de $150 si él o ella inicia el arbitraje o mediación. Aparte de dicho cargo, el Empleado / Aspirante no será responsable de pagar los honorarios y gastos del proceso efectuado de acuerdo a estas Reglas, incluyendo los viáticos requeridos de un árbitro o mediador, AAA o JAMS, y el costo de cualquier evidencia que fuere presentada a la discreción del árbitro.

F. Si la demanda para mediación o arbitraje es iniciada por la Compañía, dichos honorarios serán pagados por la Compañía.

G. Salvo se indique lo contrario en las leyes vigentes o en el fallo del árbitro, todos los otros gastos, honorarios y costos del proceso efectuado de acuerdo a estas Reglas serán pagados de manera equitativa por las Partes que no son Empleados/Aspirantes.

## 33. Interpretación y Aplicación de Estas Reglas

El árbitro deberá interpretar y aplicar estas Reglas en lo que respecta a los poderes y deberes del árbitro. Todas las otras reglas deberán ser interpretadas y aplicadas por AAA o JAMS.

## 34. Ley Aplicable

A. Los Procesos efectuados de acuerdo a estas Reglas y la revisión judicial de los fallos deberán ser regidos por la Ley.

B. Salvo se indique lo contrario de forma expresa en estas Reglas, las leyes fundamentales aplicadas

deberán ser leyes estatales o leyes federales fundamentales que serían aplicadas por un Tribunal de Distrito de los Estados Unidos que tomara el lugar del proceso de arbitraje.

## 35. Mediación

En cualquier momento después de que el proceso de arbitraje haya concluido, las Partes podrán acordar la mediación de su disputa por medio de la notificación de AAA o JAMS. AAA o JAMS deberán determinar que procesos se aplican a dicha mediación.

## 36. Español

Este Programa de Resolución de Conflictos se encuentra disponible en inglés y en español

**Nabors Industries, Inc.**
April 2001



**17 de enero de 2007**

**A:**     Todos los Empleados de Nabors Industries, Inc. y Subsidiarias

**REF:** Programa de Resolución de Disputa de Nabors

Estimado Empleado:

A partir de diez (10) días después de la fecha de este aviso, de conformidad con la Sección 6 del Programa de Resolución de Disputa de Nabors de Nabors Industries, Inc. ("Nabors") y sus subsidiarias están enmendando el Programa y Reglamentos de Resolución de Disputa de Nabors para la determinación de todas las disputas entre los empleados y Nabors o una de sus subsidiarias.

Las enmiendas al Programa y Reglamentos están anexas en la parte posterior de esta página. Nabors estás enmendando una (1) sección del Programa de Resolución de Disputa de Nabors y una (1) sección de los Reglamentos de Resolución de Disputa de Nabors. Usted debe ya tener una copia del programa y los reglamentos actuales o pueden encontrarse en la Intranet de Nabors, de acuerdo a la política número 200.80.1, en http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

Como antes, el Programa de Resolución de Disputa de Nabors, incluyendo sus enmiendas, le da los medios más efectivos y eficientes para resolver cualquier disputa que pueda tener, a través del proceso que estimula la resolución a la oportunidad más inmediata. Los empleados no renuncian a algún derecho legal sustantivo de acuerdo al Programa. En su lugar, el programa, incluyendo sus enmiendas, estipula que cualquier asunto legal sustantivo que pueda tener, sea resuelto sobre una base individual por mediación o ante un árbitro neutral, cuya decisión será final y que lo obliga a usted y a la Compañía. De acuerdo al programa. incluyendo sus enmiendas, sin embargo, usted renuncia a todo derecho de procedimiento que pueda tener para iniciar una acción judicial en base individual, colectiva, de clase o representativa; y usted renuncia al derecho de un juicio ante jurado en relación con alguna disputa que pueda tener con la Compañía o alguna Entidad Electora (como es definida en el Programa), que incluye alguna reclamación de lesión o reclamación de discriminación en base a raza, origen nacional, género, religión, edad o discapacidad ,de acuerdo con cualquier estatuto de derechos civiles federales o estatales.

Cada individuo que trabaja para Nabors Industries, Inc. o una subsidiaria está sujeto al Programa, incluyendo sus enmiendas, excepto que las disposiciones enmendadas afecten solamente a las disputas iniciadas después de la fecha efectiva de la enmiendas y sin asuntos pendientes antes de la fecha efectiva. Su empleo continuado después de la fecha en que reciba este aviso constituirá su aceptación de las enmiendas al Programa, tanto durante y después de su empleo con la Compañía.

Esperamos continuar trabajando juntos. Si tiene alguna pregunta acerca de estas enmiendas al Programa y a los Reglamentos o a cualquier otro término de su empleo, por favor, no dude en comunicarse con el Departamento de Recursos Humanos de su empleador.

Atentamente,

NABORS INDUSTRIES, INC.

*\*Una copia de este aviso está disponible en español,*
*si la solicita al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*



## Enmienda al PROGRAMA DE RESOLUCIÓN DE DISPUTA DE NABORS:

### 4. Resolución de disputas

A. Todas las disputas que no sean de otro modo establecidas por las Partes serán finales y resueltas de manera concluyente, de acuerdo a este Programa y a los Reglamentos. Las partes renuncian a todo derecho que puedan tener a un juicio ante jurado sobre reclamaciones relacionadas de alguna manera a cualquier disputa.

B. Cada disputa será arbitrada sobre una base individual. Las Partes preceden y renuncian a cualquier derecho para unirse o consolidar reclamaciones en arbitraje cono otros o para hacer reclamaciones al arbitraje como un representante o como un miembro de una clase o en capacidad de abogado particular o similar, a menos que tales procedimientos sean convenidos por todas las partes. Ni la Compañía ni algún Empleado o Solicitante puede continuar alguna Disputa sobre una base de acción de clase, de acción colectiva o consolidada o en capacidad de representación de otras personas o entidades que hayan reclamado estar situados similarmente o participado como un miembro de clase en tal demanda. El árbitro en alguna demanda de acuerdo a este Programa no tendrá autoridad para conducir el asunto como una acción consolidada, de clase colectiva o de representación.

C. Si la limitación del procedimiento en el Párrafo B de esta Sección no puede hacerse cumplir por un tribunal en una demanda en la cual una parte busca ejercer una acción consolidada, de clase o colectiva, o actuar de otra manera en una capacidad de representación, entonces este programa aplicará a tal demanda sólo al siguiente alcance. El tribunal decidirá si la Disputa debe proceder sobre una base consolidada, de clase, colectiva u otra de representación y, si es así, definirá el alcance de la clase. Ninguna de las determinaciones anteriores será remitida al árbitro y en ningún caso el árbitro tendrá el poder para determinar la certificación de acción de clase, colectiva o de representación. Las decisiones del tribunal estarán sujetas a apelación en conformidad a las reglas de procedimiento aplicables. Si el tribunal certifica una acción de clase, colectiva u otra representación, entonces todas las otras determinaciones, dentro o relacionadas con la Disputa, serán hechas por el árbitro. El árbitro determinará las preguntas de responsabilidad para, o de la clase, como un todo y los remedios disponibles para o de la clase, como un todo. En árbitro también decidirá el desagravio, si lo hay, al cual una parte o miembro de clase puede tener derecho individualmente. Si el tribunal, no obstante, niega en última instancia una solicitud de una parte para proceder sobre una base consolidada, de clase, colectiva o de representación, entonces esa reclamación individual de la parte estará todavía sujeta a este Programa y referible al arbitraje en conformidad a sus términos.

## Enmienda a los REGLAMENTOS DE RESOLUCIÓN DE DISPUTA DE NABORS:

### 30. Alcance de la Autoridad del Árbitro

A. La autoridad del árbitro será limitada a la resolución de Disputas legales entre las Partes. Como tal, el árbitro estará obligado y aplicará la ley pertinente, que incluye aquello relacionado con la ubicación de la carga de la prueba, así como la ley sustantiva. El árbitro no tendrá la autoridad, ya sea de abreviar o aumentar, los derechos sustantivos disponibles de acuerdo con la ley aplicable. El árbitro también puede otorgar desagravio de emergencia o temporal que sea o sería autorizado por la ley aplicable. El árbitro estará obligado y cumplirá con las disposiciones del Programa y los Reglamentos.

B. El árbitro no tendrá el poder de escuchar reclamaciones en el arbitraje como una acción de clase o colectiva, o en capacidad de abogado particular o similar o sobre otra base de capacidad de representación, o ausente el consentimiento de todas las partes, sobre una base consolidada. El árbitro estará autorizado a decidir solamente las reclamaciones disputadas entre las partes individuales.

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.



*Revised April, 2003*

INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS
# DRILLING BID PROPOSAL
## AND
## DAYWORK DRILLING CONTRACT - U.S.

TO:  NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____ , 20 _____ .
to the following address: _____

## THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK – SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| OPERATOR: | Penn Virginia Oil & Gas, LP |
| Address: | 840 Gessner Road, Suite 800 |
| | Houston, Texas 77024 |
| CONTRACTOR: | NABORS DRILLING USA, LP |
| Address: | 515 W. Greens Road, Suite 1000 |
| | Houston, Texas 77067 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

1. **LOCATION OF WELL:**
   Well Name
   and Number:  **To be advised by Operator**
   Parish/
   County:  **Jefferson**        State:  **Texas**      Field Name: _____
   Well location and
   land description:  **To be advised by Operator**
   1.1 Additional Well Locations or Areas:  **None.**
   Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
   Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____ , 20 ____ .
   or  **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Contractor shall have the right to terminate this Contract unless Operator pays Contractor the Standby Time Rate from such release date until the location is ready. If Contractor so terminates, the termination shall be deemed to be a termination at Operator's election, and the provisions of Sub-paragraph 6.4(a) shall apply.**

3. **DEPTH:**
   3.1 Well Depth: The well(s) shall be drilled to a depth of approximately  **10,500'**  Feet, or to the ~~formation, whichever is deeper,~~ but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ ** feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
   Contractor shall be paid at the following rates for the work performed hereunder.

   4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ or a mobilization day rate of $ _____ per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include:
   **Move-in and rig up on the new well site.**
   **\*Plus actual costs of trucks, cranes and permits and** _____ **for man-lifts, light towers and string up services.**

   4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ or a demobilization day rate ~~during tear down of~~
   $ _____ per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include:  **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.**
   **\*Plus actual costs of trucks, cranes and permits and** _____ **for man-lifts, light towers and string down services.**

   ~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ , Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.~~

   4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with  **Five (5)**  man crew the operating day rate shall be:

| Depth Intervals From | To | Without Drill Pipe | | With Drill Pipe | |
|---|---|---|---|---|---|
| 0 | Rig Release | $ _____ | per day | $ _____ | per day |
| _____ | _____ | $ _____ | per day | $ _____ | per day |
| _____ | _____ | $ _____ | per day | $ _____ | per day |

Using Operator's drill pipe $ _____ per day.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

**EXHIBIT**

C

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | | Size | Grade | Directional or Uncontrollable Deviated Hole | | Size | Grade |
|---|---|---|---|---|---|---|---|
| $ N/A per ft. | | | | $ N/A per ft. | | | |
| $ N/A per ft. | | | | $ N/A per ft. | | | |
| $ N/A per ft. | | | | $ N/A per ft. | | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ____eight (8)____ hours for any one rig repair job, but not to exceed twenty-four (24) hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig maintenance.  When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 Standby Time Rate: $____/____ **100% of the Operating Day Rate** per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 Drilling Fluid Rates: When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $_____ per man per day for Contractor's rig-site personnel.
(b) $_____ per day additional operating rate; and
(c) Cost of all labor, material and services plus _____twenty-four (24)_____ hours operating rate to clean rig and related equipment.

4.8 Force Majeure Rate: $____/____ **100% of the Operating Day Rate** per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ten (10)_____ percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10 Revision in Rates: The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than _____zero (0)_____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $___N/A_____; Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
(f) ~~Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119102) to determine to what extent a price variance has occurred in said spare parts and supplies.~~
(g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5. TIME OF PAYMENT

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 Disputed Invoices and Late Payment: Operator shall pay all invoices within _____thirty (30)_____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____1 1/2_____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

6. TERM:

6.1 Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of _____, commencing on the date specified in Paragraph 2 above.~~

6.2 ~~Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by~~ Not used. _____

6.3 Early Termination:

(a) By Either Party: Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



NCPS 000944

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4 **Early Termination Compensation:**

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.6) for a period of~~ _____ ~~days or~~ a lump sum of $ _____

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time. Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or~~ \_\_\_ **plus, as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate**

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for \_\_\_\_\_ **five (5)** \_\_\_\_\_ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $_____ ~~provided, however, if this Contract is for a term of more than one well or for a period of time. Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ **as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate**

## 7. CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

## 8. DRILLING METHODS AND PRACTICES:

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

## 9. INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges, and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

## 10. SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must



advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

## 11. EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder ~~or where canal or water depths are in excess of~~_____~~feet~~. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

## 12. TERMINATION OF LOCATION LIABILITY:

*When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.*

## 13. INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extend of the indemnification obligations assumed herein.

## 14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

*14.1 Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.*

*14.2 Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or _____100_____ percent of current new replacement cost of such equipment delivered to the well site.*

*14.3 Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.*

*14.4 Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.*

*14.5 The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.*

*14.6 Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.*

*14.7 Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against, any such liability.*

*14.8 Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.*

*14.9 Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or*

damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

of ___ THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT ___ .

**19. INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

**20. SUBCONTRACTS:**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

**21. ATTORNEY'S FEES**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

**22. CLAIMS AND LIENS:**

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

**23. ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

**24. NOTICES AND PLACE OF PAYMENT:**

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

**25. CONTINUING OBLIGATIONS:**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

**26. ENTIRE AGREEMENT:**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

**27. SPECIAL PROVISIONS:**

27.1 Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate (         )er day.

27.4 Epoch Well Services, Inc. ("Epoch"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Epoch         per day (spud to release) for rental of the Epoch Rig Watch system.

The Epoch Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included with option for 6 additional probes), trip tank volume probes (1 probe included with option for 1 additional probe), and return flow paddle.

**28. ACCEPTANCE OF CONTRACT:**

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this 23 day of Sep , 20 08 .

OPERATOR: Penn Virginia Oil & Gas

By: _____

Title: OPS MGR

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this ___22nd___ day of ___September___, 20_08_, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within ___Seven (7)__ days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR: Nabors Drilling USA, LP By NDUSA Holdings Corp., its General Partner

By: _____

Title: Vice President Marketing and Sales



# EXHIBIT "A"

To Daywork Contract dated _____ September 22 ____, 20 __08__

Operator _Penn Virginia Oil & Gas, LP_____     Contractor _____Nabors Drilling USA, LP_____

Well Name and Number ____To be advised by Operator_____

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |
| Surface | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |
| Protection | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |
| | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |
| Production | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |
| Liner | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |
| | ___ in. | ___ in. | ___ lbs/ft. | ___ | ___ ft. | ___ hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 8.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ |

Other mud specifications: _____
_____
_____
_____
_____

### 3. INSURANCE (See Paragraph 13)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million_____ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million_____ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3 Automobile Public Liability Insurance with limits of $___one (1) million____ for the death or injury of each person and $_____one (1) million_____ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $_____one (1) million_____ for each accident.

3.4 In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.

3.5 Other insurance: __Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.__

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. _____712*_____, the major items of equipment being:

Drawworks: Make and Model ____Per rig inventory attached hereto and made a part hereof._____

Engines: Make, Model, and H.P. _____

    No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

    No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size _____4 1/2"___ in. weights and grades as necessary to maintain 100,000 lbs overpull ft.; Size: _____ in. _____ ft.

Drill Collars: Number and Size ___25-6 ½" (nominal); 6-8" (nominal)_____

Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|------|--------------------|--------------|--------|
| | | | |
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____
B.O.P. Accumulator: _____

4.2 Derrick timbers.
4.3 Normal strings of drill pipe and drill collars specified above.
4.4 Conventional drift indicator.
4.5 Circulating mud pits.
4.6 Necessary pipe racks and rigging up material.
4.7 ~~Normal storage for mud and chemicals.~~
4.8 Shale Shaker.
4.9 _____
4.10 _____
4.11 _____
4.12 _____
4.13 _____
4.14 _____
4.15 _____
4.16 _____
4.17 _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1 Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.
5.2 Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.
5.3 Test tanks with pipe and fittings.
5.4 Mud storage tanks with pipe and fittings.
5.5 Separator with pipe and fittings.
5.6 Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.
5.7 Labor to disconnect and clean test tanks and mud gas separator.
5.8 Drilling mud, chemicals, lost circulation materials and other additives.
5.9 Pipe and connections for oil circulating lines.
5.10 Labor to lay, bury and recover oil circulating lines.
5.11 Drilling bits, reamers, reamer cutters, stabilizers and special tools.
5.12 Contract fishing tool services and tool rental.
5.13 Wire line core bits or heads, core barrels and wire line core catchers if required.
5.14 Conventional core bits, core catchers and core barrels.
5.15 Diamond core barrel with head.
5.16 Cement and cementing service.
5.17 Electrical wireline logging services.
5.18 Directional, caliper, or other special services.
5.19 Gun or jet perforating services.
5.20 Explosives and shooting devices.
5.21 Formation testing, hydraulic fracturing, acidizing and other related services.
5.22 Equipment for drill stem testing.
5.23 Mud logging services.
5.24 Sidewall coring service.
5.25 Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.
5.26 Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.
5.27 Casing scratchers and centralizers.
5.28 Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.
5.29 Special or added storage for mud and chemicals.
5.30 Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.
5.31 Blowout preventer testing packoff and testing services.
5.32 Replacement of BOP rubbers, elements and seals, if required, after initial test
5.33 Casing Thread Protectors and Casing Lubricants.
5.34 H₂S training and equipment as necessary or as required by law.
5.35 Site septic systems.
5.36 Ditching around rig and location.
5.37 Third party BOP testing service.
5.38 _____
5.39 _____
5.40 _____
5.41 _____
5.42 _____
5.43 _____
5.44 _____
5.45 _____
5.46 _____
5.47 _____
5.48 _____
5.49 _____
5.50 _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com
NDUSA
NCPS 000950



6. **EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:**

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| | Item | Operator | Contractor |
|---|---|:---:|:---:|
| | | **To Be Provided By and At The Expense Of** | |
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____) | X | |
| 6.4 | Fuel Lines (length ___ of rig only ___) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property: | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: Any required | X | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Epoch electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number_____ | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser | X | |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ___ (Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity _____ | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |

(U.S. Daywork Contract - "Exhibit A" - Page 3)
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NDUSA

NCPS 000951

7. OTHER PROVISIONS:

Revised April, 2003

(U.S. Daywork Contract - "Exhibit A" - Page 4)
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NCPS 000952



## EXHIBIT "B"

### (See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

*(U.S. Daywork Contract - "Exhibit B" - Page 1)*
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NCPS 000953

## EXHIBIT "C"

### CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04

**NCPS 000954**





# NABORS DRILLING USA, LP

## Rig No. 712

### Diesel Electric Land Rig

| | |
|---|---|
| **DRAWWORKS:** | Mid - Continent U712 EA, with an input rating of 1,000 horsepower, Baylor 6032 Dynamatic brake, crown-o-matic and Foster catheads. Drum is lebus grooved for a 1 1/4" drilling line. |
| **PRIMARY POWER:** | Three Caterpillar D-399 engines rated at 1,215 horsepower each, driving three KATO 1030 KW generators with a Ross Hill SCR system. |
| **MAST:** | Dreco 136' cantilever, 136' clear height x 21' base at floor. API static hook load of 571,000 lbs. w/ 10 lines strung. |
| **SUBSTRUCTURE:** | Dreco "Slingshot", with a 22' floor height and 18' clear height under the rotary beams. Substructure is designed for a 600,000 lbs. casing load simultaneous with a setback load of 350,000 lbs. |
| **MUD PUMPS:** | Two Gardner Denver PZ-10 triplex mud pumps rated at 1,300 horsepower each, driven by one 1000 horsepower GE 752 motors each. |
| **MUD TANKS:** | Two tank, 970 barrel system with a 75 barrel slugging compartment in the suction tank. Mud system is equipped with stirring guns and clean out gates. Mud mixing and 10 HP mud agitators. |
| **SOLIDS CONTROL:** | 12 cone desilter.<br>2 cone desander.<br>Two linear motion shale shakers. |
| **WATER STORAGE:** | One 500 barrel tank. |
| **FUEL STORAGE:** | One 12,000 gallon tank. |
| **HOOK/BLOCK:** | BJ 5350 Hook and National 545G Block, both rated at 350 tons. |
| **SWIVEL:** | CE LB 400. 400 ton. |
| **ROTARY:** | GD 27 1/2". |
| **ACCUMULATOR:** | Koomey, 180 gallon, eight station, with an electric powered triplex pump, two air operated pumps, regulating valves and eight station remote control. |
| **BLOWOUT PREVENTERS:** | One 11" x 5,000 psi, Annular, H2S Trim.<br>One 11" x 5,000 psi, Single ram, H2S Trim.<br>One 11" x 5,000 psi, Double ram, H2S Trim.<br>One 3 1/8 x 5,000 psi, choke manifold, H2S Trim. |
| **DRILL PIPE:** | As per contract |
| **DRILL COLLARS:** | As per contract |

**MISC. EQUIPMENT:**

| | |
|---|---|
| Automatic driller | One air hoist |
| Wireline unit | 0-7 degree drill indicator |
| 4 Pen drilling recorder | Lower Kelly valve |
| Upper Kelly valve | Inside BOP |
| Full opening safety valve | 5 ¼" x 40' Hex Kelly |
| Vapor proof lighting system | Kelly spinner |
| Spinning wrench | |

NCPS 000955

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.

Revised April, 2003

**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**
# DRILLING BID PROPOSAL
## AND
## DAYWORK DRILLING CONTRACT - U.S.

TO:  NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____ , 20 ____ ,
to the following address: _____

### THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK – SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

OPERATOR:  Penn Virginia MC Energy, LLC
Address:  110 West 7th, Suite 1800
Tulsa, Oklahoma 74119
CONTRACTOR:  NABORS DRILLING USA, LP
Address:  515 W. Greens Road, Suite 1000
Houston, Texas 77067

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

1.  LOCATION OF WELL:
Well Name and Number:  To be advised by Operator  *HUERTA #1-30H AW CA*
Parish/County:  ~~Washita~~ *LOGAN AW*  State:  Oklahoma  Field Name:  *AW CA*
Well location and land description:  To be advised by Operator  *Sec 30-16N-3W AW CA*
1.1 Additional Well Locations or Areas:  None.
Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2.  COMMENCEMENT DATE:
Contractor agrees to use reasonable efforts to commence operations for the drilling of the well ~~by the~~ _____ ~~day of~~ _____ ~~,20~~ ,
~~or~~ **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Operator shall pay Contractor the Standby Time Rate from such release date until the location is ready.** *OPERATOR ACCEPTS RIG UPON EXECUTION of CONTRACT AW CA*

3.  DEPTH:
3.1 Well Depth: The well(s) shall be drilled to a depth of approximately ____ TBA ____ Feet, ~~or to the formation, whichever is deeper~~, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4.  DAYWORK RATES:
Contractor shall be paid at the following rates for the work performed hereunder.

4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ ~~or~~ a mobilization day rate of $ _____ per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include:
**Move-in and rig up on the new well site.**
**\*Plus actual costs of trucks, cranes and permits and          for man-lifts, light towers and string up services.**

4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ ~~or~~ a demobilization day rate ~~during tear-down of~~ $ _____ per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include:  **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.** *If THE RIG HAS NO LOCATIONS TO MOVE ON. AW CA*
**\*Plus actual costs of trucks, cranes and permits and          for man-lifts, light towers and string down services.**

~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ , Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.~~

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with ____ Five (5) ____ man crew the operating day rate shall be:

| From | Depth Intervals To | | Without Drill Pipe | | With Drill Pipe |
|---|---|---|---|---|---|
| 0 | Rig Release | $ _____ | per day | $ _____ | per day |
| _____ | _____ | $ _____ | per day | $ _____ | per day |
| _____ | _____ | $ _____ | per day | $ _____ | per day |

Using Operator's drill pipe $ _____ per day. **The Operating Day Rate includes a Canrig top drive.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

**EXHIBIT**

*D*

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | Size | Grade | Directional or Uncontrollable Deviated Hole | Size | Grade |
|---|---|---|---|---|---|
| $ N/A per ft. | _____ | _____ | $ N/A per ft. | _____ | _____ |
| $ N/A per ft. | _____ | _____ | $ N/A per ft. | _____ | _____ |
| $ N/A per ft. | _____ | _____ | $ N/A per ft. | _____ | _____ |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 **Repair Time:** In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ~~eight (8)~~ four (4) *Twenty four (24)* hours for any one rig repair job, but not to exceed ~~thirty-six (36)~~ hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____ zero (0) _____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig and top drive maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 **Standby Time Rate:** $___/ 100% of the Operating Day Rate _____ per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 **Drilling Fluid Rates:** When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $___ _____ per man per day for Contractor's rig-site personnel.
(b) $___ _____ per day additional operating rate; and
(c) Cost of all labor, material and services plus _____ twenty-four (24) _____ hours operating rate to clean rig and related equipment.

4.8 **Force Majeure Rate:** $___/ 100% of the Operating Day Rate _____ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 **Reimbursable Costs:** Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ fifteen (15) percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10 **Revision in Rates:** The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than _____ zero (0) _____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $__N/A____; **Operator shall provide all fuel.**
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
~~(f)Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119102) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
~~(g)~~(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5. **TIME OF PAYMENT**

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 **Disputed Invoices and Late Payment:** Operator shall pay all invoices within _____ thirty (30) _ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____ 1 1/2 _____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

6. **TERM:**

6.1 **Duration of Contract:** This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of~~ _____, commencing on the date specified in Paragraph 2 above.

6.2 ~~Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by~~ Not used. *OPERATOR NOTIFICATION WITHIN 15 DAYS AFTER S/OD HAS THE RIGHT TO EXTEND*

6.3 **Early Termination:** *for additional well or for period of time subject to mutually Agreed Rates, Terms and conditions.*

(a) **By Either Party:** Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

(b)    By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c)    By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4    Early Termination Compensation:

(a)    Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty a sum equal to the standby time rate (Subparagraph 4.6) for a period of _____ days or a lump sum of $_____140,000_____.

(b)    Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or __plus, as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate__

(c)    Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for _____seven (7)_____ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $_____ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or __as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate__

7.    CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8.    DRILLING METHODS AND PRACTICES:

8.1    Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2    Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3    Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4    Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5    If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9.    INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10.    SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must



advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

11. **EQUIPMENT CAPACITY**

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder ~~or where canal or water depths are in excess of~~ _____ ~~feet.~~ Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

12. **TERMINATION OF LOCATION LIABILITY:**

*When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.*

13. **INSURANCE**

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extent of the indemnification obligations assumed herein.

14. **RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:**

14.1 *Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.*

14.2 *Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or ____100____ percent of current new replacement cost of such equipment delivered to the well site.*

14.3 *Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.*

14.4 *Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.*

14.5 *The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.*

14.6 *Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.*

14.7 *Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from , and shall protect, defend and indemnify Contractor from and against, any such liability.*

14.8 *Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.*

14.9 *Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or*



NCPS 000959

Revised April, 2003

damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws



NCPS 00

Revised April, 2003

of __THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT__.

19. **INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

20. **SUBCONTRACTS:**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

21. **ATTORNEY'S FEES**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

22. **CLAIMS AND LIENS:**

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

23. **ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

24. **NOTICES AND PLACE OF PAYMENT:**

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

25. **CONTINUING OBLIGATIONS:**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

26. **ENTIRE AGREEMENT:**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

27. **SPECIAL PROVISIONS:**

27.1 Exhibit "C" -- Contractors Special Provisions is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $     per day.

27.4 Canrig Drilling Technology Ltd. ("Canrig"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Canrig $     per day (spud to release) for rental of the Canrig Rig Watch system.

The Canrig Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included), trip tank volume probes (1 probe included), and return flow paddle.

28. **ACCEPTANCE OF CONTRACT:**

*The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this* 8th *day of* Sept, 20 10.

OPERATOR: _Penn Virgina MC Energy, LLC_

By: _____

Title: _Regional Mgr_

*The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this* 3rd *day of* September *, 20 10, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within* Seven (7) *days of the above date Contractor shall be in no manner bound by its signature thereto.*

CONTRACTOR: _Nabors Drilling USA, LP By: NDUSA Holdings Corp., its General Partner_

By: _E. Nelson_

Title: _Vice President Contracts_

# EXHIBIT "A"

To Daywork Contract dated _____September 3____, 20__10__

Operator __Penn Virginia MC Energy, LLC_____    Contractor __Nabors Drilling USA, LP_____

Well Name and Number ___To be advised by Operator_____

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |
| Surface | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |
| Protection | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |
| | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |
| Production | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |
| Liner | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |
| | ____ in. | ____ in. | ____ lbs/ft. | ____ | ____ ft. | ____ hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 8.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

Other mud specifications: _____
_____
_____
_____
_____

### 3. INSURANCE (See Paragraph 13)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million_____ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million_____ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3 Automobile Public Liability Insurance with limits of $___one (1) million_____ for the death or injury of each person and $___one (1) million_____ -for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___one (1) million_____ for each accident.

3.4 ~~In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.~~

3.5 Other insurance: __Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.__

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. _____F26*_____, the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof._____

Engines: Make, Model, and H.P. _____

    No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

    No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size _____5"_____ in. weights and grades as necessary to maintain 100,000 lbs overpull ft.; Size: _____ in. _____ ft.

Drill Collars: Number and Size ___43-6 3/8" (nominal); 10-8" (nominal)_____

Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

B.O.P. Closing Unit: _____

B.O.P. Accumulator: _____

4.2   Derrick timbers.

4.3   Normal strings of drill pipe and drill collars specified above.

4.4   Conventional drift indicator.

4.5   Circulating mud pits.

4.6   Necessary pipe racks and rigging up material.

4.7   ~~Normal storage for mud and chemicals.~~

4.8   Shale Shaker.

4.9   _____

4.10  _____

4.11  _____

4.12  _____

4.13  _____

4.14  _____

4.15  _____

4.16  _____

4.17  _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1   Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2   Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.

5.3   Test tanks with pipe and fittings.

5.4   Mud storage tanks with pipe and fittings.

5.5   Separator with pipe and fittings.

5.6   Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7   Labor to disconnect and clean test tanks and mud gas separator.

5.8   Drilling mud, chemicals, lost circulation materials and other additives.

5.9   Pipe and connections for oil circulating lines.

5.10  Labor to lay, bury and recover oil circulating lines.

5.11  Drilling bits, reamers, reamer cutters, stabilizers and special tools.

5.12  Contract fishing tool services and tool rental.

5.13  Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14  Conventional core bits, core catchers and core barrels.

5.15  Diamond core barrel with head.

5.16  Cement and cementing service.

5.17  Electrical wireline logging services.

5.18  Directional, caliper, or other special services.

5.19  Gun or jet perforating services.

5.20  Explosives and shooting devices.

5.21  Formation testing, hydraulic fracturing, acidizing and other related services.

5.22  Equipment for drill stem testing.

5.23  Mud logging services.

5.24  Sidewall coring service.

5.25  Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26  Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.

5.27  Casing scratchers and centralizers.

5.28  Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.

5.29  Special or added storage for mud and chemicals.

5.30  Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31  Blowout preventer testing packoff and testing services.

5.32  Replacement of BOP rubbers, elements and seals, if required, after initial test

5.33  Casing Thread Protectors and Casing Lubricants.

5.34  H$_2$S training and equipment as necessary or as required by law.

5.35  Site septic systems.

5.36    Ditching around rig and location. _____

5.37    Third party BOP testing service. _____

5.38  _____

5.39  _____

5.40  _____

5.41  _____

5.42  _____

5.43  _____

5.44  _____

5.45  _____

5.46  _____

5.47  _____

5.48  _____

5.49  _____

5.50  _____



NCPS 000963

## 6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| Item | To Be Provided By and At The Expense Of | |
| --- | --- | --- |
| | Operator | Contractor |
| 6.1 Cellar and Runways | X | |
| 6.2 Ditches and sumps | X | |
| 6.3 Fuel (located at _____) | X | |
| 6.4 Fuel Lines (length ___ of rig only _____) | | X |
| 6.5 Water at source, including required permits | X | |
| 6.6 Water well, including required permits | X | |
| 6.7 Water lines, including required permits | X | |
| 6.8 Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 Potable water and bottled water | X | |
| 6.10 Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 Maintenance of water well, if required | X | |
| 6.12 Water Pump | X | |
| 6.13 Fuel for water pump | X | |
| 6.14 Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 Transportation of Contractor's property: | | |
| Move in | See Paragraph 4.1 | |
| Move out | See Paragraph 4.2 | |
| 6.16 Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 Special strings of drill pipe and drill collars as follows: Any required | X | |
| 6.18 Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 Rate of penetration recording device (Canrig electronic) | | X |
| 6.22 Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 Casing tools | X | |
| 6.24 Power casing tongs | X | |
| 6.25 Laydown and pickup machine | X | |
| 6.26 Tubing tools | X | |
| 6.27 Power tubing tong | X | |
| 6.28 Crew Boats, Number_____ | N/A | N/A |
| 6.29 Service Barge | N/A | N/A |
| 6.30 Service Tug Boat | N/A | N/A |
| 6.31 Rat Hole | X | |
| 6.32 Mouse Hole | X | |
| 6.33 Reserve Pits | X | |
| 6.34 Upper Kelly Cock | | X |
| 6.35 Lower Kelly Valve | | X |
| 6.36 Drill Pipe Safety Valve | | X |
| 6.37 Inside Blowout Preventer | | X |
| 6.38 Drilling hole for or driving for conductor pipe | X | |
| 6.39 Charges, cost of bonds for public roads | X | |
| 6.40 Portable Toilet | X | |
| 6.41 Trash Receptacle | X | |
| 6.42 Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 Shale Shaker Screens | X | |
| 6.44 Mud Cleaner | X | |
| 6.45 Mud/Gas Separator | X | |
| 6.46 Desander | | X |
| 6.47 Desilter | | X |
| 6.48 Degasser (Per rig inventory) | | X |
| 6.49 Centrifuge | X | |
| 6.50 Rotating Head | X | |
| 6.51 Rotating Head Rubbers | X | |
| 6.52 Hydraulic Adjustable Choke | X | |
| 6.53 Pit Volume Totalizer | X | |
| 6.54 Communication, type ____ (Cellular phone for rig use only) | | X |
| 6.55 Forklift, capacity ____ Model JLG G9-43A (NDUSA, LP preferred model) or a JLG G10-55A (10,000 lb lift with outriggers) with a Star Industries Quick-Tach Truss boom Model 1302-JLG | X | |
| 6.56 Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | |
| 6.58 | | |
| 6.59 | | |
| 6.60 | | |

7.   OTHER PROVISIONS:

*(U.S. Daywork Contract - "Exhibit A" - Page 4)*
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NCPS 000965

Revised April, 2003

EXHIBIT "B"

(See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)    The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)    The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)    The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)    The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NCPS 000966

# EXHIBIT "C"

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Oklahoma May04   NCPS 000967

 

# NABORS DRILLING USA, LP

## PACE 1500 – RIG F26

## Programmable AC Electric 1500 HP Rig

| | |
|---|---|
| **DRAWWORKS:** | 1,500 horsepower AC drawworks featuring regenerative AC braking. Drawworks is driven by two (2) 800 horsepower AC motors. Autodrill functionality utilizing AC motor. |
| **POWER GENERATION:** | Three (3) – Caterpillar 3512B engines rated at 1,476 horsepower each, driving one (1) Kato 1365 KW generator, for a total of 4,428 horsepower. AC power generation, Variable Frequency Drive (VFD) and MCC unitized in a single house. |
| **MAST:** | Pyramid Fast Moving Land Rig 152' three section mast manufactured to API-4F specification. Static hook load of 1,000,000 lbs. on 12 lines. Mast is raised and lowered utilizing hydraulic cylinders. Mast has integrated top drive rails (enables top drive to travel in mast during rig move). |
| **SUBSTRUCTURE:** | Pyramid hydraulically elevated substructure with 30' floor height and 26' clear height under rotary beams. Substructure is rated for 1,000,000 lbs rotary load simultaneous with a 600,000 lbs setback load. |
| **DRILLER'S CONTROL:** | Climate controlled driller's cabin provides integrated joystick control utilizing PLC technology. Touch screen controls provide state-of-the-art monitoring, control of rig equipment and drilling parameters. |
| **MUD PUMPS:** | Two (2) 1,600 horsepower mud pumps. Each powered by one (1) 1600 horsepower AC motor, pumps are equipped with hydraulic liner retention and pump rod systems. |
| **MUD TANKS:** | Three (3) tank system total capacity approximately 1,500 BBL; four (4) 6" x 8" centrifugal pumps powered by 100 horsepower electric motors. 100 BBL trip tank. |
| **SOLIDS CONTROL:** | Three (3) Swaco Mongoose shale shakers<br>One (1) Swaco mud cleaner with desander / desilter. |
| **WATER STORAGE:** | One (1) 500 BBL water tank. |
| **FUEL STORAGE:** | One (1) 20,000 gallon diesel fuel tank. |
| **TRAVELING BLOCK** | 500 ton traveling block, grooved for 1 3/8" drill line. |
| **TOP DRIVE** | Canrig 1250 AC, 500 ton integrally mounted top drive system. |
| **ROTARY:** | 37-1/2" rotary table, independently driven by AC motor. |
| **ACCUMULATOR:** | Six (6) station accumulator unit with one (1) electric triplex and two (2) air operated pumps. Unit will be designed in accordance with API 16D. Remote panel will be mounted at drill floor. |
| **BLOWOUT PREVENTERS:** | Annular: 13-5/8" x 5000 psi.<br>Double Ram: 13-5/8" x 10,000 psi.<br>Single Ram: 13-5/8" x 10,000 psi.<br>Manifold: 4-1/16" x 3-1/16" 10,000 psi. |
| **DRILL PIPE:** | As per contract. |
| **DRILL COLLARS:** | As per contract. |

**ADD. EQUIPMENT:**

| | |
|---|---|
| Dedicated man-rider winch | Automated catwalk / pipe handling system |
| Varco ST-80 Iron Roughneck | Two (2) air operated hoists |
| BOP Handling system | Air operated slips |
| Rotating mousehole | Camera system |
| Intercom system | Vacuum degasser |

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED , minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, LP, PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § | 281ST JUDICIAL DISTRICT |

## AFFIDAVIT OF KEITH NICHOLSON

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Keith Nicholson, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Keith Nicholson. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am Assistant General Counsel for Nabors Corporate Services, Inc.

3. In my capacity as Assistant General Counsel, I am required to be familiar with Nabors Industries, Inc.'s corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also required to be familiar with the Nabors Dispute Resolution Program ("DRP").

4. Nabors Industries, Inc. is the "Sponsor" of the Nabors DRP as that term is defined by the DRP. A true and correct copy of the DRP is attached to my affidavit as Exhibit 1-A.

5. The DRP provides that it applies to all direct and indirect subsidiaries of Nabors Industries, Inc., as well as all "Electing Entities" that have agreed to be bound by same.

6. Nabors Completion & Production Services Co. ("NCPS") was a subsidiary of Nabors



EXHIBIT
E

Industries, Inc. at the time of the April 29, 2014 incident which makes the basis of the lawsuit.

7. On September 23, 2008, Penn Virginia Oil & Gas, LP agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

8. The Contractors Special Provisions page states at paragraph 16 that "Operator, its parent, subsidiary, and affiliated corporations...(collectively "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity..."

9. In addition, on September 8, 2010, Penn Virginia MC Energy, LLC agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E. It is my understanding that Penn Virginia MC Energy, LLC is a subsidiary or affiliated corporation of Penn Virginia Oil & Gas, LP and/or Penn Virginia Oil & Gas GP, LLC.

10. As an "Electing Entity," Defendants, Penn Virginia Oil & Gas, LP and Penn Virginia Oil & Gas GP, LLC are required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

11. Based upon my review of the personnel file of Mr. Adame, I can confirm that Mr. Adame was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

12. Specifically, my review of the relevant documents confirms that on January 2, 2013, Mr. Adame executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-F. Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."

13. Further, on January 7, 2013, Mr. Adame executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-H. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."

14. Mr. Adame was employed by NCPS as a crew worker. As a crew worker, Mr. Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. Adame's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. While employed by NCPS, Mr. Adame was never a commercial truck driver or transportation worker.

15. Based upon my review of the personnel file of Mr. Alfredo De La Garza, I can confirm that Mr. De La Garza was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

16. Specifically, my review of the relevant documents confirms that on July 16, 2013, Mr. De La Garza executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-G. By his signature, Mr. De La Garza acknowledged and agreed that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

17. Further, on July 22, 2013, Mr. De La Garza executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-I. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. De La Garza acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

18. Mr. De La Garza was employed by NCPS as a crew worker. As a crew worker, Mr. De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. De La Garza's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. Mr. De La Garza's job duties and responsibilities did not include the movement of goods in interstate commerce. While employed by NCPS, Mr. De La Garza was never a commercial truck driver or transportation worker.

19. At all times relevant to this matter, NCPS was engaged in interstate commerce as it was in the business of providing services for the development of oil and gas resources that are placed into commerce in both Texas and other states of the United States.

20. On information and belief, Penn Virginia is also engaged in interstate commerce as it is in the business of producing oil and gas resources that are placed into commerce in both Texas and other states of the United States.

21. Attached as Exhibit 1-A to my affidavit is a true and correct copy of Nabors Industries, Inc.'s DRP booklet, in English and Spanish, respectively. These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

22. Attached as Exhibit 1-B to my affidavit is a true and correct copy of the 2008 IADC Drilling Contract between Nabors and Penn Virginia Oil & Gas, LP, and attached as Exhibit 1-C is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

23. Attached as Exhibit 1-D to my affidavit is a true and correct copy of the 2010 IADC Drilling Contract between Nabors and Penn Virginia MC Energy, LLC, and attached as Exhibit 1-E is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

24. The records attached as Exhibits 1-F, 1-G, 1-H, and 1-I are true and correct copies of records that are kept by NCPS in the regular course and scope of business, and it was the regular course of business of NCPS for an employee or representative of NCPS, with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time the act or event that was recorded."

FURTHER AFFIANT SAYETH NOT.

_____
Keith Nicholson

Sworn to and subscribed before me by Keith Nicholson on the 16TH day of June, 2015.

_____
Notary Public in and for the State of Texas
My Commission expires: MAY 5, 2018

MARY D. HOISINGTON
Notary Public, State of Texas
My Commission Expires
May 05, 2018

CAUSE NO. _____

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FORREDACTED and REDACTED minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP LLC, MIKE FERGUSON, TRIFECTA OILFIED SERVICES, LLC, CUDD PRESSURE CONTROL, INC., and ROYWELL SERVICES, INC. | § § § § § § § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Alfredo De La Garza, Individually and as Next Friend for REDACTE La REDACTED minors, hereinafter referred to collectively as "Plaintiffs," and file this their Original Petition complaining of Penn Virginia Oil & Gas, L.P., Penn Virginia Oil & Gas GP LLC, Mike Ferguson, Trifecta Oilfield Services, LLC, Cudd Pressure Control, Inc., and Roywell Services, Inc., hereinafter referred to collectively as "Defendants," and for cause of action would respectfully show unto the Court as follows:

1.00 **Discovery Control Plan**

1.01 This case will be governed by Discovery Control Plan III as set forth in Rule 190.4 of the Texas Rules of Civil Procedure.

2.00 **Jurisdiction and Venue**

2.01 Plaintiff Alfredo De La Garza, Individually and as Next Friend for REDACTED , is a resident of the State of Texas who resides at 6510 E. Business 83,

Plaintiffs' Original Petition – Page 1



Mercedes, Texas 78570. The last three digits of his driver's license are 866 and the last three digits of his social security number are 964.

2.02   Plaintiffs REDACTED                                are minor children of Plaintiff Alfredo De La Garza. Plaintiff Alfredo De La Garza is the natural father of both minor children.

2.03   Defendant Penn Virginia Oil & Gas, L.P. is a domestic limited partnership organized under the laws of the State of Texas with its principal place of business in Houston, Harris County, Texas. This Defendant can be served by serving its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

2.04   Defendant Penn Virginia Oil & Gas GP LLC is a foreign limited liability company organized under the laws of the State of Delaware with its principal place of business in Houston, Harris County, Texas. This Defendant maintains such minimum contacts with the State of Texas so as to subject it to the jurisdiction of the laws of the State of Texas. This Defendant can be served by serving its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

2.05   Defendant Mike Ferguson is an individual who is a nonresident of Texas whose residence is located at 16415 Highway 74, Purcell, Oklahoma 73080. This Defendant maintains such minimum contacts with the State of Texas so as to subject him to the jurisdiction of the laws of the State of Texas. This Defendant was conducting business in this state at the time of the incident made the basis of this suit pursuant to Texas Civil Practice & Remedies Code §17.042(2). The Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711-2079, is the agent for service pursuant to Texas Civil Practices & Remedies Code § 17.044.

2.06   Defendant Trifecta Oilfield Services, LLC is a domestic limited liability company organized under the laws of the State of Texas with its principal place of business in Corrigan,

Polk County, Texas. This Defendant can be served by serving its registered agent, Melba Locke at 608 North Home Street, Corrigan, Texas 75939.

2.07 Defendant Cudd Pressure Control, Inc. is a foreign corporation incorporated under the laws of the State of Delaware with its principal place of business in The Woodlands, Montgomery County, Texas. This Defendant maintains such minimum contacts with the State of Texas so as to subject it to the jurisdiction of the laws of the State of Texas. This Defendant can be served by serving its registered agent, Prentice Hall Corporation, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

2.08 Defendant Roywell Services, Inc. is a domestic corporation organized under the laws of the State of Texas with its principal place of business in Bellaire, Harris County, Texas. This Defendant can be served by serving its registered agent, John D. Mclain at 5630 Cheena, Houston, Texas 77096.

2.09 Venue is proper in Harris County, Texas, because Defendants Penn Virginia Oil & Gas, L.P. and Defendant Roywell Services, Inc.'s principal places of business in this state are located in Harris County, Texas.

3.00 **Statement of Facts**

3.01 On April 29, 2014, Plaintiff Alfredo De La Garza was an employee of Nabors Completion & Production Services Company working at Nabors Rig #1480, on the Wellhausen well number one, outside of Shiner, Texas.

3.02 Defendant Penn Virginia Oil & Gas, L.P. is the operator of this lease.

3.03 Defendant Penn Virginia Oil & Gas, L.P. was directing the work being completed on the well site.

3.04    Defendant Mike Ferguson, the company representative for Defendant Penn Virginia Oil & Gas, L.P, was on the location and acting in the course and scope of his employment with Defendant Penn Virginia Oil & Gas, L.P., and failed to perform completion services in a reasonable manner.

3.05    Defendant Trifecta Oilfield Services, LLC was on location for pressure testing at the well site. Defendant Trifecta Oilfield Services, LLC was operating equipment on the well site.

3.06    Defendant Cudd Pressure Control, Inc. was operating snubbing equipment on the well site.

3.07    Defendant Roywell Services, Inc. provided the equipment used in completion services. Defendant Roywell Services, Inc. failed to act in a reasonable manner in the services provided.

3.08    Defendants were conducting completion operations on the well. Defendants failed to perform the completion and related services safely. A line attached to the choke manifold "blew out," causing serious and permanent injuries to Plaintiff Alfredo De La Garza.

3.09    As a result of the serious, permanent and disabling injuries to Plaintiff Alfredo De La Garza, minor Plaintiffs REDACTED                                have suffered a loss of consortium.

3.10    Plaintiff Alfredo De La Garza was an invitee on said lease.

3.11    Defendant Penn Virginia Oil & Gas, L.P. failed to keep the premises in a reasonable safe condition, failed to make safe any defects, failed to maintain the well in a reasonably safe condition, failed to direct the services being performed on the well in a reasonable manner and failed to give an adequate warning of any dangers.

3.12    Defendant Penn Virginia Oil & Gas, L.P. was negligent in conducting the completion operations in an unsafe manner.

3.13    Defendant Penn Virginia Oil & Gas GP LLC is the sole general partner of Defendant Penn Virginia Oil & Gas, L.P.

3.14    Defendants Penn Virginia Oil & Gas, L.P. and/or Penn Virginia Oil & Gas GP LLC are vicariously liable for the acts and/or omissions of their employees, agents, servants and representatives, including Defendant Mike Ferguson.

3.15    Defendant Mike Ferguson was negligent.

3.16    Defendant Trifecta Oilfield Services, LLC was negligent in its operations conducted in connection with the completion activities for the well.

3.17    Defendant Trifecta Oilfield Services, LLC is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.18    Defendant Cudd Pressure Control, Inc. was negligent in its operations conducted in connection with the completion activities for the well.

3.19    Defendant Cudd Pressure Control, Inc. is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.20    Defendant Roywell Services, Inc. was negligent.

3.21    Defendant Roywell Services, Inc. is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.22    Plaintiff Alfredo De La Garza is the natural father of REDACTED REDACT

## 4.00    **Causes of Action**

4.01    The above-referenced incident occurred as a proximate result of Defendants' negligence. This negligence was a proximate cause of the occurrence in question and of Plaintiffs' resulting injuries and damages.

## 5.00   **Damages**

5.01   As a proximate result of Defendants' breach of duty, Plaintiffs have sustained severe damages in amounts within the minimum jurisdictional limits of the Court.

5.02   Plaintiffs are seeking monetary relief over $1,000,000.00.

## 6.00   **Demand For Trial By Jury**

6.01   Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Plaintiffs request a trial by jury as to all issues of fact presented herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Alfredo De La Garza, Individually and as Next Friend for REDACTED minors, respectfully pray that they be permitted recovery for the damages as set forth above jointly and severally against the Defendants, together with such pre-judgment and post-judgment interest as allowed by law, for costs herein, and for such other relief to which they may be entitled, whether in law or equity.

Respectfully submitted,

JOHN DAVID HART
State Bar #09147700

LAW OFFICES OF JOHN DAVID HART
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
817/870-2102 - Telephone
817/332-5858 – Facsimile
johnhart@hartlaw.com

**ATTORNEY FOR PLAINTIFFS**

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED and REDACTED , minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP LLC, MIKE FERGUSON, TRIFECTA OILFIED SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC., and OAKS PERSONNEL SERVICES INC. d/b/a THE OAKS GROUP | § § § § § § § § | 215TH JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Alfredo De La Garza, Individually and as Next Friend for REDACTED REDACTED , minors, and files this his First Amended Original Petition complaining of Penn Virginia Oil & Gas, L.P., Penn Virginia Oil & Gas GP LLC, Mike Ferguson, Trifecta Oilfield Services, LLC, Cudd Pressure Control, Inc., Roywell Services, Inc., and Oaks Personnel Services, Inc. d/b/a The Oaks Group, hereinafter referred to collectively as "Defendants," and for cause of action would respectfully show unto the Court as follows:

1.00 **Discovery Control Plan**

1.01 This case will be governed by Discovery Control Plan III as set forth in Rule 190.4 of the Texas Rules of Civil Procedure.

2.00 **Jurisdiction and Venue**

2.01 Plaintiff Alfredo De La Garza, Individually and as Next Friend for REDACTED REDACTED is a resident of the State of Texas who resides at 6510 E. Business 83,



EXHIBIT
G

Mercedes, Texas 78570. <span style="color:red">REDACTED</span>

2.02 <span style="color:red">REDACTED</span>                                    are minor children of Plaintiff Alfredo De La Garza. Plaintiff Alfredo De La Garza is the natural father of both minor children.

2.03    Defendant Penn Virginia Oil & Gas, L.P. is a domestic limited partnership organized under the laws of the State of Texas with its principal place of business in Houston, Harris County, Texas. This Defendant has answered and is before the Court.

2.04    Defendant Penn Virginia Oil & Gas GP LLC is a foreign limited liability company organized under the laws of the State of Delaware with its principal place of business in Houston, Harris County, Texas. This Defendant maintains such minimum contacts with the State of Texas so as to subject it to the jurisdiction of the laws of the State of Texas. This Defendant has answered and is before the Court.

2.05    Defendant Mike Ferguson is an individual who is a nonresident of Texas whose residence is located at 16415 Highway 74, Purcell, Oklahoma 73080. This Defendant maintains such minimum contacts with the State of Texas so as to subject him to the jurisdiction of the laws of the State of Texas. This Defendant was conducting business in this state at the time of the incident made the basis of this suit pursuant to Texas Civil Practice & Remedies Code §17.042(2). This Defendant is not yet before the Court.

2.06    Defendant Trifecta Oilfield Services, LLC is a domestic limited liability company organized under the laws of the State of Texas with its principal place of business in Corrigan, Polk County, Texas. This Defendant is not yet before the Court.

2.07    Defendant Cudd Pressure Control, Inc. is a foreign corporation incorporated under the laws of the State of Delaware with its principal place of business in The Woodlands,

Montgomery County, Texas. This Defendant maintains such minimum contacts with the State of Texas so as to subject it to the jurisdiction of the laws of the State of Texas. This Defendant has answered and is before the Court.

2.08 Defendant Roywell Services, Inc. is a domestic corporation organized under the laws of the State of Texas with its principal place of business in Bellaire, Harris County, Texas. This Defendant is not yet before the Court.

2.09 Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group, hereinafter referred to as "The Oaks Group", is a domestic corporation organized under the laws of the State of Texas with its principal place of business in Houston, Harris County, Texas. This Defendant may be served through its registered agent, Corporation Service Company, 800 Brazos Street, Austin, Texas 78701.

2.10 Venue is proper in Harris County, Texas, because Defendants Penn Virginia Oil & Gas, L.P., Defendant Roywell Services, Inc., and Defendant The Oaks Group's principal places of business in this state are located in Harris County, Texas.

3.00 **Statement of Facts**

3.01 On April 29, 2014, Plaintiff Alfredo De La Garza was an employee of Nabors Completion & Production Services Company working at Nabors Rig #1480, on the Wellhausen A, outside of Shiner, Texas.

3.02 Defendant Penn Virginia Oil & Gas, L.P. is the operator of this lease.

3.03 Defendant Penn Virginia Oil & Gas, L.P. was directing the work being completed on the well site.

3.04 Defendant Mike Ferguson, the company representative for Defendant Penn Virginia Oil & Gas, L.P, was on the location and acting in the course and scope of his employment with

Defendant Penn Virginia Oil & Gas, L.P. and Defendant The Oaks Group, and failed to perform completion services in a reasonable manner.

3.05    Defendant Trifecta Oilfield Services, LLC was on location for pressure testing at the well site. Defendant Trifecta Oilfield Services, LLC was operating equipment on the well site.

3.06    Defendant Cudd Pressure Control, Inc. was operating snubbing equipment on the well site.

3.07    Defendant Roywell Services, Inc. provided the equipment used in completion services. Defendant Roywell Services, Inc. failed to act in a reasonable manner in the services provided.

3.08    Defendant The Oaks Group provided employee staffing to Defendant Penn Virginia Oil & Gas, L.P. for services in connection with the completion operations on the Welhausen A in April 2014.

3.09    Defendants were conducting completion operations on the well. Defendants failed to perform the completion and related services safely. A line attached to the choke manifold "blew out," causing serious and permanent injuries to Plaintiff Alfredo De La Garza.

3.10    As a result of the serious, permanent and disabling injuries to Plaintiff Alfredo De La Garza, minor Plaintiffs REDACTED                           have suffered a loss of consortium.

3.11    Plaintiff Alfredo De La Garza was an invitee on said lease.

3.12    Defendant Penn Virginia Oil & Gas, L.P. failed to keep the premises in a reasonable safe condition, failed to make safe any defects, failed to maintain the well in a reasonably safe condition, failed to direct the services being performed on the well in a reasonable manner and failed to give an adequate warning of any dangers.

3.13    Defendant Penn Virginia Oil & Gas, L.P. was negligent in conducting the completion operations in an unsafe manner.

3.14    Defendant Penn Virginia Oil & Gas GP LLC is the sole general partner of Defendant Penn Virginia Oil & Gas, L.P.

3.15    Defendants Penn Virginia Oil & Gas, L.P. and/or Penn Virginia Oil & Gas GP LLC are vicariously liable for the acts and/or omissions of their employees, agents, servants and representatives, including Defendant Mike Ferguson and Defendant The Oaks Group.

3.16    Defendant Mike Ferguson was negligent.

3.17    Defendant Trifecta Oilfield Services, LLC was negligent in its operations conducted in connection with the completion activities for the well.

3.18    Defendant Trifecta Oilfield Services, LLC is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.19    Defendant Cudd Pressure Control, Inc. was negligent in its operations conducted in connection with the completion activities for the well.

3.20    Defendant Cudd Pressure Control, Inc. is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.21    Defendant Roywell Services, Inc. was negligent.

3.22    Defendant Roywell Services, Inc. is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.23    Defendant The Oaks Group is vicariously liable for the acts and/or omissions of its employees, agent, servants, and representatives.

3.24    Plaintiff Alfredo De La Garza is the natural father of REDACTED

4.00    **Causes of Action**

4.01    The above-referenced incident occurred as a proximate result of Defendants' negligence. This negligence was a proximate cause of the occurrence in question and of Plaintiff's resulting injuries and damages.

5.00    **Damages**

5.01    As a proximate result of Defendants' breach of duty, Plaintiff has sustained severe damages in amounts within the minimum jurisdictional limits of the Court.

5.02    Plaintiff is seeking monetary relief over $1,000,000.00.

6.00    **Demand For Trial By Jury**

6.01    Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Plaintiff requests a trial by jury as to all issues of fact presented herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Alfredo De La Garza, Individually and as Next Friend for REDACTED , minors, respectfully prays that he be permitted recovery for the damages as set forth above jointly and severally against the Defendants, together with such pre-judgment and post-judgment interest as allowed by law, for costs herein, and for such other relief to which they may be entitled, whether in law or equity.

Respectfully submitted,

JOHN DAVID HART
State Bar #09147700
LAW OFFICES OF JOHN DAVID HART
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
817/870-2102 - Telephone
817/332-5858 – Facsimile
johnhart@hartlaw.com
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing instrument has been forwarded on this the 8th day of September 2014 to the following attorneys of records pursuant to the Texas Rules of Civil Procedure:

J.J. Knauff              **VIA CMRRR & FACSIMILE**
THE MILLER LAW FIRM
Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 1950
Dallas, Texas 75219

Douglas E. Dilley       **VIA CMRRR & FACSIMILE**
Hella V. Scheuerman
Miguel E. Dilley
DILLEY LAW FIRM, P.C.
635 S. Presa
San Antonio, Texas 78210

Benjamin A. Escobar, Jr.    **VIA CMRRR & FACSIMILE**
Brit T. Brown
BEIRNIE, MAYNARD & PARSONS, L.L.P.
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056

_____
JOHN DAVID HART

## CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR REDACTED and REDACTED , minors | § § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP LLC, MIKE FERGUSON, TRIFECTA OILFIED SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC., and OAKS PERSONNEL SERVICES INC. d/b/a THE OAKS GROUP | § § § § § § § § | 215TH JUDICIAL DISTRICT |

---

## PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Alfredo De La Garza, Individually and as Next Friend for REDACTED

REDACTED                                 minors, and files this his Second Amended Original Petition

complaining of Penn Virginia Oil & Gas, L.P., Penn Virginia Oil & Gas GP LLC, Mike

Ferguson, Trifecta Oilfield Services, LLC, Cudd Pressure Control, Inc., Roywell Services, Inc.,

and Oaks Personnel Services, Inc. d/b/a The Oaks Group, hereinafter referred to collectively as

"Defendants," and for cause of action would respectfully show unto the Court as follows:

1.00    **Discovery Control Plan**

1.01    This case will be governed by Discovery Control Plan III as set forth in Rule 190.4 of the

Texas Rules of Civil Procedure.



Plaintiff's Second Amended Original Petition -- Page 1

## 2.00  **Jurisdiction and Venue**

2.01  Plaintiff Alfredo De La Garza, Individually and as Next Friend for REDACTED

REDACTED ., is a resident of the State of Texas who resides at 6510 E. Business 83,

Mercedes, Texas 78570. REDACTED


2.02  REDACTED are minor children of Plaintiff Alfredo De

La Garza. Plaintiff Alfredo De La Garza is the natural father of both minor children.

2.03  Defendant Penn Virginia Oil & Gas, L.P. is a domestic limited partnership organized

under the laws of the State of Texas with its principal place of business in Houston, Harris

County, Texas. This Defendant has answered and is before the Court.

2.04  Defendant Penn Virginia Oil & Gas GP LLC is a foreign limited liability company

organized under the laws of the State of Delaware with its principal place of business in

Houston, Harris County, Texas. This Defendant maintains such minimum contacts with the

State of Texas so as to subject it to the jurisdiction of the laws of the State of Texas. This

Defendant has answered and is before the Court.

2.05  Defendant Mike Ferguson is an individual who is a nonresident of Texas whose home is

located at 16415 Highway 74, Purcell, Oklahoma 73080. This Defendant maintains such

minimum contacts with the State of Texas so as to subject him to the jurisdiction of the laws of

the State of Texas. This Defendant was conducting business in this state at the time of the

incident made the basis of this suit pursuant to Texas Civil Practice & Remedies Code

§17.042(2). Defendant's name and address of his home was provided to the Texas Secretary of

State for execution of service of process, pursuant to Texas Civil Practice & Remedies Code

§17.045. This Defendant is not yet before the Court.

2.06   Defendant Trifecta Oilfield Services, LLC is a domestic limited liability company organized under the laws of the State of Texas with its principal place of business in Corrigan, Polk County, Texas. This Defendant was served through its registered agent Melba Locke at 608 North Home Street, Corrigan, Texas. This Defendant is not yet before the Court.

2.07   Defendant Cudd Pressure Control, Inc. is a foreign corporation incorporated under the laws of the State of Delaware with its principal place of business in The Woodlands, Montgomery County, Texas. This Defendant maintains such minimum contacts with the State of Texas so as to subject it to the jurisdiction of the laws of the State of Texas. This Defendant has answered and is before the Court.

2.08   Defendant Roywell Services, Inc. is a domestic corporation organized under the laws of the State of Texas with its principal place of business in Bellaire, Harris County, Texas. This Defendant can be served by serving its registered agent, John D. Mclain at 5630 Cheena, Houston, Texas 77096. This Defendant is not yet before the Court.

2.09   Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group, hereinafter referred to as "The Oaks Group", is a domestic corporation organized under the laws of the State of Texas with its principal place of business in Houston, Harris County, Texas. This Defendant may be served through its registered agent, Luis Acosta, 11511 Katy Freeway, Suite 605, Houston, Texas 77079. This Defendant is not yet before the Court.

2.10   Venue is proper in Harris County, Texas, because Defendants Penn Virginia Oil & Gas, L.P., Defendant Roywell Services, Inc., and Defendant The Oaks Group's principal places of business in this state are located in Harris County, Texas.

## 3.00 **Statement of Facts**

3.01 On April 29, 2014, Plaintiff Alfredo De La Garza was an employee of Nabors Completion & Production Services Company working at Nabors Rig #1480, on the Welhausen A, outside of Shiner, Texas.

3.02 Defendant Penn Virginia Oil & Gas, L.P. is the operator of this lease.

3.03 Defendant Penn Virginia Oil & Gas, L.P. was directing the work being completed on the well site.

3.04 Defendant Mike Ferguson, the company representative for Defendant Penn Virginia Oil & Gas, L.P, was on the location and acting in the course and scope of his employment with Defendant Penn Virginia Oil & Gas, L.P. and Defendant The Oaks Group, and failed to perform completion services in a reasonable manner.

3.05 Defendant Trifecta Oilfield Services, LLC was on location for pressure testing at the well site. Defendant Trifecta Oilfield Services, LLC was operating equipment on the well site.

3.06 Defendant Cudd Pressure Control, Inc. was operating snubbing equipment on the well site.

3.07 Defendant Roywell Services, Inc. provided the equipment used in completion services. Defendant Roywell Services, Inc. failed to act in a reasonable manner in the services provided.

3.08 Defendant The Oaks Group provided employee staffing to Defendant Penn Virginia Oil & Gas, L.P. for services in connection with the completion operations on the Welhausen A in April 2014.

3.09 Defendants were conducting completion operations on the well. Defendants failed to perform the completion and related services safely. A line attached to the choke manifold "blew out," causing serious and permanent injuries to Plaintiff Alfredo De La Garza.

3.10    As a result of the serious, permanent and disabling injuries to Plaintiff Alfredo De La Garza, minor Plaintiffs REDACTED have suffered a loss of consortium.

3.11    Plaintiff Alfredo De La Garza was an invitee on said lease.

3.12    Defendant Penn Virginia Oil & Gas, L.P. failed to keep the premises in a reasonable safe condition, failed to make safe any defects, failed to maintain the well in a reasonably safe condition, failed to direct the services being performed on the well in a reasonable manner and failed to give an adequate warning of any dangers.

3.13    Defendant Penn Virginia Oil & Gas, L.P. was negligent in conducting the completion operations in an unsafe manner.

3.14    Defendant Penn Virginia Oil & Gas GP LLC is the sole general partner of Defendant Penn Virginia Oil & Gas, L.P.

3.15    Defendants Penn Virginia Oil & Gas, L.P. and/or Penn Virginia Oil & Gas GP LLC are vicariously liable for the acts and/or omissions of their employees, agents, servants and representatives, including Defendant Mike Ferguson and Defendant The Oaks Group.

3.16    Defendant Mike Ferguson was negligent.

3.17    Defendant Trifecta Oilfield Services, LLC was negligent in its operations conducted in connection with the completion activities for the well.

3.18    Defendant Trifecta Oilfield Services, LLC is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.19    Defendant Cudd Pressure Control, Inc. was negligent in its operations conducted in connection with the completion activities for the well.

3.20    Defendant Cudd Pressure Control, Inc. is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.21    Defendant Roywell Services, Inc. was negligent.

3.22    Defendant Roywell Services, Inc. is vicariously liable for the acts and/or omissions of its employees, agents, servants and representatives.

3.23    Defendant The Oaks Group is vicariously liable for the acts and/or omissions of its employees, agent, servants, and representatives.

3.24    Plaintiff Alfredo De La Garza is the natural father of REDACTED

## 4.00    **Causes of Action**

4.01    The above-referenced incident occurred as a proximate result of Defendants' negligence. This negligence was a proximate cause of the occurrence in question and of Plaintiff's resulting injuries and damages.

## 5.00    **Damages**

5.01    As a proximate result of Defendants' breach of duty, Plaintiff has sustained severe damages in amounts within the minimum jurisdictional limits of the Court.

5.02    Plaintiff is seeking monetary relief over $1,000,000.00.

## 6.00    **Demand For Trial By Jury**

6.01    Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Plaintiff requests a trial by jury as to all issues of fact presented herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Alfredo De La Garza, Individually and as Next Friend for REDACTED                , minors, respectfully prays that he be permitted recovery for the damages as set forth above jointly and severally against the

Defendants, together with such pre-judgment and post-judgment interest as allowed by law, for costs herein, and for such other relief to which they may be entitled, whether in law or equity.

Respectfully submitted,

JOHN DAVID HART
State Bar #09147700
LAW OFFICES OF JOHN DAVID HART
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
817/870-2102 - Telephone
817/332-5858 – Facsimile
johnhart@hartlaw.com

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing instrument has been forwarded on this the ___ day of October, 2014 to the following attorneys of records pursuant to the Texas Rules of Civil Procedure:

Mr. J.J. Knauff     **VIA CMRRR & FACSIMILE**
The Miller Law Firm
Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 1950
Dallas, Texas 75219

Mr. Douglas E. Dilley    **VIA CMRRR & FACSIMILE**
Ms. Hella V. Scheuerman
Mr. Miguel E. Dilley
Dilley Law Firm, P.C.
635 S. Presa
San Antonio, Texas 78210

Mr. Benjamin A. Escobar, Jr.   **VIA CMRRR & FACSIMILE**
Mr. Brit T. Brown
Beirne, Maynard & Parsons, L.L.P.
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056

JOHN DAVID HART



# APPLICATION FOR
# HOURLY AND DAILY EMPLOYMENT

## Employment Information

| Business Unit: | ☐ NCS ☐ NDUSA ☐ Peak USA ☐ Ramshorn | ☐ Ryan USA ☐ Ryan Canada ☐ NWSC ☐ SWS | ☐ NOC ☐ Canrig USA ☐ Canrig Canada ☐ Canrig Int'l | ☐ NAD ☐ NINTL ☐ NIML ☐ NDIL | ☐ NDL ☐ NPS ☐ NCM ☒ Other |
|---|---|---|---|---|---|

WE DO NOT DISCRIMINATE ON THE BASIS OF RACE, RELIGION, NATIONAL ORIGIN, COLOR, SEX, AGE OR DISABILITY. IT IS OUR INTENT THAT ALL APPLICANTS BE GIVEN EQUAL OPPORTUNITY AND SELECTION DECISIONS BE BASED ON JOB RELATED FACTORS.

## Personal

| Last Name | First Name | Middle name | Email Address |
|---|---|---|---|
| De La Garza | Alfredo | | |

| Present Street Address | City/State | Zip Code | Phone No. |
|---|---|---|---|
| 21130 rebeca lane | San Benito Tx | 78586 | (956)281-8874 |

| Permanent Street Address | City/State | Zip Code | Phone No. |
|---|---|---|---|
| 21130 rebeca lane | San Benito Tx | 78586 | (956)281-8874 |

| In Emergency, Contact | Relationship | Phone No. | Are you at least 18 years old? |
|---|---|---|---|
| Maria Hernandes | Spouse | 956-320-3981 | ☒ Yes   ☐ No |

| Address | City/State | Zip Code | Do you have the legal right to work in the United States? |
|---|---|---|---|
| 21130 rebeca lane | San Benito Tx | 78586 | ☒ Yes   ☐ No |

## Miscellaneous

| Date of Application | Date you can start work | Are you employed now? | Position(s) Desired |
|---|---|---|---|
| 7-16-13 | 7-16-13 | ☐ Yes   ☒ No | Operator |

| Do you have any relatives in our employ? | If yes, name | Relationship |
|---|---|---|
| ☐ Yes   ☒ No | | |

| Drivers License No. | Date Expires | State Issued |
|---|---|---|
| | 1-23-15 | Texas |

| Passport No. | Country of Issue | Date Issued | Date Expires |
|---|---|---|---|
| | | | |

| Have you ever been convicted of a felony? | If so, please explain. (An affirmative response will not automatically disqualify you from being considered as a candidate for employment) |
|---|---|
| ☐ Yes   ☒ No | |

## Skills and Qualifications

| Describe Size And Type Of Equipment On Which You Are Experienced | Drilling Experience | YRs | MOs |
|---|---|---|---|
| Work over rig (P&A) | Toolpusher | | |
| torch cutting | Driller | 1 | |
| Pulling casing  4½ up to 9½ | Derrickman | 2 | |
| | Motorman | | |
| | Floorman | | 3 |
| | Rig Mechanic | | |

| Foreign Languages | Speak | Read | Military Experience | Rig Electrician | | |
|---|---|---|---|---|---|---|
| Spanish | X | X | Did you serve in the military? ☐ Yes ☒ No | Crane Operator | | |
| | | | Military occupational specialty | Roustabout | | |
| | | | | Other (specify) | | |

EXHIBIT
I

HR-105 (01/07/11)

NCPS 000855



## Employment History

| Have worked for a Nabors Company? ☐ Yes ☒ No | If yes, name subsidiary: | Dates of employment with Nabors: |
|---|---|---|

Name and address of previous employers, starting with the most recent.

**1.**

| From 10-1-11 | To 7-15-13 | Employer Basic Energy Services | Telephone No. |
|---|---|---|---|

Job Title: Operator
Address: 1303 East Constitution

Immediate Supervisor's Name: Mike Gaulding
Summarize the nature of work performed and job responsibilities: PnA Work, running rig + pump, taking care of eqoipment, driving crew from home to work

Supervisor's Title: Area Manager

Reason for Leaving: Personal
Hourly Rate / Salary: Start $ 20.00 Per hr, Final 20.00 Per hr.

**2.**

| From 5-1-11 | To 10-1-11 | Employer Smith Pipe of Abilene | Telephone No. |
|---|---|---|---|

Job Title: Derrick man
Address: Victoria Tx.

Immediate Supervisor's Name: Mike Gaulding
Summarize the nature of work performed and job responsibilities: Working derricks, floors, driving crew from home to work

Supervisor's Title: Area Yard Manager

Reason for Leaving: Sold out
Hourly Rate / Salary: Start $ 17.00 Per (8hrs) Final 17.00 Per (hr)

**3.**

| From 1-23-99 | To 1-23-10 | Employer Albert De la Garza | Telephone No. |
|---|---|---|---|

Job Title: Welder/construction
Address: 2¾ mile N 6½ W Mercedes, Tx 78576

Immediate Supervisor's Name: Albert De La Garza
Summarize the nature of work performed and job responsibilities: erecting of metal building, welding, torch cutting,

Supervisor's Title:

Reason for Leaving: work got slow
Hourly Rate/Salary: Start $ 10.00 Per 1 hr Final 12.00 Per 1 hr

## Educational Background

| Name and Location of School | Circle Highest Grade Completed | Major Field of Study | Degree | GPA |
|---|---|---|---|---|
| High School Mercedes High School | 8 9 10 11 ⑫ | Math | | |
| College/Univ. | 1 2 3 4 5 6 | | | |
| Grad. School | 1 2 3 4 | | | |
| Other | | | | |

Special schools and courses attended. Include any training and completion dates, i.e., B.O.P., 1st aid, H2S, etc.

Welding classes, Auto Mechanic classes all High School

HR-105 (01/07/11)

NCPS 000856



# APPLICATION FOR HOURLY AND DAILY EMPLOYMENT

## Employment History

| Have worked for a Nabors Company? ☐ Yes  ☐ No | If yes, name subsidiary: | Dates of employment with Nabors: |
|---|---|---|

Name and address of previous employers, starting with the most recent.

| 1. | From | To | Employer | | Telephone No. |
|---|---|---|---|---|---|
| | Job Title | | Address | | |
| | Immediate Supervisor's Name | | Summarize the nature of work performed and job responsibilities | | |
| | Supervisor's Title | | | | |
| | Reason for Leaving | | Hourly Rate / Salary   Start $ _____ Per _____  Final $ _____ Per _____ | | |

| 2. | From | To | Employer | | Telephone No. |
|---|---|---|---|---|---|
| | Job Title | | Address | | |
| | Immediate Supervisor's Name | | Summarize the nature of work performed and job responsibilities | | |
| | Supervisor's Title | | | | |
| | Reason for Leaving | | Hourly Rate / Salary   Start $ _____ Per _____  Final $ _____ Per _____ | | |

| 3. | From | To | Employer | | Telephone No. |
|---|---|---|---|---|---|
| | Job Title | | Address | | |
| | Immediate Supervisor's Name | | Summarize the nature of work performed and job responsibilities | | |
| | Supervisor's Title | | | | |
| | Reason for Leaving | | Hourly Rate/Salary   Start $ _____ Per _____  Final $ _____ Per _____ | | |

## Educational Background

| Name and Location of School | Circle Highest Grade Completed | Major Field of Study | Degree | GPA |
|---|---|---|---|---|
| High School | 8 9 10 11 12 | | | |
| College/Univ. | 1 2 3 4 5 6 | | | |
| Grad. School | 1 2 3 4 | | | |
| Other | | | | |

**Special schools and courses attended. Include any training and completion dates, i.e., B.O.P., 1st aid, H$_2$S, etc.**

HR-105 (01/07/11)

NCPS 000857



## Applicant Must Read And Verify With Signature

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me.
_____Adlg_____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. ___Adlq___ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.
_____Adlg_____ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. ___Adlq___ - INITIALS

This application will be considered active for thirty (30) days.

_____Alfredo De la Haya_____          _____7-16-13_____
Applicant's Signature                          Date

HR-105 (01/07/11)

**NCPS 000858**



**GALLOWAY**
**JOHNSON**
**TOMPKINS**
**BURR AND**
**SMITH**

Texas ■ Louisiana ■ Missouri ■ Mississippi ■ Alabama ■ Florida ■ Georgia

THOMAS J. SMITH
Shareholder
Licensed in Louisiana and Texas
tsmith@gallowayjohnson.com

KELLY C. HARTMANN
Director
Licensed in Texas and Colorado
khartmann@gallowayjohnson.com

ALEXIS B. HESTER
Associate
ahester@gallowayjohnson.com
Licensed in Texas

April 20, 2015

1301 McKinney Street, Suite 1400
Houston, Texas 77010
Tel: 713-599-0700
Fax: 713-599-0777
www.gjtbs.com

*Via Facsimile: 817-332-5858*
John David Hart
LAW OFFICES OF JOHN DAVID HART
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102

Re:  Cause No. 14-06-53276-CV; *Alfredo De La Garza, Individually and as Next Friend of* REDACTED *1, a Minor Child*; in the 215ᵗʰ Judicial District Court of Harris County, Texas; GJTBS File No. HO4177-876.

Dear Mr. Hart:

Please accept this Notice of Arbitration on behalf of Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC (collectively, "PVOG") in the above referenced matter.

Mr. Alfredo De La Garza contractually obligated himself to submit all claims relating to or arising out of his employment with Nabors Completion & Production Services, Co. ("NCPS") to binding arbitration pursuant to the Nabors Dispute Resolution Program ("DRP"). Upon receiving a copy of the DRP, Mr. De La Garza signed an acknowledgment, which specifically states, "I have received a copy of the Nabors Dispute Resolution Program...By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration." We have attached a copy of the DRP as well as documents executed by Mr. De La Garza for your review.

In 2008, Penn Virginia Oil & Gas, L.P. elected into the DRP on its behalf and on behalf of its subsidiary, parent, and affiliated companies. We have attached documents reflecting as



EXHIBIT
J



GALLOWAY
JOHNSON
TOMPKINS
BURR AND
SMITH

Texas ■ Louisiana ■ Missouri ■ Mississippi ■ Alabama ■ Florida ■ Georgia

*Mr. John Hart*
*Page 2*

much for your reference. In doing so, PVOG became an "Electing Entity" to the DRP such that Mr. De La Garza's claims against PVOG are subject to arbitration.

The DRP provides a means for the "resolution of Disputes between the Company and the Company's present and former Employees." As you will see at page 2 of the DRP, the "Company" is defined to include Nabors Industries, Inc., its direct and indirect subsidiaries, and Electing Entities. Because NCPS is a subsidiary of Nabors Industries, Inc., NCPS is part of the "Company." Page 2 states further that parties that are Electing Entities to the DRP are also included in the definition of the "Company." Because PVOG is an Electing Entity to the DRP, it too is part of the "Company." Finally, the DRP defines "Dispute" as "all legal and equitable claims, demands, and controversies...whether in contract (or) tort...between persons bound by the Program...or between a person bound by the Program and a person or entity otherwise entitled to (the Program's) benefits." The definition includes "any personal injury incurred...in the course and scope of an Employee's employment."

Because Mr. De La Garza, an employee of NCPS, has filed a claim against PVOG, an Electing Entity to the DRP, he has filed a claim against the "Company." Pursuant to his contractual agreement to submit such claims to the DRP, Mr. De La Garza's claims against PVOG are subject to arbitration. The arbitration agreement between Nabors, its employees, and its employees' heirs and beneficiaries has been found valid on numerous occasions. *E.g. Nabors Drilling USA, LP v. Carpenter,* 198 S.W.3d 240, 249 (Tex. App.—San Antonio 2006, orig. proceeding). Most recently, the San Antonio Fourth Court of Appeals found that the beneficiaries of a deceased Nabors employee were bound by the decedent's agreement to arbitrate pursuant to Nabors' DRP. *Nabors Drilling USA, LP v. Pena,* 385 S.W.3d 103 (Tex. App.—San Antonio 2012).

It is undisputed that Mr. De La Garza, as an NCPS employee, agreed to be bound by the DRP and to submit all claims against the Company to arbitration. There is no question that PVOG, as an Electing Entity, is a member of the Company and is, therefore, entitled to the benefits of the DRP. This lawsuit clearly arises out of Mr. De La Garza's employment with NCPS and he has filed a claim against the Company. Therefore, the DRP is applicable to this matter. Accordingly, PVOG formally requests that you dismiss the present civil suit against it and initiate the claim in arbitration. Should you fail to voluntarily do so, we are prepared to proceed with a Motion to Compel Arbitration and will seek to abate the claims against PVOG pending resolution of the Motion to Compel.



**GALLOWAY
JOHNSON
TOMPKINS
BURR AND
SMITH**

Texas ■ Louisiana ■ Missouri ■ Mississippi ■ Alabama ■ Florida ■ Georgia

*Mr. John Hart*
*Page 3*

We look forward to receiving your response. In the event you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Thomas J. Smith
Kelly C. Hartmann

TJS/KCH/ABH
Attachments

cc:   *Via Facsimile*
Benjamin A. Escobar, Jr.
Brit T. Brown

*Via Facsimile*
Conrad Bodden

*Via Facsimile*
J. Javier Gutierrez
Ana Laura Gutierrez

*Via Facsimile*
Douglas E. Dilley
Hella V. Scheuerman
Miguel E. Dilley

THE LAW OFFICES OF

# JOHN DAVID HART

BOARD CERTIFIED
TEXAS BOARD OF LEGAL SPECIALIZATION
CIVIL TRIAL LAW
PERSONAL INJURY TRIAL LAW

WELLS FARGO TOWER
201 MAIN STREET, SUITE 1720
FORT WORTH, TEXAS 76102
TELEPHONE (817) 870-2102
E-MAIL: JOHNHART@HARTLAW.COM

METRO:
(817) 654-1922
FAX:
(817) 332-5858

July 30, 2015

**VIA E-FILING**
Clerk of the Court
215th Judicial District Court
Harris County Civil Courthouse
201 Caroline, 13th Floor
Houston, Texas 77002

Re:     Cause No. 2014-42519
        Alfredo De La Garza, Individually and as Next Friend for REDACTED
        REDACTED            a, minors v. Penn Virginia Oil & Gas, L.P., Penn Virginia Oil & Gas
        GP LLC, Mike Ferguson, Trifecta Oilfield Services, LLC, Cudd Pressure Control, Inc.,
        Roywell Services, Inc. and Oaks Personnel Services, Inc. d/b/a The Oaks Group

Dear Clerk:

Enclosed please find Plaintiffs' Response to Defendants, Penn Virginia Oil & Gas, L.P.
and Penn Virginia Oil & Gas GP LLC's Motion to Compel Arbitration and to Abate.

I am also providing a copy of this response to all counsel of record.

Very truly yours,

John David Hart

JDH/cd
Enclosure

Cc:     **VIA CMRRR & FACSIMILE**          **VIA CMRRR & FACSIMILE**
        Mr. Thomas J. Smith                Mr. Brit T. Brown
        Mr. Kelly C. Hartmann              Mr. Benjamin A. Escobar, Jr.
        Ms. Alexis Butler Hester           Beirne, Maynard & Parsons, L.L.P.
        Galloway, Johnson, Tompkins,       1300 Post Oak Blvd., Suite 2500
        Burr & Smith                       Houston, Texas 77056
        1301 McKinney, Suite 1400
        Houston, Texas 77010

**VIA CMRRR & FACSIMILE**
Mr. J. Javier Gutierrez
Ms. Ana Laura Gutierrez
The Gutierrez Law Firm, Inc.
700 East Third Street
Alice, Texas 78332

| | | |
|---|---|---|
| **ALFREDO DE LA GARZA,** | § | **IN THE DISTRICT COURT OF** |
| **INDIVIDUALLY and AS NEXT FRIEND** | § | |
| **FOR**REDACTED **and** | § | |
| REDACTED **, minors** | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **PENN VIRGINIA OIL & GAS, L.P., PENN** | § | |
| **VIRGINIA OIL & GAS GP LLC,** | § | |
| **MIKE FERGUSON, TRIFECTA OILFIELD** | § | |
| **SERVICES, LLC, CUDD PRESSURE** | § | |
| **CONTROL, INC., ROYWELL** | § | **215ᵗʰ JUDICIAL DISTRICT** |
| **SERVICES, INC., and OAKS PERSONNEL** | § | |
| **SERVICES, INC. d/b/a THE OAKS GROUP** | § | |

---

### ORDER DENYING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE

---

On _____ day of _____, 2015, came to be considered Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion to Compel Arbitration and to Abate. After considering the motion and hearing the arguments of counsel, this Court is of the opinion that the Motion should be DENIED and that Plaintiffs' claims against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group be severed from and proceed to trial on October 19, 2015.

SIGNED this _____ day of _____, 2015

_____
**Elaine H. Palmer**
JUDGE, 215ᵀᴴ DISTRICT COURT